# Exhibit H

**From:** Jillian Orticelli
**Sent:** Friday, September 26, 2014 5:44 PM
**To:** 'jkatz@jacobslaw.com'
**Cc:** Glenn Duhl
**Subject:** Xie v. Beta Pharma, Inc., et al.

Hi Jonathan:

Per Glenn, I am attaching an order entered today by the New Jersey Superior Court in an Order to Show Cause filed by Beta Pharma, Inc., Beta Pharma Scientific, Inc., and Don Zhang against Lance Liu ("Order"). The Order states, in relevant part: "pending the [January 26, 2015] return date of [the] Order to Show Cause, Defendant [Lance Liu] shall take no action to . . . [c]ommunicat[e] directly or indirectly with Guojian Xie about the Xie Action. . . [or] [c]ommunicat[e] directly or indirectly with Jonathan Katz, Esquire, regarding the Xie Action." ("Xie Action" refers to our Connecticut Superior Court case, Dkt. No. NNH-CV-13-6035116.) Do not hesitate to contact Glenn if you have any questions.

I trust that email service of the Order is acceptable to you; if it is not, please inform me immediately so that I can put a copy in the mail. Many thanks, Jillian.

Jillian R. (Calaceto) Orticelli, Esq.



150 Trumbull Street  Hartford, CT 06103-2446
Direct: (860) 280-1238  Main: (860) 727-8900  Fax: (860) 527-5131
jorticelli@siegeloconnor.com  www.siegeloconnor.com

Management-side labor and employment law and litigation.

V-Card    Attorney Bio    Directions

NOTICE: This message contains information that is CONFIDENTIAL and PRIVILEGED. If you are not the intended recipient or have received this message in error, please inform the sender by immediate reply and delete the original message with all attachments without retaining a copy. Thank you.

1

CLERK OF SUPERIOR COURT
SUPERIOR COURT OF N.J.
MERCER COUNTY
RECEIVED AND FILED

SEP 2 6 2014

*Sue Regan*
SUE REGAN
DEPUTY CLERK OF SUPERIOR COURT

FOX ROTHSCHILD LLP
Formed in the Commonwealth of Pennsylvania
    By:    Jack L. Kolpen, Esquire  (N.J.I.D.# 026411987)
            Barry J. Muller, Esquire (N.J.I.D. # 016911998)
            Abbey True Harris, Esquire (N.J.I.D. #029112005)
Princeton Pike Corporate Center
997 Lenox Drive, Building 3
Lawrenceville, NJ  08648-2311
(609) 896-3600
*Attorneys for Plaintiffs Beta Pharma, Inc.,*
*Beta Pharma Scientific, Inc., and Don Zhang*

|  |  |
|---|---|
| BETA PHARMA, INC.; BETA PHARMA SCIENTIFIC, INC., AND DON ZHANG,<br><br>              Plaintiff,<br><br>    v.<br><br>LANCE LIU,<br><br>           Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION – MERCER COUNTY<br>DOCKET NO.: L-2040-14<br><br><br>CIVIL ACTION<br><br>**ORDER TO SHOW CAUSE<br>TEMPORARY RESTRAINTS** |

      **THIS MATTER** having been opened to the Court by Fox Rothschild LLP (Jack L.

Kolpen, Esq., appearing), attorneys for Plaintiffs, Beta Pharma, Inc., Beta Pharma Scientific, Inc.

and Don Zhang, on notice to Defendant, Lance Liu, Esquire, and the Court having considered the

moving papers and any opposition thereto; and the Court have considered the arguments of

counsel; and for the reasons set forth on the record; and for other good cause having been shown;

      **IT IS** on this 26 day of September ___, 2014;

**ORDERED** that defendants shall show cause before this Court at the Mercer County Court House, 175 South Broad Street, Trenton, New Jersey 08650 on this ___ day of ~~September, 2014~~ at ___ .m., as to why an Order should not be entered in favor of Plaintiffs and against Defendant:

1.      barring Attorney Liu from communicating with the attorneys who are representing adverse parties in Xie v. Beta Pharma et al, NNH-CV13-6035116-S, pending in the Superior Court of Connecticut ("Xie Action") and Shao et al. v. Beta Pharama, Inc et al., No. Civil Action No. 3:14CV01177 (CSH), pending in the USDC Conn. ("Buyers' Action");

2.      barring Attorney Liu from soliciting parties to sue the Beta Pharma Parties, his former clients;

3.      barring Attorney Liu from participating in joint representations adverse to his former clients' interests in the Xie Action or Buyers' Action;

4.      barring Attorney Liu from communicating with parties who are suing the Beta Pharma parties in Xie Action and Buyers' Action about the Xie Action and Buyers' Action;

5.      barring Attorney Liu from disclosing confidential information related to the representation of Beta Pharma, Scientific and Zhang;

6.      compelling Attorney Liu to terminate his attorney-client relationship with Guojian Xie in the Xie Action;

7.      compelling defendant to terminate his attorney-client relationship with Shanshan Shao, Hongliang Chu, Qian Liu, Song Lu and Xinshan Kang in the Buyers' Action;

8.      compelling defendant to terminate his joint representation with Jonathan Katz, Esq., in the Xie Action and Buyers' Action;

9.      compelling Attorney Liu to identify parties he solicited to sue Plaintiffs;

- 2 -

10.   compelling Attorney Liu to identify Beta Pharma's confidential and protected information he disclosed;

11.   compelling Attorney Liu to identify any information he disclosed to third parties regarding his representation of Beta Pharma, Inc. and Beta Pharma Scientific, Inc..

12.   requiring that the parties conduct expedited discovery as to Defendant's disclosure of information regarding Plaintiffs as follows:

  a.   The parties must serve interrogatories and document demands on this limited issue must be served no later than ___October 10, 2014.___

  b.   The parties must respond to interrogatories and document demands on this limited issue no later than ___November 25, 2014;___

  c.   Fact witness depositions on this limited issue must conclude no later than ___December 23, 2014___

FURTHER ORDERED that pending the return date of this Order to Show Cause, Defendant shall take no action to:

1.   Soliciting any person or entity to bring a legal claim against Plaintiffs anywhere in the world.

2.   Communicating directly or indirectly with Gojian Xie about the Xie Action or any Plaintiff in the Buyers' Action about the Buyers' Action;

3.   Communicating directly or indirectly with Jonathan Katz, Esquire, regarding the Xie Action or the Buyers Action; and it is

FURTHER ORDERED, that a copy of this Order to Show Cause and the Verified ~~Please dispensed~~ by the court Complaint and Letter Brief filed herein ~~shall be served~~ upon the Defendant ~~via hand delivery within ___ days of entry hereof;~~ and it is

*Hazdate*

- 3 -

**FURTHER ORDERED**, that the Defendant shall serve and file any opposition to this ~~from~~ Order to Show Cause upon the attorneys for Plaintiffs at least _3 0_ days ~~prior to the return date~~ ~~of this Order to Show Cause~~. Plaintiffs may serve a reply to the opposition upon attorneys for the Defendant at least _14_ days prior to the return date of the Order to Show Cause; and it is

**FURTHER ORDERED**, that Defendant must serve upon the attorneys for the Plaintiffs an Answer to the Verified Complaint within _30_ days after service of this Order to Show Cause and Verified Complaint, exclusive of the date of the service. If the Defendant fails to answer, judgment by default may be entered against the defaulting Defendant for the relief demanded in the Verified Complaint. The Answer should be filed promptly with proof of service thereof in duplicate with the Clerk of the Superior Court of New Jersey, Law Division, Mercer County, 175 South Broad Street, Trenton, New Jersey 08650 in accordance with the Rules of Civil Practice and Procedure. If Defendant cannot afford to pay an attorney, the telephone number for the Mercer County Legal Services is (609)695-6249. If the individual is not eligible for free legal assistance he may obtain a referral to an attorney by calling the Mercer County Bar Association's Lawyer Referral Service at (609) 585-6200. This Order to Show Cause shall serve as a substitute summons.

_____
J.S.C.

- 4 -

# Exhibit I

SUBPOENA – DUCES TECUM – ALL COURTS

To:    Lance Liu
of     4 Colonial Court, Middlebury, CT 06762

BY AUTHORITY OF THE STATE OF CONNECTICUT, *You are hereby commanded to appear for a deposition to be held at* **Jacobs & Dow, LLC, 350 Orange Street, New Haven, Connecticut,** *on* **FRIDAY, OCTOBER 24, 2014, AT 10:00 o'clock in the forenoon,** *or to such day thereafter and within 60 days hereof on which the action is legally to be tried, to testify what you know in a certain Civil Action pending in the Court between*

                    *GUOJIAN XIE, plaintiff(s),*

*and*

                    *BETA PHARMA, INC., ET AL., defendant(s).*

     *YOU ARE FURTHER COMMANDED to bring with you and produce at the same time and place, the following:*

*SEE ATTACHED SCHEDULE A incorporated here by reference.*

                 Hereof fail not, under penalty of the Law.

             To any proper officer or indifferent person to serve and return.

*Dated at New Haven, Connecticut this 2nd day of October, 2014.*

                             *JONATHAN KATZ (203-772-3100)*
                             *Commissioner of the Superior Court*

---

STATE OF CONNECTICUT  )
                     )   ss.:
*County of*            )

     *Then I made due service of the within Subpoena by reading the same in the presence and hearing of and leaving a true copy thereof with the following person(s) at the address indicated:*

                        *Name*                      *Address*

*and paid/tendered (to each) the fees allowed by law.*

     *The within is a true copy of the original Subpoena.*

                        *Attest,*

*Witness Fee* _____ $
*Service* _____
*Travel* _____       ..............................................................................................
*Endorsement* _____                              *Deputy Sheriff*
              $                                     *Constable*
                                         *Indifferent Person*

## SCHEDULE A

## TO DEPOSITION NOTICE AND SUBPOENA DUCES TECUM
## FOR WITNESS ATTORNEY LANCE LIU

The deponent is instructed to bring with him to the deposition the following documents:

As used herein the term "ZJBP" or "ZBP" means Zhejiang Beta Pharma Co., Ltd.

Items 13 through 16 described in the Subpoena and Notice of Deposition previously served on Lance Liu by Beta Pharma, which paragraphs are renumbered but set forth verbatim as items 1 through 4 below.

1.      Any and all documents, transmittals, correspondence or records of communication between the deponent and any person or entity that refers to, relates to or concerns the sale of stock in Zhejiang Beta Pharma Co., Ltd. ("ZJBP").

2.      Any and all documents, transmittals, correspondence or records of communication that refers to, relates to or concerns the sale of stock ZJBP.

3.      Any and all documents, transmittals, correspondence or records of communication that refers to, relates to or concerns an initial public offering of stock in ZJBP.

4.      Any and all documents, transmittals, correspondence or records of communication between the deponent and ZJBP or any person or entity that is employed by or is otherwise engaged by ZJBP in any capacity.

5.      All documents and records pertaining to any and all Board meetings of ZJBP, including the September, 2012 meeting during which ZJBP confirmed it would not permit Beta Pharma to transfer ZJBP stock to certain investors including "the plaintiffs in the Buyer's Action" Shanshan Shao, Hongliang Chu, Qian Liu, Song Lu and Xinshan Kang, as stated at page 14 of Beta Pharma's Brief in Support of Plaintiffs' Applicaton for an Order to Show Cause with Temoprary Restraints filed in Beta Pharma, Inc., Beta Pharma Scientific, Inc., and Don Zhang v. Lance Liu, Superior Court of New Jersey Law Division— Mercer County, Docket Number L-2040-14.

6.      All documents and records containing any information that refers to or relates to any reduction of Beta Pharma's ownership interest in ZJBP, whether by sale of ZJBP stock, gift, contribution to investment partnership or other entity, payment, dilution or any other means from the date of Beta Pharma's initial investment in ZJBP to the present.

7.     All documents and records concerning compensation from Beta Pharma, Beta Pharma Scientific, or ZJBP paid to, payable to, or claimed due and owing by Guojian Xie, whether in cash, BP stock, ZJBP stock, or other form.

8.     All documents and records concerning promises made by Beta Pharma or Don Zhang to invest in the deponent's generic drug business, and breaches of those promises.

9.     All documents and records concerning promises made by Beta Pharma or Don Zhang to compensate the deponent with stock of ZJBP, and breaches of those promises.

10.     All documents referring or relating to the following sworn averment made by Don Zhang and contained in Beta Pharma's Verified Complaint in the case of Beta Pharma, Inc., Beta Pharma Scientific, Inc., and Don Zhang v. Lance Liu, Superior Court of New Jersey Law Division—Mercer County, Docket Number L-2040-14:

> 28.  Liu threatened Zhang with criminal prosecution by the U.S. Attorney's office if Zhang did not, among other things, pay Liu money and give Liu shares of ZJBP stock owned by Beta Pharma.

11.     All documents and records containing any evidence of actual or suspected criminal activity committed by Beta Pharma, Beta Pharma Scientific or Don Zhang, including but not limited to violations of the Federal and state securities laws, Federal and state tax laws, Federal patent laws, immigration laws, laws pertaining to transaction of business with persons or entities in the Peoples Republic of China, and any statute prohibiting any crime of violence.

12.     All documents and records containing any evidence of actual or suspected fraud or fraudulent activity committed by Beta Pharma, Beta Pharma Scientific or Don Zhang, including but not limited to securities fraud, tax fraud, patent fraud, immigration fraud, fraud in connection with international trade, and common law fraud.

13.     All documents referring or relating to the following sworn averment made by Don Zhang and contained in Beta Pharma's Verified Complaint in the case of Beta Pharma, Inc., Beta Pharma Scientific, Inc., and Don Zhang v. Lance Liu, Superior Court of New Jersey Law Division—Mercer County, L-2040-14:

> 29.  During June 2013, Liu informed third parties with whom Beta Pharma has an ongoing business relationship that Zhang would hire an assassin to have Liu killed should Beta Pharma receive the money from its sale of ZJBP stock in China, and that Liu was actively preparing a federal lawsuit against Beta Pharma.

14.     All documents referring or relating to the following sworn averment made by Don Zhang and contained in Beta Pharma's Verified Complaint in the case of Beta Pharma, Inc., Beta Pharma Scientific, Inc., and Don Zhang v. Lance Liu, Superior Court of New Jersey Law Division—Mercer County, Docket Number L-2040-14:

>      30. Liu made written statements to business associates of Beta Pharma and Scientific, accusing Zhang of criminal activity.

15.     Any and all of the following:  Prospectuses or financial disclosure statements provided to any actual or potential investors who were offered ZJBP stock by Beta Pharma or Don Zhang; documents and information stating that any such investors were "accredited investors"; and other documents proving or tending to prove that Beta Pharma and Don Zhang complied with the Federal securities laws or state securities laws when they offered and sold shares of ZJBP stock, including any and all such documents provided to Shanshan Shao, Hongliang Chu, Qian Liu, Song Lu, Xinshan Kang or Wei Yuan.

16.     A complete list of all persons and entities known to hold shares or rights to purchase shares in ZJBP.

17.     A complete list of all persons or entitiesl to whom Beta Pharma and Don Zhang offered or sold any shares in ZJBP.

18.     All documents referring or relating to the repurchase of any ZJBP shares from any person or entity to whom Beta Pharma or Don Zhang sold them.

| DOCKET NO.: NNH-CV13-6035116-S | : | SUPERIOR COURT |
| GUOJIAN XIE | : | JUDICIAL DISTRICT OF NEW HAVEN |
| VS. | : | AT NEW HAVEN |
| BETA PHARMA, INC., ET AL. | : | OCTOBER 2, 2014 |

## NOTICE OF DEPOSITION

Pursuant to Practice Book Section 13-27(h), plaintiff will take the deposition of **Lance Liu**, to be used at the trial thereof, on **FRIDAY, OCTOBER 24, 2014, at 10:00 A.M.** at the law offices of Jacobs & Dow, LLC, 350 Orange Street, New Haven, Connecticut.

A subpoena duces tecum for the deponent, with documents, is attached hereto as Exhibit A.

You ("you" or "deponent") are further commanded to bring with you and produce at said deposition the following described documents (listed on Schedule A annexed hereto) within your possession, custody or control. As used herein, the term "document" shall include e-mail sent from or received by any address (including, but not limited to, liuly2006@yahool.com and any email address provided for you by Beta Pharma including any email address you used in the betapharma.com domain), text messages and other electronic communications.

If you withhold any document responsive to any of the foregoing-described requests based on any claim of privilege, then you are further commanded to bring with you and produce at said deposition a privilege log as follows:

Where a privilege is applicable, a privilege log is to be provided. It should identify the specific ground(s) upon which your claim is based and the document withheld by identifying:

(a) the author; (b) the recipient or addressee; (c) all copy recipients; (d) its date; (e) those persons participating in its formulation; (f) a description of the document; (g) the type of privilege being claimed; and (h) the request to which the document is responsive.

If the privilege is claimed to arise from a writing such as a confidentiality agreement or other contract, produce a copy of any such writing.

The deponent will be asked to translate into English for the record documents written in Chinese, and may, at his choice, prepare written translation in advance.

This deposition will be taken before a court reporter of the State of Connecticut, designated by Brandon Husebey Reporting Service, 249 Pearl Street, Hartford, Connecticut, and will be videotaped. You are invited to attend and cross-examine.

THE PLAINTIFF,
GUOJIAN XIE

By_____
Jonathan Katz
JACOBS & DOW, LLC
350 Orange Street
New Haven, CT 06511
Telephone: 203-772-3100 / Fax: 203-772-1691
Juris No.: 432271

2

# EXHIBIT A

SUBPOENA – DUCES TECUM – ALL COURTS

To:  Lance Liu
of   4 Colonial Court, Middlebury, CT 06762

BY AUTHORITY OF THE STATE OF CONNECTICUT, *You are hereby commanded to appear for a deposition to be held at* **Jacobs & Dow, LLC, 350 Orange Street, New Haven, Connecticut,** *on* **FRIDAY, OCTOBER 24, 2014, AT 10:00 o'clock** *in the forenoon, or to such day thereafter and within 60 days hereof on which the action is legally to be tried, to testify what you know in a certain Civil Action pending in the Court between*

and

*GUOJIAN XIE, plaintiff(s),*

*BETA PHARMA, INC., ET AL., defendant(s).*

*YOU ARE FURTHER COMMANDED to bring with you and produce at the same time and place, the following:*

*SEE ATTACHED SCHEDULE A incorporated here by reference.*

Hereof fail not, under penalty of the Law.

To any proper officer or indifferent person to serve and return.

*Dated at New Haven, Connecticut this 2nd day of October, 2014.*

JONATHAN KATZ (203-772-3100)
Commissioner of the Superior Court

STATE OF CONNECTICUT   )
                       )   ss.:
County of              )

*Then I made due service of the within Subpoena by reading the same in the presence and hearing of and leaving a true copy thereof with the following person(s) at the address indicated:*

Name                           Address

*and paid/tendered (to each) the fees allowed by law.*

*The within is a true copy of the original Subpoena.*

Attest,

Witness Fee _____  $
Service _____
Travel _____
Endorsement _____
                    $

Deputy Sheriff
Constable
Indifferent Person

### SCHEDULE A

### TO DEPOSITION NOTICE AND SUBPOENA DUCES TECUM
### FOR WITNESS ATTORNEY LANCE LIU

The deponent is instructed to bring with him to the deposition the following documents:

As used herein the term "ZJBP" or "ZBP" means Zhejiang Beta Pharma Co., Ltd.

Items 13 through 16 described in the Subpoena and Notice of Deposition previously served on Lance Liu by Beta Pharma, which paragraphs are renumbered but set forth verbatim as items 1 through 4 below.

1.     Any and all documents, transmittals, correspondence or records of communication between the deponent and any person or entity that refers to, relates to or concerns the sale of stock in Zhejiang Beta Pharma Co., Ltd. ("ZJBP").

2.     Any and all documents, transmittals, correspondence or records of communication that refers to, relates to or concerns the sale of stock ZJBP.

3.     Any and all documents, transmittals, correspondence or records of communication that refers to, relates to or concerns an initial public offering of stock in ZJBP.

4.     Any and all documents, transmittals, correspondence or records of communication between the deponent and ZJBP or any person or entity that is employed by or is otherwise engaged by ZJBP in any capacity.

5.     All documents and records pertaining to any and all Board meetings of ZJBP, including the September, 2012 meeting during which ZJBP confirmed it would not permit Beta Pharma to transfer ZJBP stock to certain investors including "the plaintiffs in the Buyer's Action" Shanshan Shao, Hongliang Chu, Qian Liu, Song Lu and Xinshan Kang, as stated at page 14 of Beta Pharma's Brief in Support of Plaintiffs' Applicaton for an Order to Show Cause with Temoprary Restraints filed in Beta Pharma, Inc., Beta Pharma Scientific, Inc., and Don Zhang v. Lance Liu, Superior Court of New Jersey Law Division—Mercer County, Docket Number L-2040-14.

6.     All documents and records containing any information that refers to or relates to any reduction of Beta Pharma's ownership interest in ZJBP, whether by sale of ZJBP stock, gift, contribution to investment partnership or other entity, payment, dilution or any other means from the date of Beta Pharma's initial investment in ZJBP to the present.

7.    All documents and records concerning compensation from Beta Pharma, Beta Pharma Scientific, or ZJBP paid to, payable to, or claimed due and owing by Guojian Xie, whether in cash, BP stock, ZJBP stock, or other form.

8.    All documents and records concerning promises made by Beta Pharma or Don Zhang to invest in the deponent's generic drug business, and breaches of those promises.

9.    All documents and records concerning promises made by Beta Pharma or Don Zhang to compensate the deponent with stock of ZJBP, and breaches of those promises.

10.    All documents referring or relating to the following sworn averment made by Don Zhang and contained in Beta Pharma's Verified Complaint in the case of Beta Pharma, Inc., Beta Pharma Scientific, Inc., and Don Zhang v. Lance Liu, Superior Court of New Jersey Law Division—Mercer County, Docket Number L-2040-14:

> 28.  Liu threatened Zhang with criminal prosecution by the U.S. Attorney's office if Zhang did not, among other things, pay Liu money and give Liu shares of ZJBP stock owned by Beta Pharma.

11.    All documents and records containing any evidence of actual or suspected criminal activity committed by Beta Pharma, Beta Pharma Scientific or Don Zhang, including but not limited to violations of the Federal and state securities laws, Federal and state tax laws, Federal patent laws, immigration laws, laws pertaining to transaction of business with persons or entities in the Peoples Republic of China, and any statute prohibiting any crime of violence.

12.    All documents and records containing any evidence of actual or suspected fraud or fraudulent activity committed by Beta Pharma, Beta Pharma Scientific or Don Zhang, including but not limited to securities fraud, tax fraud, patent fraud, immigration fraud, fraud in connection with international trade, and common law fraud.

13.    All documents referring or relating to the following sworn averment made by Don Zhang and contained in Beta Pharma's Verified Complaint in the case of Beta Pharma, Inc., Beta Pharma Scientific, Inc., and Don Zhang v. Lance Liu, Superior Court of New Jersey Law Division—Mercer County, L-2040-14:

> 29.  During June 2013, Liu informed third parties with whom Beta Pharma has an ongoing business relationship that Zhang would hire an assassin to have Liu killed should Beta Pharma receive the money from its sale of ZJBP stock in China, and that Liu was actively preparing a federal lawsuit against Beta Pharma.

14.     All documents referring or relating to the following sworn averment made by Don Zhang and contained in Beta Pharma's Verified Complaint in the case of Beta Pharma, Inc., Beta Pharma Scientific, Inc., and Don Zhang v. Lance Liu, Superior Court of New Jersey Law Division—Mercer County, Docket Number L-2040-14:

> 30.  Liu made written statements to business associates of Beta Pharma and Scientific, accusing Zhang of criminal activity.

15.     Any and all of the following:  Prospectuses or financial disclosure statements provided to any actual or potential investors who were offered ZJBP stock by Beta Pharma or Don Zhang; documents and information stating that any such investors were "accredited investors"; and other documents proving or tending to prove that Beta Pharma and Don Zhang complied with the Federal securities laws or state securities laws when they offered and sold shares of ZJBP stock, including any and all such documents provided to Shanshan Shao, Hongliang Chu, Qian Liu, Song Lu, Xinshan Kang or Wei Yuan.

16.     A complete list of all persons and entities known to hold shares or rights to purchase shares in ZJBP.

17.     A complete list of all persons or entitiesl to whom Beta Pharma and Don Zhang offered or sold any shares in ZJBP.

18.     All documents referring or relating to the repurchase of any ZJBP shares from any person or entity to whom Beta Pharma or Don Zhang sold them.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served electronically via email, this 2nd

day of October, 2014, to:

Donald Altschuler, Esq.
Altschuler & Altschuler
509 Campbell Avenue
West Haven, CT 06516
Donalt44@sbcglobal.net; Altschuler.don@snet.net

Glenn A. Duhl, Esq.
Attorney Jillian Orticelli
Siegel, O'Connor, O'Donnell & Beck, P.C.
150 Trumbull Street
Hartford, CT 06103
gduhl@siegeloconnor.com
jorticelli@siegeloconnor.com

Jack L. Kolpen, Esq.
Benjamin R. Kurtis, Esq.
Fox Rothschild LLP
Princeton Pike Corporation Center
997 Lenox Drive, Building 3
Lawrenceville, NJ 08648-2311
jkolpen@foxrothschild.com
bkurtis@foxrothschild.com

Lance Liu
4 Colonial Court
Middlebury, CT 06762
lanceliu2000@gmail.com

Jonathan Katz

3

# Exhibit J

Westlaw.

Not Reported in A.2d, 1992 WL 189367 (Conn.Super.), 7 Conn. L. Rptr. 167
**(Cite as: 1992 WL 189367 (Conn.Super.))**

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Connecticut, Judicial District of
Danbury.
ARJ TRUCKING, INC.
v.
EMERY WORLDWIDE and CONSOLIDATED
FREIGHTWAYS, INC.

No. 30 62 00.
July 29, 1992.

MEMORANDUM OF DECISION

WEST, Judge.

**\*1** In September of 1986, the plaintiff, ARJ
Trucking, Inc. (hereafter "ARJ"), entered into an
agreement to provide drayage services to the defend-
ant, Emery Worldwide (hereafter "Emery"). The
contract negotiations took place between Robert D.
Foglia, the founder of ARJ, and Daniel J. McCauley,
who was at that time general counsel to Emery. The
parties executed Emery's standard drayage agreement,
which allegedly contains a provision that either party
can terminate the agreement upon thirty days notice.
However, Foglia and McCauley subsequently exe-
cuted a side letter agreement, allegedly intended to
supersede conflicting provisions of the standard con-
tract. The letter agreement contains a provision that
six months notice is required prior to termination by
either party. ARJ and Emery commenced performance
under the agreement on October 20, 1986.

In April of 1989, defendant, Consolidated
Freightways, Inc. (hereafter "Consolidated"), pur-
chased all of the stock of Emery. At that time,
McCauley was relieved of his title as general counsel
to Emery, but was retained as a legal consultant to
both Emery and Consolidated.

On February 15, 1991, Emery informed ARJ of
its intent to terminate the drayage agreement effective
March 17, 1991. Consequently, a dispute arose as to
whether the terms of the standard contract or the letter
agreement governed the situation regarding the notice
required prior to termination. Soon thereafter,
McCauley was contacted by his successor as general
counsel to Emery, Eberhard G.H. Schmoller, to dis-
cuss the dispute that had arisen between ARJ and
Emery and the legal import of the letter agreement. On
July 30, 1991, McCauley ceased to be in the employ of
the defendants.

ARJ filed the instant action in five counts on July
1, 1991, alleging two counts of breach of contract,
unjust enrichment, violation of the Connecticut Unfair
Trade Practices Act (General Statutes, Sec. 42-110a et
seq.), and tortious interference. On February 20, 1992,
in the course of attempting to secure a prejudgment
attachment, counsel for ARJ submitted in support of
its application an affidavit of McCauley. In the affi-
davit, McCauley reveals various details regarding the
drayage agreement with ARJ, as well as his conver-
sation with Schmoller.

On March 25, 1992, based upon McCauley's al-
leged disclosure of attorney-client confidences in the
affidavit, the defendants filed motions to: (1) strike the
McCauley affidavit from the file; (2) disqualify
plaintiff's counsel, Cohen and Wolf, from the case; (3)
enjoin future disclosure by McCauley to plaintiff or its
counsel. The plaintiff opposes the motion. Both par-
ties have filed memoranda in support of their respec-
tive positions, and the matter was argued before this
court on May 1, 1992.

Rule 1.6 of the Connecticut Rules of Professional
Conduct states in relevant part that "[a] lawyer shall

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 1992 WL 189367 (Conn.Super.), 7 Conn. L. Rptr. 167
**(Cite as: 1992 WL 189367 (Conn.Super.))**

not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation...." The comment to the rule clearly provides that "[t]he duty of confidentiality continues after the client-lawyer relationship has terminated." While there are other exceptions to this rule, they are not relevant to this case.

**\*2** In the case at bar, McCauley's statements in the affidavit regarding the formation and content of the agreement and his conversation with Schmoller relate to his representation of Emery in that transaction. Furthermore, Emery's strong opposition to the submission of the affidavit is sufficient evidence that it has not consented to the disclosure.

Rule 1.9 of the Connecticut Rules of Professional Conduct provides, inter alia, that "[a] lawyer who has formerly represented a client in a matter shall not thereafter: ... (b) Use information relating to the representation to the disadvantage of the former client except as Rule 1.6 would permit with respect to a client or when the information has become generally known."

Clearly, McCauley's affidavit on behalf of ARJ, which contains statements relating directly to his prior representation of Emery in the subject transaction, is to his former client's disadvantage. The affidavit contains statements regarding the meaning, content, and applicability of the agreement, as well as a statement concerning Schmoller's consultation with McCauley. The fact that these statements address issues that are disputed and in litigation indicates that they are not generally known information.

Therefore, McCauley's statements in the affidavit were improper under Rules 1.6 and 1.9 of the Connecticut Rules of Professional Conduct, and the defendants have been prejudiced by these disclosures. Accordingly, in order to remedy the situation the affidavit should be stricken from the record.

The defendants have moved to disqualify the law firm of Cohen and Wolf from representing the plaintiff in this action. One of the reasons cited is the possibility that the firm may have received client confidences from McCauley when the affidavit was taken. The plaintiff denies that any such transmission of confidences has occurred, saying: "[a]ssuming that McCauley had such information, he did not disclose it to Cohen and Wolf." (No. 126.05, Plaintiff's Memorandum in Opposition to Motion, p. 12.)

Every client has a right to expect that his lawyer will not disclose his secrets. To protect that right, courts will not inquire whether the lawyer has, in fact, used confidential information to the client's detriment because such inquiry would require the revelation of the very information the ... [rule] is designed to protect. [Citations omitted.] Where the opportunity for disclosure of confidential information to an adversary is shown, the breach of confidence would not have to be proved; it is presumed in order to preserve the spirit of the [Rules of Professional Conduct]. [Citation omitted.]

*Goldenberg v. Corporate Air, Inc.,* 189 Conn. 504, 512, 457 A.2d 296 (1983), reversed on other grounds in *Burger & Burger, Inc. v. Murren,* 202 Conn. 660, 522 A.2d 812 (1987). The presumption created by the Supreme Court in *Goldenberg* has been construed as irrebuttable. See *MMR/Wallace Power and Industrial, Inc. v. Thames Associates,* 764 F.Supp. 712, 726 n. 24 (D.Conn.1991).

**\*3** Given the fact that McCauley negotiated the contract at issue on behalf of Emery, and that Schmoller consulted with McCauley after the contract dispute arose, the court may reasonably conclude that McCauley was privy to the confidences of his former client. The opportunity for disclosure of these confidences existed when McCauley's statements were

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 1992 WL 189367 (Conn.Super.), 7 Conn. L. Rptr. 167
**(Cite as: 1992 WL 189367 (Conn.Super.))**

taken by Cohen and Wolf. (It is noted by the court that McCauley's affidavit is printed on the firm's stationery.) Further, under *Goldenberg,* it must be presumed that McCauley disclosed confidences of his former client regarding this matter to Cohen and Wolf. Accordingly, the defendants' motion to disqualify Cohen and Wolf from representing the plaintiff is granted since " 'the potential for unfair discovery of information through private consultation rather than through normal discovery procedures threatens the integrity of the trial process.' " (Citation omitted.) *MMR/Wallace Power and Industrial, Inc. v. Thames Associates,* supra, 722.

Clearly, any future contact by the plaintiff or counsel succeeding Cohen and Wolf with McCauley would raise the same appearances of impropriety that the court is now attempting to remedy. Therefore, the defendants' motion to enjoin future disclosure is granted to the extent that plaintiff or its counsel is prohibited from having any ex parte communications with McCauley regarding this matter.

As a consequence of McCauley's obligations under Rules 1.6 and 1.9 of the Connecticut Rules of Professional Conduct, his submission of an affidavit on behalf of the plaintiff containing information relating to his prior representation of the defendants was improper. Therefore, the defendants' motion to strike the affidavit from the record is granted. Additionally, and in accord with the foregoing, the defendants' motion to disqualify plaintiff's counsel is also granted.

Finally, the defendants' motion to enjoin future disclosure is granted insofar as ex parte communications between plaintiff and McCauley are concerned.

Conn.Super.,1992.
ARJ Trucking, Inc. v. Emery Worldwide and Consol. Freightways, Inc.
Not Reported in A.2d, 1992 WL 189367 (Conn.Super.), 7 Conn. L. Rptr. 167

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit K

Westlaw.

Not Reported in F.Supp.2d, 2011 WL 683963 (E.D.N.Y.)
**(Cite as: 2011 WL 683963 (E.D.N.Y.))**

# H

Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
The GERFFERT COMPANY, INC., et al., Plaintiffs,
v.
James DEAN, et al., Defendant.

No. 09 CV 266(KAM).
Feb. 16, 2011.

Joseph E. Magnotti, Staten Island, NY, Mark M. Horowitz, Mineola, NY, Howard Benjamin, Law Offices of Howard Benjamin, New York, NY, for Plaintiffs.

Michael Paul Kandler, Callan Regenstreich Koster & Brady, Peter J. Zambito, Dougherty Ryan Giuffra Zambito & Hession, New York, NY, Kevin I. Shenkman, Jeffrey J. Zuber, Zuber & Taillieu LLP, Los Angeles, CA, for Defendants.

Allen Reiter Arent Fox LLP, Arent Fox LLP, New York, NY, pro se.

### MEMORANDUM & ORDER

CHERYL L. POLLAK, United States Magistrate Judge.

**\*1** On January 22, 2009, plaintiffs The Gerffert Company, Inc. ("Gerffert") and Stephen Panigel filed this action against defendants James Dean, Dolores King, William J. Hirten Co. LLC, HMH Religious Manufacturing Co., Inc., Andrea Bonella, Mario Bonella, Gianfranco Bonella, Fratelli Bonella, s.r.l., and "John Doe" and "Jane Doe," d/b/a Fratelli Bonella, s.r.l. ("Fratelli Bonella"), seeking damages based on defendants' alleged breach of an agreement granting

Gerffert the exclusive right to market and distribute the "Bonella Line" of religious artwork in the United States.

Presently before this Court is a motion to disqualify plaintiffs' counsel, Mark Horowitz, Esq., and Joseph E. Magnotti, Esq., based on an alleged conflict of interest. On November 10, 2010, the parties consented to the jurisdiction of the undersigned to decide the motion to disqualify only.

For the reasons set forth below, the Court grants defendants' motion for disqualification as to Mr. Horowitz and as to Mr. Magnotti.

### FACTUAL BACKGROUND

In connection with the motion, both sides have submitted affidavits setting forth what each contends are the salient facts in this dispute.

Andrea Bonella, a named defendant and employee of Fratelli Bonella, represents that Mark Horowitz, a New York attorney, began representing Fratelli Bonella and members of the Bonella family (collectively, the "Bonellas"), as early as March 2003, continuing up to December 2008. (Bonella Decl.[FN1] ¶ 3). According to Mr. Bonella, Mr. Horowitz "handled virtually all of Bonellas' legal affairs in the United States for at least three years" (*id.* ¶ 5), including: 1) the Bonellas' relationship with plaintiffs; 2) the Fratelli Bonella litigation against Quadriga Art LLC and the impact of Mr. Panigel's potential testimony in that litigation; 3) issues relating to intellectual property management and protection; 4) contractual matters relating to the sale of Bonella merchandise; and 5) the selection of other attorneys retained by Fratelli Bonella. (*Id.* ¶ 4). Mr. Bonella asserts that during the time of Mr. Horowitz's representation, people associated with Fratelli Bonella "shared a great deal of confidential information" with Mr, Horowitz, (*Id.* ¶ 5).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 683963 (E.D.N.Y.)
**(Cite as: 2011 WL 683963 (E.D.N.Y.))**

> FN1. Citations to "Bonella Decl." refer to the Declaration of Andrea Bonella in Support of Defendants' Motion to Disqualify Plaintiffs' Counsel, dated November 1, 2010.

According to Mr. Bonella, in October 2007, Fratelli Bonella agreed in principle to purchase certain of Gerffert's assets and Gerffert, who had been represented by Mr. Horowitz as well, wanted Mr. Horowitz to represent Gerffert in the negotiations and transaction. (*Id.* ¶¶ 6, 7). At that time, Mr. Horowitz prepared a conflict waiver for Andrea Bonella's signature on behalf of Fratelli Bonella. (*Id.* ¶ 8, Ex. D). The waiver only extended to certain matters where Gerffert and Panigel might be potentially adverse to the Bonellas' interests, including:

> (i) sale of certain assets of Gerffert to Fratelli Bonella ...; (ii) establishment of an ongoing relationship of Mr. Panigel with Fratelli Bonella ...; (iii) negotiation of an agreement between Mr. Panigel and Fratelli Bonella s.r.l. regarding Mr. Panigel's participation in the Quadriga Art litigation; and (iv) the transactions and agreements related to all the foregoing.

**\*2** (Bonella Decl., Ex. D). The waiver did not extend to any other instances where the interests of Gerffert or Panigel were adverse to those of the Bonellas; indeed, the conflict waiver explicitly stated that Horowitz would not represent either party in the event that a dispute arose between them. The waiver stated:

> I [Horowitz] confirm that in the event that a dispute should arise between or among any of Mr. Panigel, Gerffert and Fratelli Bonella, s.r.l., I will not represent any party in any litigation arising therefrom.

(*Id.*) Mr. Horowitz also agreed in the conflict waiver that he would not disclose the "non-public or proprietary information that [he] learned or may learn

in connection with [his] representation of Fratelli Bonella, s.r.l.." (*Id.*) According to Mr. Bonella's Declaration, neither he or anyone associated with Fratelli Bonella ever agreed or authorized Mr. Horowitz to represent Mr, Panigel and/or Gerffert in the instant litigation. (Bonella Decl. ¶ 11).

In response to the motion for disqualification, plaintiffs have submitted the Declarations of Mr. Horowitz and Stephen Panigel, Gerffert's principal. According to Mr. Horowitz, he first represented Gerffert in connection with a real estate transaction in 1981 and thereafter continuously represented Gerffert and Panigel since 1985. (Horowitz Decl.[FN2] ¶¶ 3–4; *see also* Panigel Decl.[FN3] ¶ 2 (explaining that Mr. Horowitz has "continuously represented Gerffert and me since 1985")). According to Mr. Horowitz, he first represented Fratelli Bonella in 1985 when the company was a co-plaintiff with Gerffert in a copyright infringement and unfair competition action. (Horowitz Decl. ¶ 5). He states that he received all of his information in connection with that litigation, including exhibits, from Mr. Panigel, who dealt with Mario Bonella. (*Id.*) According to Mr. Horowitz, he also jointly represented Fratelli Bonella and Gerffert in an infringement action in 1987, which was settled, and he states that again he received all of his information from Mr. Panigel. (*Id.* ¶ 6).

> FN2. Citations to "Horowitz Decl." refer to the Declaration of Mark Horowitz in Opposition to Defendants' Motion to Disqualify Plaintiffs' Counsel, dated November 15, 2010.

> FN3. Citations to "Panigel Decl." refer to the Declaration of Stephen Panigel in Opposition to the Defendants' Motion to Disqualify Plaintiffs' Counsel, dated November 12, 2010.

Mr. Horowitz represents that from time to time,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 683963 (E.D.N.Y.)
**(Cite as: 2011 WL 683963 (E.D.N.Y.))**

he wrote cease and desist letters on behalf of Fratelli Bonella to various small infringers who, in most instances, complied after a reasonable period of time. (Horowitz Decl. ¶ 7). Again, he claims that he received all the necessary information, including copyright registration certificates and copies of images, from Mr. Panigel. (*Id.*) Mr. Panigel confirms that there have been occasions when Mr. Horowitz represented both Bonella and Gerffert, but, according to Panigel, Horowitz "never met with the Bonellas outside of [his] presence" and "never received confidential information or documents from the Bonellas." [FN4] (Panigel Decl. ¶ 3).

> FN4. *See* discussion *infra* at 12–13.

With respect to Quadriga Art, formally Reproducta, Inc., Mr. Horowitz explains that in 1960, Reproducta entered into an agreement with Fratelli Bonella, giving Reproducta the right to reproduce and sell Fratelli Bonella images for certain purposes such as religious fundraising. (*Id.* ¶ 8). The more traditional retail market was reserved for Fratelli Bonella, which distributed its products in the United States through Gerffert. (*Id.*) In 1993, Mr. Panigel supplied a copy of the agreement between Reproducta and Fratelli Bonella to Mr. Horowitz and asked him to review it. (*Id.* ¶ 10).

*3 According to Mr. Horowitz, Reproducta began to encroach on Fratelli Bonella's and Gerffert's business by licensing the Bonella images to Gerffert competitors. (*Id.* ¶¶ 11–12). In 1995, at Mr. Panigel's request, Mr. Horowitz drafted a complaint on behalf of Fratelli Bonella and Gerffert against Reproducta, Quadriga, Regina Press, and Autom, Inc., which used Bonella images to manufacture competing retail items. (*Id.* ¶ 13). Eventually, Fratelli Bonella retained the law firm of Darby and Darby to prosecute the action only against Autom, dropping co-plaintiff Gerffert and the other defendants. (*Id.* ¶ 14). Mr. Horowitz was not involved in that litigation and claims to have never received any correspondence from the other attorneys.

(*Id.*)

In 1999, Quadriga licensed Regina Press to reproduce Bonella images in competition with Gerffert. (*Id.* ¶ 15). Another firm represented Fratelli Bonella in that case and, according to Mr. Horowitz, Gerffert and Fratelli Bonella shared equally in paying the attorneys' fees. (*Id.*) Indeed, according to Panigel, Gerffert signed a joint retainer agreement with Sonnenschein Nath & Rosenthal LLP ("the Sonnenschein firm"), and Gerffert paid fifty percent of the legal fees in connection with that litigation. (*Id.*) Mr. Horowitz, however, was not involved in that litigation until the summer of 2004, when Mr. Panigel sent Horowitz a draft settlement agreement, which both believed was a terrible deal for Fratelli Bonella. (*Id.* ¶ 18). According to Mr. Horowitz, he and Panigel prepared a revised draft settlement agreement at the request of Andrea and Mario Bonella, but it was rejected by Quadriga's lawyers. (*Id.* ¶¶ 19–20). Thereafter, at the urging of Panigel and Horowitz, the Bonellas replaced their original attorneys and retained the Sonnenschein firm, signing a retainer agreement in January 2005, which was also signed by Panigel on behalf of Gerffert. (*Id.* ¶ 20). Horowitz thereafter acted as "contact person" for Panigel and Fratelli Bonella. (*Id.* ¶ 21).

In October 2007, Horowitz and Panigel attempted unsuccessfully to negotiate a potential sale of Gerffert or its assets to Fratelli Bonella. (*Id.* ¶ 22). It was during the course of these discussions that Mr. Horowitz executed the conflict waiver with respect to his continuing representation of Fratelli Bonella. (*Id .* ¶ 23). Although the waiver references any proprietary or confidential information that Mr. Horowitz has "learned or may learn" by reason of representing Fratelli Bonella in matters other than the matters specifically referenced in the waiver letter, according to Mr. Horowitz, he has never received any proprietary or confidential information from the Bonellas or Fratelli Bonella. (*Id.*) Moreover, according to Mr. Horowitz, as of December 1, 2008, after the Quadriga matter settled, he "had no pending matters on which

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 683963 (E.D.N.Y.)
**(Cite as: 2011 WL 683963 (E.D.N.Y.))**

he represented the Bonellas, nor did he perform any services on their behalf thereafter." (*Id.* ¶ 28)

*\*4* On January 22, 2009, plaintiffs, by their counsel of record, Joseph Magnotti, commenced this lawsuit against Fratelli Bonella and members of the Bonella family.[FN5] Almost two years into the lawsuit, Mr. Horowitz filed a Notice of Appearance on behalf of Gerffert and Stephen Panigel on October 12, 2010. Thereafter, defendants brought the instant motion, seeking to disqualify Mr. Horowitz, arguing two grounds: 1) under the "per se" rule, his simultaneous and/or concurrent representation of Fratelli Bonella and plaintiffs requires disqualification; and 2) because there is a substantial relationship between Horowitz's former representation of the Bonellas during which he had access to relevant privileged information of the defendants that may relate to the current litigation, his disqualification is also mandated by the "substantial relationship" test.

> FN5. The Complaint also names James Dean, Dolores King, William J. Hirten Co., and HMH Religious Manufacturing Co. William J. Hirten Co ., who is represented by the Bonella defendants' counsel, joins in the motion to disqualify plaintiffs' counsel and has provided no new or additional substantive arguments in support of disqualification apart from the arguments advanced by the Bonella defendants.

In response, plaintiffs contend that the "per se" rule does not apply because Fratelli Bonella ceased to be a client of Horowitz's in December 2008. With respect to the "substantial relationship" test, plaintiffs contend that Mr. Horowitz never received any confidential information directly from Fratelli Bonella or the Bonellas; any relevant information was received directly from Mr. Panigel.

*DISCUSSION*

A. *Standards*

It is well established that the Court's authority to disqualify an attorney stems from its general supervisory power over the attorneys appearing before it. *see Handelman v. Weiss,* 368 F.Supp. 258, 263 (S.D.N.Y.1973): *see also United States v. Miller,* 624 F.2d 1198, 1201 (3d Cir.1980), and the determination of disqualification is discretionary in nature. *Hull v. Celanese Corp.,* 513 F.2d 568, 571 (2d Cir.1975); *see also Laker Airways Ltd. v. Pan Am. World Airways,* 103 F.R.D. 22, 27 n. 4 (D.D.C.1984). There is a longstanding rule that,

> [w]hen dealing with ethical principles, ... we cannot paint with broad strokes. The lines are fine and must be so marked. Guideposts can be established when virgin ground is being explored, and the conclusion in a particular case can be reached only after painstaking analysis of the facts and precise application of precedent.

*Fund of Funds. Ltd. v. Arthur Andersen & Co.,* 567 F.2d 225, 227 (2d Cir.1977) (quoting *United States v. Standard Oil Co.,* 136 F.Supp. 345, 367 (S.D.N.Y.1955)). Indeed, as the court in *Fund of Funds, Ltd.* noted, "in deciding questions of professional ethics men of good will often differ in their conclusions." *Id.* Recognizing this, the Second Circuit has held that the district court's finding will only be overturned upon a showing of abuse of that discretion. *Bobal v. Rensselaer Polytechnic Inst.,* 916 F.2d 759, 764 (2d Cir.1990) (citing *Hull v. Celanese Corp.,* 513 F.2d at 571), *cert. denied,* 499 U.S. 943 (1991).

In considering defendants' argument that the plaintiffs' attorneys should be disqualified, this Court is mindful of its responsibility to "preserve a balance, delicate though it may be, between an individual's right to his own freely chosen counsel and the need to maintain the highest ethical standards of professional responsibility." *Ernie Indus., Inc. v. Patentex, Inc.,* 478 F.2d 562, 564–65 (2d Cir.1973): *accord General Motors Corp. v. City of N.Y.,* 501 F.2d 639, 649 (2d

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 683963 (E.D.N.Y.)
**(Cite as: 2011 WL 683963 (E.D.N.Y.))**

Cir.1974); *see also GSI Comm. Solutions, Inc. v. Baby Center, LLC,* 618 F.3d 204, 209 (2d Cir.2010); *Nordwind v. Rowland,* 584 F.3d 420, 435 (2d Cir.2010); *Fund of Funds Ltd. v. Arthur Andersen & Co.,* 567 F.2d at 237 (noting that "above all else, we must maintain public trust in the integrity of the Bar"). The Court is also mindful of its responsibility to supervise the members of its bar, *see id.,* and recognizes the admonition of the Second Circuit that "any doubt is to be resolved in favor of disqualification." *Hull v. Celanese Corp.,* 513 F.2d at 571; *see also Baird v. Hilton Hotel Corp.,* 771 F.Supp. 24, 27 (E.D.N.Y.1991) (holding that " 'if there were any doubt as to the propriety of our action, we would resolve it in favor of disqualification' ") (quoting *Cheng v. GAF Corp.,* 631 F.2d 1052, 1059 (2d Cir.1980), *judgment vacated on other grounds,* 450 U.S. 903, 101 S.Ct. 1338, 67 L.Ed.2d 327(1981)).

**\*5** The disqualification of an attorney upon the motion of opposing counsel is a serious sanction that ought not be imposed lightly. It is well-established that courts in the Second Circuit approach motions for disqualification with "fairly strict scrutiny" and that they are generally disfavored. *See Murray v. Metropolitan Life Ins. Co.,* 583 F.3d 173, 178 (2d Cir.2009); *Lamborn v. Dittmer,* 873 F.2d 522, 531 (2d Cir.1989); *accord Ragdoll Prods. (UK) Ltd. v. Wal–Mart Stores, Inc.,* No. 99 CV 2101, 1999 WL 760209, at \*1 (S.D.N.Y. Sept. 27, 1999) (holding that motions to disqualify are "subject to strict scrutiny"); *see also Stratavest Ltd. v. Rogers,* 903 F.Supp. 663, 666 (S.D.N.Y.1995) (noting that "[m]otions to disqualify opposing counsel are viewed with disfavor in this Circuit"); *United States Football League v. Nat'l Football League,* 605 F.Supp. 1448, 1452 (S.D.N.Y.1985) (holding same).

Indeed, courts have become increasingly "skeptical of motions to disqualify counsel, and they now approach them with cautious scrutiny." *Laker Airways Ltd. v. Pan American World Airways Ltd.,* 103 F.R.D. at 28. *See also Murray v. Metropolitan Life Ins. Co.,*

583 F.3d at 178; *Bennett Silvershein Assocs. v. Furman,* 776 F.Supp. 800, 802 (S.D.N.Y.1991) (noting that "[m]otions to disqualify opposing counsel are viewed with disfavor in this Circuit because they are 'often interposed for tactical reasons' ") (citing *United States Football League v. Nat'l Football League,* 605 F.Supp. at 1452 (collecting cases)); *Laker Airways Ltd. v. Pan American World Airways,* 103 F.R.D. at 28 (noting that "[d]isqualification motions have become increasingly popular tools of the litigation process, being used ... for purely strategic purposes") (internal quotations omitted). At least one court has commented that "[d]isqualification motions are subject to abuse for tactical purposes," often resulting in "complex satellite litigation extraneous to the case." *Universal City Studios. Inc. v. Reimerdes,* 98 F.Supp.2d 449, 455 (S.D.N.Y.2000); *see also Evans v. Artek Sys. Corp.,* 715 F.2d 788, 790 (2d Cir.1983) (noting that " 'even when made in the best of faith, such motions inevitably cause delay' ") (quoting *Board of Educ. v. Nyquist,* 590 F.2d 1241, 1246 (2d Cir.1979)).

Moreover, because disqualification deprives a client of its choice of counsel, the Second Circuit has cautioned courts that disqualification of an attorney is only appropriate where there has been a clear violation of the Rules of Professional Conduct that leads to a "significant risk of trial taint," *Glueck v. Jonathan Logan, Inc.,* 653 F.2d 746, 748 (2d Cir.1981), such as when "the attorney is in a position to use privileged information acquired in the representation of a client against that client in another matter," *Universal City Studios. Inc. v. Reimerdes,* 98 F.Supp.2d at 455, or when "there is a significant risk that [a conflict of interest] will affect the attorney's ability to represent his or her client with vigor." *Id.; see also Mitchell v. Metro. Life Ins. Co., Inc.,* No. 01 CV 2112, 2002 WL 441194, at \*4 (E.D.N.Y. Mar. 21, 2002) (noting that "relief will be granted only when the facts concerning the lawyer's conduct pose[ ] a significant risk of trial taint").

**\*6** Attorneys arguing before this Court must abide

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 683963 (E.D.N.Y.)
**(Cite as: 2011 WL 683963 (E.D.N.Y.))**

by the recently implemented New York State Rules of Professional Conduct (the "Rules"), 22 N.Y.C.R.R. § 1200, which replaced the old Canons and Disciplinary Rules that were formerly in place in the State of New York. *See* E.D.N.Y. Local Rule 1.3. The New York Rules of Professional Conduct were revised and implemented on April 1, 2009. To interpret the Rules, this Court may look to decisions of the New York State courts. E.D.N.Y. Local Rule 1.5(b)(5). Rule 1.7 states as follows:

> [A] lawyer shall not represent a client if a reasonable lawyer would conclude that either: (1) the representation will involve the lawyer in representing differing interests; or (2) there is a significant risk that the lawyer's professional judgment on behalf of a client will be adversely affected by the lawyer's own financial, business, property or other personal interests.

N.Y. R. Prof 1 Conduct 1.7(a), 22 N.Y.C. R.R. § 1200.

Under the former Canons and Disciplinary Rules, courts considering an alleged conflict distinguished between situations involving concurrent and successive representation. *See, e.g., Hempstead Video, Inc. v. Incorporated Village of Valley Stream,* 409 F.3d 127, 133 (2d Cir.2005) (holding that "[t]he standard for disqualification varies depending on whether the representation is concurrent or successive"). If the representation was concurrent, it was considered " 'prima facie improper' for an attorney to simultaneously represent a client and another party with interests directly adverse to that client." *Id.* (quoting *Cinema 5, Ltd. v. Cinerama, Inc.,* 528 F.2d 1384, 1387 (2d Cir.1976)). In such instances, the attorney with an apparent conflict of interest must be disqualified unless he can demonstrate "at the very least, that there will be no actual or apparent conflict in loyalties or diminution in the vigor of his representation." *Id.* (quoting *Cinema 5,* 528 F.2d at 1387). Even though the Canons have been replaced by the New York

Rules of Professional Conduct, the new rules still incorporate much of the substance of the old rules. *See Mercado v. City of New York.* No. 08 CV 2855, 2010 WL 3910594, at *7 (S.D.N.Y. Sept. 30, 2010); *Merck Eprova AG v. ProThera. Inc.,* No. 08 CV 0035, 2009 WL 4067209, at *11, n. 1 (S.D .N.Y. Sept. 17, 2009). Therefore, much of the precedent interpreting the old rules still remains applicable. Under both the new Rules and the Canons, it is clear that all attorneys owe a duty of undivided loyalty to the clients which have hired them. *Cinema 5, Ltd. v. Cinerama, Inc.,* 528 F.2d at 1386. Clients have a right to expect that their lawyers will not accept money from other parties to act in a manner that is adverse to their interests. *Id.*

These rules are not the only source of authority for the court's power to disqualify attorneys. "In a technical sense the only truly binding authority on disqualification issues is [Second] Circuit precedent, because our authority to disqualify an attorney stems from the Court's inherent supervisory authority." *Med. Diagnostic Imaging. PLLC v. CareCore Nat., LLC,* 542 F.Supp.2d 296, 305 (S.D.N.Y.2008).

B. *Analysis*
**\*7** The "per se rule" applies when an attorney "simultaneously represents clients with differing interests" even though the representation ceases prior to the disqualification motion. *Erick v. Binghamton City Sch. Dist.,* 210 F.R.D. 17, 26 (N.D.N.Y.2002). The Second Circuit has already opined that "we think it would be questionable conduct for an attorney to participate in any lawsuit against his own client without the knowledge and consent of all concerned." *Cinema 5. Ltd. v. Cinerama. Inc.,* 528 F.2d at 1386. In the case of concurrent representation of two clients, suing one client on behalf of the other is "prima facie improper." *Id.* at 1387. Moreover, an attorney or firm may not transform the relationship by abandoning one client in order to avoid the application of the more stringent per se test. *See Fund of Funds Ltd. v. Arthur Andersen & Co.,* 435 F.Supp. 84, 99 (S.D.N.Y.), *aff'd in part, rev'd in part on other grounds,* 567 F.2d 225

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 683963 (E.D.N.Y.)
**(Cite as: 2011 WL 683963 (E.D.N.Y.))**

(2d Cir.1977). The presumption in favor of disqualification in this type of situation may be rebutted if the attorney can show that "there will be no actual or apparent conflict in loyalties or diminution in the vigor of his representation." *Id.*

Thus, the first question is whether or not the Bonellas should be considered a current client of Mr. Horowitz. Courts in New York employ a six-factor test to decide whether an attorney-client relationship exists, though no one factor is dispositive. *Merck Eprova AG v. ProThera, Inc.,* 2009 WL 4067209, at *8. The factors include:

> 1) whether a fee arrangement was entered into or a fee paid; 2) whether a written contract or retainer agreement exists indicating that the attorney accepted representation; 3) whether there was an informal relationship whereby the attorney performed legal services gratuitously; 4) whether the attorney actually represented the individual in one aspect of the matter (e.g., at a deposition); 5) whether the attorney excluded the individual from some aspect of [the] litigation in order to protect another (or a) client's interest; 6) whether the purported client believes that the attorney was representing him and whether this belief is reasonable.

> *Id.*

Here, it is undisputed that Mr. Horowitz represented both Gerffert and the Bonella defendants beginning in 2003. Although plaintiffs contend that Mr. Horowitz has been in-house counsel for Gerffert for over 20 years (Magnotti Let.[FN6] at 7), he has also held himself out to be counsel to the Bonellas. In a letter dated March 18, 2003, which he sent to Barton Cotton, a seller of religious artifacts, Mr. Horowitz stated: "Gentlemen, I am the attorney for Fratelli Bonella, S.r.l., of Milan, Italy." (Bonella Decl., Ex. A). Even Mr. Horowitz concedes that he represented the Bonellas in connection with a variety of matters over

the years, sending out cease and desist letters to various infringers and becoming involved in certain litigation during the period. Indeed, even as late as December 2008, he was submitting invoices to the Bonellas for their payment for his services. There is no question that the Bonellas believed that Mr. Horowitz was representing them during this period and that belief was certainly reasonable under the circumstances, particularly in light of the undisputed fact that he submitted invoices and received payment from the Bonellas for his services.

> FN6. Citations to "Magnotti Let." refer to the letter filed by Joseph Magnotti, Esq. on June 14, 2010.

**\*8** Mr. Horowitz, however, takes the position that his representation of the Bonellas ceased as of December 1, 2008, prior to the filing of this lawsuit. The Bonella defendants dispute this contention and argue that the per se rule applies because Horowitz's representation has never formally ceased; Fratelli Bonella has never received a cessation of service communication from Horowitz, and it was still receiving invoices for his services as of December 2008, after the instant conflict arose. Specifically, the defendants contend that the conflict between Bonella and Gerffert arose in November 2008, at which time Gerffert confirmed that it had retained counsel and indicated its intention to file a lawsuit. (Dean Decl., Ex. B), Indeed, Horowitz concedes that he sent an invoice on December 1, 2008, seeking payment for services rendered but he contends that once the Quadriga matter settled, he had no pending matters in which he represented the Bonellas. (Horowitz Decl. ¶¶ 27–28). In fact, he claims that he sent a letter relating to the dispute, dated December 10, 2008, indicating that he was "willing to offer you my legal guidance and if I can be of any help in finding a solution to this problem between you and Stephen [Panigel], I would be very happy to do so." (Bonella Decl., Ex. D). This communication constitutes an acknowledgment on Mr. Horowitz's part that there was a need for a new conflict waiver; in the letter,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 683963 (E.D.N.Y.)
**(Cite as: 2011 WL 683963 (E.D.N.Y.))**

he noted: "the letters that you and Steve [Panigel] signed last year do not cover the present situation." (*Id.*)

In responding to defendants' motion, plaintiffs largely ignore the per se rule, spending the majority of their submission arguing that Horowitz never received any confidential information from the defendants. In essence, Mr. Horowitz asserts that he has not "received any documentation or information from the Bonellas which is proprietary, confidential, or privileged" as a result of his alleged representation of defendants.[FN7] (Horowitz Decl. ¶ 29). He further claims that his communications with defendants were not subject to the attorney-client privilege, and since he terminated his relationship with them, defendants cannot be deemed to be his clients. (*Id.* ¶¶ 28–29).

> FN7. The defendants disagree and argue strenuously that Mr. Horowitz has obtained significant privileged and confidential information during the course of his representation. (*See* Bonella Decl. ¶ 5).

Regardless of whether defendants did impart any confidential information to Mr. Horowitz in connection with his representation of Fratelli Bonella over the years,[FN8] the rules concerning disqualification apply even when no client confidences have been shared because the rules serve additional purposes. "First, the rule forbidding the representation of one client against another encourages clients to be completely honest and open with their attorneys." *Pierce & Weiss, LLP v. Subrogation Partners LLC,* 701 F.Supp.2d 245, 252 (E.D.N.Y.2010) (citing *Schairer v. Schairer* 192 Misc.2d 155, 158, 745 N.Y.S.2d 410, 413 (N.Y.Sup.Ct.2002)); *see also Tekni–Plex, Inc. v. Mevner & Landis,* 89 N.Y.2d 123, 131, 651 N.Y.S.2d 954, 958, 674 N.E.2d 663, 667 (N.Y.1996). Secondly, the rules on disqualification are in place to avoid even the "appearance" of representing conflicting interests. *Id.* at 253, 651 N.Y.S.2d 954, 674 N.E.2d 663. Thus, although no actual conflict may exist, the appearance

of a conflict can still undermine faith in the judicial system and its fairness.

> FN8. Although Mr. Horowitz in his Declaration refutes point by point each of the examples of privileged communications provided by defendants, the Court declines to hold a hearing to determine the respective credibility of each side's representations with respect to the communications between counsel and his clients. To do so would result in the type of "complex satellite litigation extraneous to the case" decried by the court in the *Universal City Studios* case, and, in this case, is wholly unnecessary given the parties' express agreement as to Mr. Horowitz's role in the litigation going forward. (*See* discussion *infra* at 13–14).

**\*9** Indeed, in this case, the appearance of a conflict is substantiated by the existence of the specific conflict waiver that the parties entered into in 2007. Nowhere in the papers do plaintiffs address in any substantive way the representation made by Horowitz in the 2007 conflict waiver which clearly states: "I confirm that in the event that a dispute should arise between or among any of Mr. Panigel, Gerffert, and Fratelli Bonella, s.r.l., *I will not represent any party* in any litigation arising therefrom." (Bonella Decl. ¶ 8 (emphasis added)). There are no qualifying statements that would relieve Mr. Horowitz of his obligation under this clause; there is nothing that says that if he no longer represents the Bonellas "in any pending matters" that he is relieved from his obligation under the waiver. There is also no time limit mentioned in the letter. Indeed, the waiver language is arguably even more stringent than the per se rule because there appears to be no exception to it whatsoever.

The waiver represents a recognition by all parties that while their interests were aligned and not adversarial, Mr. Horowitz could continue to represent both Gerffert and the Bonellas. However, the language of

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 683963 (E.D.N.Y.)
**(Cite as: 2011 WL 683963 (E.D.N.Y.))**

the waiver is clear: both parties recognized that it would be inappropriate for Mr. Horowitz to represent either of his clients in the event that they became adversaries. Whether there was an understanding that Mr. Horowitz was in possession of confidential proprietary or privileged information or whether there was a desire of both parties to utilize one attorney as a cost-saving matter of efficiency, the parties and counsel recognized the inherent conflict that would arise in an adversarial situation.

Given the absence of any expressed cessation of the representation and the fact that even after problems arose between Gerffert and the Bonellas, Horowitz was submitting invoices to defendants and offering to mediate between the two sides, but only under a revised conflict waiver, the Court finds that there was concurrency of representation and, based on the agreement between the parties, concludes that Mr. Horowitz's disqualification is warranted.

C. *Disqualification of Mr. Magnotti*

Defendants also seek to disqualify Mr. Magnotti from further representation of plaintiffs, arguing that even though Mr. Magnotti never represented the Bonellas, he should also be disqualified on the theory that Mr. Horowitz has shared confidential information with him.

Based on the record before this Court, it appears that Mr. Horowitz has been involved in this case behind the scenes long before he filed a formal Notice of Appearance on October 12, 2010. Defendants assert that "[b]y their own admission, Mr. Horowitz worked with Mr. Magnotti on this very case for at least eighteen months, without ever notifying the Bonella entities or their counsel of Mr. Horowitz's participation." (Mot.[FN9] at 15). Although defendants provide no citation for this statement, it appears from plaintiffs' own submissions that Mr. Horowitz has been actively working on this case since June 2010, at least four months before he filed a Notice of Appearance. Specifically, in a letter filed with the Court on June 14,

2010, Mr. Magnotti informed the Court that "Mark Horowitz, Esq.... is Gerffert's in-house counsel, and has been for over 20 years. He is an integral part of the Gerffert team. He will continue to assist in this case." (Magnotti Let. at 7).

> FN9. Citations to "Mot." refer to the Motion to Disqualify Plaintiffs' Counsel, filed on November 1, 2010.

**\*10** In support of their motion to disqualify, defendants cite a number of cases regarding the disqualification of entire firms when one lawyer is disqualified. Thus, where two attorneys are members of the same firm, courts have held that: "an attorney's conflicts are ordinarily imputed to his firm based on the presumption that 'associated' attorneys share client confidences." *Hempstead Video, Inc. v. Incorporated Village of Valley Stream,* 409 F.3d at 133. There is a presumption that if one attorney is conflicted, then the entire firm is conflicted; this presumption may, however, be rebutted if a protective screen is in place or the conflicted attorney is only partially associated with the firm (i.e. has "of counsel" status). *Id.* Courts in this circuit are particularly wary of the risk that a small number of lawyers working together may, intentionally or otherwise, share information that should be confidential. *See Cheng v. GAF Corp.,* 651 F.2d 1052, 1058 (2d Cir.1980) (noting that, among members of a relatively small firm, there was "a continuing danger that [the conflicted attorney] may unintentionally transmit information he gained through his prior association ... during his day-to-day contact").

In *Crudele v. N.Y.C. Police Dep't,* No. 97 CV 6687, 2001 WL 1033539 (S.D.N.Y. Sept.7, 2001), the district court disqualified the firm representing plaintiffs because a new member of the firm had previously represented defendants on a similar matter. The court decided to disqualify the firm even though the firm took numerous precautions, including prohibiting the conflicted attorney from "speak[ing] about or have any dealings with" the case against his former client

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 683963 (E.D.N.Y.)
**(Cite as: 2011 WL 683963 (E.D.N.Y.))**

and denying the conflicted attorney access to any physical and electronic files for those cases. *Id.* at *2. The court looked to the American Bar Association Code of Professional Responsibility for guidance and found that there is a presumption "that client confidences are shared among the attorneys within a law firm-whether advertently or inadvertently ...." *Id.* at *3. That presumption, the court noted, "is only rebutted if (1) the attorney is effectively screened ... and (2) there is no further appearance of impropriety." *Id.* In the context of a small firm, "courts are concerned that the disqualified attorney, in his day-to-day contact with his new associates, may unintentionally transmit information learned in the course of the prior representation." *Id.* at *4.

Here, on the one hand, it does not appear that Horowitz and Magnotti are members of a firm; they are simply co-counsel on the case. However, while they are not members of an actual law firm, their working relationship approximates the relationship of members of a firm. Moreover, neither Mr. Horowitz nor Mr. Magnotti have represented that any screen is currently in place that would prevent the exchange of confidential information. Indeed, there have been no allegations of *any* screen being erected. In fact, plaintiffs freely concede that Mr. Horowitz has been actively involved in the representation of plaintiffs and "assist[ing]" Mr. Magnotti in this case at least since June 2010. Given Mr. Horowitz's position as Gerffert's in-house counsel, it is reasonable to assume that his involvement with this case dates to its inception. Thus, even if, in response to Mr. Horowitz's disqualification, Mr. Magnotti were to cut off all communication with Mr. Horowitz, the risk that confidential information had already passed between them would remain and taint the fairness of the proceedings.

**\*11** Plaintiffs' only argument appears to be that because Mr. Horowitz never received any confidential information and therefore could not have passed it on to Magnotti, there is no basis to disqualify Magnotti. As noted above, Mr. Horowitz denies that he has ever

received any confidential information from the Bonellas. (*See* Horowitz Decl. ¶ 29). However, the entire premise underlying the 2007 conflict waiver indicates that both sides considered the potential for acquiring privileged information and entered into an agreement designed to prevent Horowitz from using any such information in an adversarial proceeding between his two clients. Even if the Court were to accept as true the exceedingly unlikely scenario that no privileged information was exchanged, the appearance of impropriety remains overwhelming. Mr, Horowitz willfully violated his agreement in the conflict waiver not to represent one party in litigation against the other. To make matters worse, he and Mr. Magnotti failed to disclose Mr. Horowitz's involvement in the case until months into the litigation. It was not until June 2010 that Mr. Magnotti disclosed to the Court and to his adversaries that Mr. Horowitz had been participating in this case in contravention of the conflict waiver. It would not be unreasonable to infer from the circumstances that Mr. Horowitz and/or Mr. Magnotti sought to avoid disclosing Mr. Horowitz's involvement until disclosure was unavoidable. [FN10]

> FN10. On June 28, 2010, three weeks after Mr. Magnotti disclosed the fact that Mr. Horowitz was assisting him in this matter, defendants filed a letter to Judge Matsumoto informing her of their intention to file a motion to disqualify Mr. Magnotti as counsel and direct Mr. Horowitz to cease his involvement in this case.

Given the possibility that defendants' confidential information has been shared by Mr. Horowitz with Mr. Magnotti, as well as the overwhelming appearance of impropriety, the Court finds that Mr. Magnotti should also be disqualified from representing plaintiffs in this matter. While the consequences may appear harsh under the circumstances, had plaintiff informed defendants of their intention to consult Mr. Horowitz at an earlier stage of the litigation, these problems may have been avoided.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 683963 (E.D.N.Y.)
**(Cite as: 2011 WL 683963 (E.D.N.Y.))**

### *CONCLUSION*

Based on the foregoing, the Court concludes that Mr. Horowitz has a conflict of interest that disqualifies him from representing plaintiffs in this case and grants defendants' motion. The Court also grants defendants' motion to disqualify Mr. Magnotti. Plaintiffs are given 30 days to obtain new counsel. A status conference with this Court is scheduled for March 19, 2010 at 10:00 a.m.

**SO ORDERED.**

E.D.N.Y.,2011.
Gerffert Co., Inc. v. Dean
Not Reported in F.Supp.2d, 2011 WL 683963 (E.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.