UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SHANSHAN SHAO, HONGLIANG CHU, QIAN LIU, SONG LU, AND XINSHAN KANG, Plaintiffs,<br><br>v.<br><br>BETA PHARMA, INC., AND DON ZHANG, Defendants. | Civil Action No. 3:14CV01177 (CSH)<br><br><br>NOVEMBER 18, 2014 |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION TO DISQUALIFY OPPOSING COUNSEL**

Defendants' motion to disqualify attorney Jonathan Katz from representing plaintiffs Shanshan Shao, Hongliang Chu, Qian Liu, Song Lu and Xinshan Kang in this action lacks merit and should be denied.  In their motion, defendants allege that Katz's representation violates Rule of Professional Conduct 1.9 because of his consultation with Attorney Lance Liu, whom defendants maintain acted as general counsel to defendant Beta Pharma, Inc. ("Beta Pharma") from July 2011 to November/December 2012.  Defendants contend that Liu's prior representation of Beta Pharma has given him access to confidential information that he may use in this matter to the detriment of Beta Pharma, his former client.  In turn, defendants contend that because Liu is "jointly representing" the plaintiffs with Katz, and because Katz has consulted with Liu, Katz has been "infected" by Liu's alleged conduct and thus must be disqualified from representing plaintiffs in this action.

However, under the precedents established by the United States Court of Appeals for the Second Circuit and the United States District Court for the District of Connecticut,

defendants have failed to demonstrate that Lance Liu's prior representation of defendant Beta Pharma was substantially related to the current representation of the Shao plaintiffs. Further, defendants have not demonstrated that Liu had access to relevant privileged information in the course of any prior representation of Beta Pharma. Nor have defendants offered evidence that Katz received confidential or privileged information from Liu relevant to the claims made by the Shao plaintiffs.   Finally, defendants have made no showing that the balancing of interests required by the Second Circuit mandates disqualification. Rather, the balancing of the relevant, competing interests weighs in favor of denying defendants' motion to disqualify Katz.

## I.  <u>FACTUAL BACKGROUND</u>

Defendant Beta Pharma is a privately owned corporation engaged in research, development and marketing of pharmaceuticals. At the time of the stock transactions at issue in this case, defendant Don Zhang ("Zhang") was the majority stockholder and President of Beta Pharma. (Complaint at ¶¶1 – 3). In approximately 2002 and 2003, Beta Pharma scientists invented, patented and synthesized "Icotinib," a molecule that showed promise as a treatment for non-small cell lung cancer, and in 2002 Beta Pharma formed Zhejiang Beta Pharma Co. Ltd. ("Zhejiang Beta Pharma"), a privately owned corporation organized under the laws of the Peoples Republic of China.   Zhejiang Beta Pharma was a joint venture to which Beta Pharma contributed the patent rights to Icotinib, and received, in return, a 45% interest in  Zhejiang Beta Pharma. At all relevant times, defendant Zhang was Vice-President of Zhejiang Beta Pharma and one of its directors.   (Complaint at ¶¶4 – 8).  Zhejiang Beta Pharma has successfully developed Icotinib as a safe and effective

treatment for non-small cell lung cancer, and now markets that compound in China as a prescription drug under the brand name "Conmana."

The chronology in the <u>Shao</u> case demonstrates that the plaintiffs purchased their shares before Attorney Lance Liu became involved with Beta Pharma, and that Beta Pharma's offer to repurchase their shares at a price reduced by Beta Pharma's own taxes occurred many months after Liu left the company. The timeline, discussed in detail below, may be summarized as follows:

February 15, 2010—Hongliang Chu purchases shares of Zhejiang Beta Pharma from Beta Pharma and Don Zhang. He is the first plaintiff to purchase.

March 15, 2011—Qian Liu purchases shares of Zhejiang Beta Pharma from Beta Pharma and Don Zhang. He is the last plaintiff to purchase.

July, 2011—Attorney Lance Liu first begins to work for Beta Pharma; his legal work for Beta Pharma begins either in July, 2011 (according to Zhang) or December, 2011 (according to Liu).

November, 2012—Attorney Lance Liu stops performing legal work for Beta Pharma (although Zhang states Liu continued to be involved in Beta Pharma legal issues for another month, till December, 2012)

July 21, 2013—Don Zhang emails plaintiffs that " . . . .we have partially closed the deal on sale of our shares . . . ." of Zhejiang Beta Pharma at a valuation of $600 million for the entire company.

November 13-18, 2013—Jirong Peng, Vice President of Beta Pharma, sends "Agreement of Beta Pharma Payment Calculation" spreadsheets to plaintiffs, showing an initial sale price of $6 million for 1% of Zhejiang Beta Pharma, and then deducting from their

proposed payment 10% for "China taxes", 35% for Beta Pharma corporate taxes, and "10% bonus shares to ZJBP employees," effectively cutting the payouts in half. Copies of the documents sent to plaintiff Qian Liu are attached to the Affidavit of Jonathan Katz, submitted herewith as Exhibit B.

November 18, 2013—Qian Liu rejects proposal, warns of possibility of legal action.

More particularly, plaintiffs in this matter, Shanshan Shao, Hongliang Chu, Qian Liu, Song Lu and Xinshan Kang, purchased shares of Zhejiang Beta Pharma, which represented percentage interests in that company.   Defendant Beta Pharma, acting through defendant Zhang – who was also Vice President of Zhejiang Beta Pharma – sold these ownership interests to plaintiffs in 2010 and early 2011.  (Complaint at ¶¶4 – 8).

Specifically:

(a)     On February 15, 2010, plaintiff Hongliang Chu purchased 45,310 shares, or 0.1% of all stock in Zhejiang Beta Pharma;

(b)     On March 11, 2011 Shanshan Shao purchased 22,655 shares, or 0.05% of all stock in Zhejiang Beta Pharma;

(c)     On April 7, 2010 and November of 2010, Song Lu purchased 105,620 shares, or 0.2331% of all stock in Zhejiang Beta Pharma;

(d)     On March 15, 2011, Qian Liu purchased100,000 shares, or 0.2207% of all stock in Zhejiang Beta Pharma;

(e)     On August 16, 2010, Xinshan Kang purchased 90,000 shares, or 0.2% of all stock in Zhejiang Beta Pharma.

(Complaint at ¶9); (Affidavit of Jonathan Katz at ¶3) (Exhibit B).  These stock sales were evidenced by written agreements executed by Defendant Zhang on behalf of Beta Pharma.

Those agreements provided that Beta Pharma would hold plaintiffs' shares in Beta Pharma's name until defendants could cause the shares to be registered in the specific purchaser's name on the books of Zhejiang Beta Pharma.  However, defendants failed to cause plaintiffs' shares to be registered on the books of Zhejiang Beta Pharma.  (Complaint at ¶¶10 – 12).

In July of 2013 defendant Zhang represented to plaintiffs that Zhejiang Beta Pharma had been valued at $600 million.  (Complaint at ¶¶13 – 14).[1]

In July of 2013, nearly one year after Liu departed Beta Pharma, defendant Zhang, acting on Beta Pharma's behalf, represented to plaintiffs that he would cause Beta Pharma to repurchase plaintiffs' shares of Zhejiang Beta Pharma.  Zhang communicated that this offer was based on the $600 million valuation price, and that plaintiffs would receive payment in proportion to their percentages of share ownership, such that a plaintiff who held 0.1% of Zhejiang Beta Pharma would receive $600,000.  (Complaint at ¶16).

In connection with the offers to repurchase the Zhejiang Beta Pharma shares purchased by plaintiffs, Zhang, both individually and acting on behalf of Beta Pharma, made certain negligent and/or false representations to plaintiff.  In particular, Zhang represented that plaintiffs would be required to pay Beta Pharma's corporate tax burden in both China and the United States, significantly reducing the proceeds received by plaintiffs for the repurchase.  Further, Zhang told plaintiffs that their repurchase proceeds would be further reduced by 10% to account for a stock purchase program for Zhejiang Beta Pharma employees.  In short, Zhang, individually and on behalf of Beta Pharma, misrepresented to

---

[1] Zhejiang Beta Pharma is now in the process of making an initial public offering of its shares in China, and becoming a public company in China.  (Complaint at ¶14).

plaintiffs that they were required to accept approximately half of the promised value in exchange for their shares.  See Complaint, inter alia, Third Count at ¶¶17 - 18.

Plaintiffs accepted defendants' offers to repurchase their shares of Zhejiang Beta Pharma based upon receipt of the full price agreed for their shares.  Although defendants have made partial payments to some plaintiffs, they have failed and refused to pay balances due to plaintiffs.  (Complaint at ¶¶17 – 18).  Further, defendants have never caused plaintiffs to be registered as stockholders on the books of Zhejiang Beta Pharma.  (Complaint, Second Count at ¶¶21).

Attorney Lance Liu performed legal work for defendant Beta Pharma from approximately late 2011 to November of 2012.  (Affidavit of Lance Liu at ¶¶ 4 – 7; 12; 16) (Exhibit A).[2]  There is dispute between Liu and Beta Pharma about when Liu commenced performing legal work for Beta Pharma.  Liu avers that his legal work for defendants began in December of 2011 and concluded on November 3, 2012.  (Affidavit of Lance Liu at ¶¶12; 16).  For its part, Beta Pharma contends that Liu performed legal work beginning in July of 2011 and, although it admits that Liu terminated his representation in November of 2012, Beta Pharma contends that Liu continued to be involved in defendants' legal issues through December of 2012.  (Affidavit of Don Zhang at ¶10) (Exhibit A to defendants' motion).

Liu's relationship with Beta Pharma and defendant Zhang did not begin as legal representation.  Rather, in July of 2011 Liu began discussions with Beta Pharma about collaborating on developing generic drugs as a consultant or business partner.  (Affidavit of Lance Liu at ¶¶ 4 – 6).  In connection with that collaboration, Liu and Beta Pharma entered

---

[2] Defendant Beta Pharma brought an action against Liu in the Superior Court of New Jersey Chancery Division, Mercer County.  The action, Docket No. C-46-14, sought the return of certain documents and files that Beta Pharma alleged were in Liu's possession.  Attorney Liu filed his affidavit in support of his opposition to Beta Pharma's motion for preliminary injunction in that case.

into a "Mutual Non-disclosure and Non-use Agreement," dated July 26, 2011.  A plain reading of this document demonstrates that its clear purpose is to facilitate the transfer of technology and scientific development information between the parties.  It does not address the provision of legal services.  (Exhibit A-1 to defendants' motion).

Although Liu and Beta Pharma had drafted a collaboration agreement to develop generic drug products by August of 2011, Beta Pharma then proposed to Liu that he "handle certain legal issues with payment deferred because of Beta Pharma's liquidity issues." (Affidavit of Lance Liu at ¶¶ 6 – 7).  Liu averred that, "[i]nitially I declined because my main interest with Beta Pharma was getting into generic drug business and I did not want to complicate the relationship."  (Id. at ¶7).  However, Liu agreed to perform legal work for Beta Pharma after defendant Zhang advised him that "the liquidity at Beta Pharma was only temporary and that I could help Beta Pharma to improve its liquidity problem by taking on some legal work on a deferred payment basis."  (Id. at ¶8).  To that end, Liu attested that "[b]etween December, 2011 and November 3, 2012, I performed legal work for Beta Pharma relating to patent applications, leasing, employee relations, and corporate issues."  (Id. at ¶12).

Defendant Zhang asserts that Liu had access to broad categories of Beta Pharma corporate information such as "research projects, business contracts, investor information, financial information, tax filings and related information, employee information and settlements, and proposed stock valuations," as well as intellectual property issues, corporate issues, employment issues, stock sale issues, tax issues, and real estate issues. (Id. at ¶17).  With regard to stock issues in particular, Zhang avers that, during his mid-2011 to November/December 2012 representation of Beta Pharma, Liu provided defendants with

legal advice regarding Beta Pharma's stock transactions concerning Zhejiang Beta Pharma, including the tax consequences of the transactions, as well as prospective repurchase of Zhejiang Beta Pharma stock from prior purchasers. (Id. at ¶19). Further, Zhang maintains that in September 2012, Liu attended a Zhejiang Beta Pharma board meeting in China at which stock transactions were discussed, as well as Zhejiang Beta Pharma's intended initial public offering. (Id. at ¶¶20 - 23).[3]

Liu has not participated with Katz in representing the investor-plaintiffs, nor has Liu had any responsibility for the conduct of the litigation. (Affidavit of Jonathan Katz at ¶19). Further, other than the materials he transmitted for the investors, Liu has given Katz no documents in connection with representing the investors. (Id. at ¶20). Nor did Liu ever provide Katz with any confidential, privileged or non-public information concerning Beta Pharma, including, but not limited to, information regarding Beta Pharma's dealings with Zhejiang Beta Pharma stock. (Id.)

Katz currently represents plaintiff Guojian Xie, Ph.D. in a lawsuit pending in the Connecticut Superior Court alleging breach of contract and other claims against Beta Pharma and Zhang. (Id. at ¶5). Dr. Xie's case against Beta Pharma and Zhang was initiated in Connecticut Superior Court by Attorney Thomas Flanagan in late December 2012, and was pending for nearly one year prior to the time Katz' firm, Jacobs & Dow, LLC, entered an appearance on Dr. Xie's behalf on November 25, 2013. Attorney Donald Altschuler represented defendants. (Id. at ¶6). Katz and Liu met when Dr. Xie brought Liu to a meeting on October 30, 2013. At that time, Dr. Xie informed Katz that Liu was helping him with some personal matters. (Id. at ¶7). By the time of this October 30, 2013 meeting,

---

[3] This took place two years after plaintiffs purchased their shares of Zhejiang Beta Pharma from defendants in 2010, and one year before defendants approached plaintiffs about repurchasing those shares in July of 2013.

Katz had become aware that Dr. Xie already had a pending case against Beta Pharma and Zhang, and that Attorney Altschuler represented defendants Beta Pharma and Zhang. (Id. at ¶8).

In connection with his representation of Dr. Xie, through non-privileged sources, Katz became aware that Beta Pharma, through defendant Zhang, had sold stock in Zhejiang Beta Pharma. (Id. at ¶9). In March of 2014, Liu brought to Katz' attention that some investors were interested in bringing lawsuits against Beta Pharma and Zhang in connection with those stock transactions. (Affidavit of Jonathan Katz at ¶10). Liu then informed Katz that he would communicate with those investors about whether any were interested in retaining Jacobs & Dow, LLC to bring suit against Beta Pharma and Don Zhang. (Id. at ¶11). Liu acted as contact between Katz and the stockholders, including Song Lu and Xinshan Kang, who live in China. In particular, in view of his facility with the Chinese language, Liu transmitted representation agreement to the stockholders, and transmitted the completed representation agreements back to Jacobs & Dow.[4] Liu also transmitted the investors' stock purchase agreements to Katz for review, as well as certain e-mails between the investors and Don Zhang discussing Beta Pharma's repurchase of their shares. (Id. at ¶12).

None of these documents were Beta Pharma internal documents. None were marked confidential, and none are attorney-client privileged between Beta Pharma and its lawyers. (Id.). Further, after receiving these initial documents, Katz has dealt directly with all of the investors that he represents, and Liu's role as contact has ceased. (Id.).

---

[4] Jacobs & Dow agreed with Liu that he would be entitled to a forwarding fee of 25% of the contingent fee, which constituted a referral fee. (Id. at ¶14).

The above referenced investors' e-mail communications with Don Zhang establish that the investors warned Zhang that they were contemplating legal action against him and Beta Pharma as early as November of 2013. (Id. at ¶13).  This is factually contrary to defendants' assertion in Exhibit E to their motion to disqualify which contends that Liu actively solicited plaintiffs to join this action.  In fact, defendants submit the affidavit of stock purchaser Wei Yuan dated September 12, 2014 in support of their claim that Liu had contacted Yuan to solicit him to join this lawsuit.  When defendants deposed Yuan on October 29, 2014, Yuan unequivocally recanted the contents of this affidavit, testifying that he did not understand the questions he was being asked or the purpose of the affidavit, and that he gave the affidavit absent a later recollection of his January, 2014 e-mail exchange in which he had already expressed interest in bringing suit against defendants and in finding an attorney to do so.  Yuan testified at pages 52 and 53 of his transcript that by the time Lance Liu called him, he had already agreed to join the investor lawsuit against Beta Pharma.  (Yuan Deposition at 27-28; 32; 34; 45- 49; 52-53;67-68) (Exhibit C).

In connection with Dr. Xie's case in Connecticut Superior Court, in December of 2012, Katz served an interrogatory on Beta Pharma asking them to identify their lawyers to discover the identity of the attorneys who had prepared and managed Beta Pharma's stock option plan.  Beta Pharma did not respond to that interrogatory until six months later, on June 23, 2014.  Their response identified Lance Liu as having been their general counsel. (Affidavit of Katz at ¶15).  June 23, 2014 was the first time that Katz became aware that Lance Liu had served as Beta Pharma's general counsel.  (Id. at ¶16).

After learning that Beta Pharma claimed that Liu had served as its general counsel, Katz and Liu terminated the forwarding fee arrangement, and notified the investors.  Liu no longer has any financial interest in the investor cases.  (Id. at ¶¶17 - 18).

## II.   LEGAL STANDARD FOR MOTIONS TO DISQUALIFY OPPOSING COUNSEL

This Court recently considered the standard of proof necessary to disqualify an attorney from representing a party.  In Ardemasov v. Citibank, No. 3:12cv1570, 2014 WL 1614165 (D.Conn. April 23, 2014) (Haight, J.), the Court noted that a district court has "substantial latitude" to require disqualification.  Id. at *5 (citing United States v. Zichettello, 208 F.3d 72, 104 (2d Cir. 2000)).  In considering whether disqualification is necessary, courts balance a client's right to freely choose counsel with the need to preserve the highest standards of the profession.  Id.[5] The focus of the disqualification inquiry is whether the attorney's conduct would tend to "taint" the underlying trial.  Id. (citation omitted).

As the Court recognized in Ardemasov, the party moving for disqualification bears "'the heavy burden of proving facts required for disqualification.'"  Id. (quoting Evans v. Artek Sys.Corp., 715 F.2d 788, 794 (1983)).  Further, "[i]n general, the Second Circuit 'disfavors motions to disqualify because of the potentially adverse effect on a client's right to engage counsel of his or her choosing, and because such motions are often made for tactical reasons.'"  Id. (quoting Rodriguez, 214 F.R.D. at 68).  See also Board of Education of City of New York v. Nyquist, 590 F.2d 1241, 1246 (2d Cir. 1979) (acknowledging that the Second Circuit's reluctance to disqualify attorneys "probably derives from the fact that

---

[5] See Rodriguez v. City of New Haven, 214 F.R.D. 66, 68 (D.Conn. 2003) ("'There is a particularly trenchant reason for requiring a high standard of proof on the part of one who seeks to disqualify his former counsel, for in disqualification matters we must be solicitous of a client's right freely to choose his counsel, a right which must be balanced against a need to maintain the highest standards of the profession.") (quoting Evans v. Artek Systems Corp., 715 F.2d 788, 791 (2d Cir. 1983)).

disqualification has an immediate adverse effect on the client by separating him from counsel of his choice, and that disqualification motions are often interposed for tactical reasons. . . And even when made in the best of faith, such motions inevitably cause delay.") (citation omitted).

Disqualification of a party's chosen counsel is viewed as a "drastic measure." Ardemasov, 2014 WL 1614165 at * 5 (citing First Interregional Advisors Corp. v. Wolff, 956 F.Supp. 480, 489 (S.D.N.Y. 1997)).  Accordingly, and because motions to disqualify are generally disfavored in this Circuit, such motions are subject to "fairly strict scrutiny."  Id. at *5 n. 8 (citing Lamborn v. Dittmer, 873 F.2d 522, 531 (2d Cir. 1989)).  See Ardemasov, 2014 WL 1614165 at *12 ("The Court recognizes that '[i]n view of their potential for abuse as a tactical device, motions to disqualify opposing counsel are subject to particularly strict scrutiny.'").  See also Norris v. City of New Haven, No. 3:04cv543, 2006 WL 2567866 (D.Conn. Sept. 5, 2006) (Kravitz, J.) (noting that "[b]ecause of a concern that such motions may be used for tactical reasons, and in order to safeguard the interests of clients in selecting the lawyers of their choice, the Second Circuit has emphasized that a party moving for disqualification carries a heavy burden, and for this reason, courts should approach motions to disqualify with caution.").

III.   **ARGUMENT**

A.   **Defendants have failed to sustain the heavy burden of demonstrating that the subject matter of Liu's prior representation of Beta Pharma is substantially related to the issues in the present lawsuit.**

Defendants claim that Katz must be disqualified because he has been "infected" by the conduct of Lance Liu since Liu has "switched sides" in this litigation and is now in a position to use confidential information obtained during his representation of Beta Pharma to

that party's disadvantage in this litigation.  In support of their claim, defendants cite

Goldenberg v. Corporate Air, Inc., 189 Conn. 504, 512-13 (1983) for the proposition that

disqualifying conduct on the part of one attorney is sufficient to disqualify another attorney

who, at a minimum, consults with that attorney.

      In particular, defendants claim that Liu substantively consulted with Katz regarding

the Shao plaintiffs and this litigation, and that this consultation violates Rule 1.9 of the Rules

of Professional Conduct of the State of Connecticut which prohibits conflicts of interest

relating to representation of a client whose interests may be adverse to those of a prior

client.[6]  Defendants claim that because Liu's position as Beta Pharma's general counsel

from July 2011 to December 2012 allowed him to receive confidential information about

Beta Pharma and about its stock transactions, he is disqualified from representing these

plaintiffs and that this disqualification must be imputed to Katz as plaintiffs' counsel in this

case.

---

[6] Rule 1.9 provides:  (a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.
(b) A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client
(1) whose interests are materially adverse to that person; and
(2) about whom the lawyer had acquired information protected by Rules 1.6 and 1.9 (c) that is material to the matter; unless the former client gives informed consent, confirmed in writing.
(c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:
(1) use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known; or
(2) reveal information relating to the representation except as these Rules would permit or require with respect to a client.

Thus, it is clear that, in order for Katz to be disqualified, defendants must shoulder the heavy burden of proving facts showing that Liu's actions require disqualification given that defendants are relying on Liu's conduct to have "infected" Katz.  Specifically, defendants contend that Liu's actions violate Rule 1.9, <u>supra</u>, which addresses successive representation.  The Second Circuit has reasoned that "[a]lthough our decisions on disqualification motions often benefit from guidance offered by the American Bar Association (ABA) and state disciplinary rules . . . such rules merely provide general guidance and not every violation of a disciplinary rule will necessarily lead to disqualification. . . ."  <u>Hempstead Video, Inc. v. Village of Valley Stream</u>, 409 F.3d 127, 132 (2d Cir. 2005) (internal quotations and citations omitted).[7]  Rather, disqualification is warranted only where an attorney's conduct would tend to "taint" the underlying trial.  <u>Board of Education of City of New York v. Nyquist</u>, 590 F.2d 1241, 1246 (2d Cir. 1979).  "One recognized form of taint arises when an attorney places himself in a position where he could use a client's privileged information against that client."  <u>Hempstead Video</u>, 409 F.3d at 133.

Where a party alleges that opposing counsel previously represented that party, i.e. "successive representation," an attorney may be disqualified if:

(1) the moving party is a former client of the adverse party's counsel;

---

[7] Rule 83.2(a) of the Local Rules of the District of Connecticut provides that: "[o]ther than the specific Rules enumerated in Rule 83.2(a)(2) of these Local Rules, this Court recognizes the authority of the 'Rules of Professional Conduct,' as approved by the Judges of the Connecticut Superior Court as expressing the standards of professional conduct expected of lawyers practicing in the District of Connecticut.  Any changes made by the Judges of the Connecticut Superior Court to the Rules of Professional Conduct shall not be binding in the District of Connecticut, unless such changes are expressly adopted by order to the District Judges.  The Clerk shall report to the Judges any such changes.  The interpretation of said Rules of Professional Responsibility by any authority other than the United States Supreme Court, the United States Court of Appeals for the Second Circuit and the United States District Court for the District of Connecticut shall not be binding on disciplinary proceedings initiated in the United States District Court for the District of Connecticut.

(2) there is a substantial relationship between the subject matter of the counsel's
prior representation of the moving party and the issues in the present lawsuit; and

(3) the attorney whose disqualification is sought had access to, or was likely to have
had access to, relevant privileged information in the course of his prior
representation of the client.

Id. (citing Evans v. Artek Sys.Corp., 715 F.2d 788, 794 (1983)).  See Vincent v. Essent

Healthcare of Connecticut, 465 F.Supp.2d 142, 145 (D.Conn. 2006) (Arterton, J.)

(recognizing that "[p]rofessional rules of conduct do not bind this Court's broad discretion in

deciding motions to disqualify.").

There is no factual dispute that Liu represented Beta Pharma as its general counsel,

although the exact dates are disputed.  However, the developed factual record shows that

defendants have not met their substantial burden of demonstrating that the subject matter of

Liu's prior representation of Beta Pharma is substantially related to the issues in present

litigation under the precedents of the Second Circuit and this District.

"The key inquiry is whether the present and former matters are 'substantially

related.'"  Norris v. City of New Haven, No. 3:04cv543, 2006 WL 2567866 at *1 (D.Conn.

Sept. 5, 2006) (Kravitz, J.) (quoting Government of India v. Cook Industries, Inc., 569 F.2d

737, 739 (2d Cir. 1978)).  Thus:

However, despite the seeming breadth of that phrase, the Rule's substantial
relationship test 'has been honed in its practical application to grant disqualification
only upon a showing that the relationship between the issues in the prior and present
cases is 'patently clear' or where the issues are 'identical' or 'essentially the same.'

Id. (quoting Bergeron v. Mackler, 225 Conn. 391, 399 (1993) (citing Government of India,

569 F.2d at 739; Rodriguez v. New Haven, 214 F.R.D. 66, 68 (2003); InterAct Sys., Inc. v.

Catalina Marketing Corp., Nos. 3:96cv274 (AWT), 3:98cv422 (AWT), 1999 WL 545533, at *

1383 (D.Conn. Mar. 29, 1999); Colorpix Sys. of Am. v. Broan Mfg. Co., 131 F.Supp.2d 331,

338 (D.Conn.2001)).   "Applying the substantial relationship element of the Evans test

requires a painstaking factual analysis." Leslie Dick Worldwide, Ltd. v. Soros,

No.08Civ7900, 2009 WL 2190207 (S.D.N.Y. July 22, 2009) (internal quotation marks and

citation omitted).

The precise factual analysis required by Evans demonstrates that defendants cannot

sustain their burden of proving that the substance of Liu's prior representation of Beta

Pharma and the stock sales/repurchase agreements at issue in this litigation are "identical"

or "essentially the same."  In support of their position, defendants claim that, during the

representation, Liu received unfettered access to Beta Pharma's corporate information,

including a variety of subjects such as proprietary research projects, business contracts,

investor information, tax filings, financial information, etc.  However, as the Commentary to

Rule 1.9 makes clear in the case of organizational clients, general knowledge of the client's

policies and practices ordinarily will not preclude a subsequent representation.

In Vincent v. Essent Healthcare of Connecticut, 465 F.Supp.2d 142, 145 (D.Conn.

2006), the defendant medical practices in a birth trauma obstetric malpractice case moved

to disqualify the plaintiffs' law firm because of its partner's former employment with a

medical malpractice defense firm that had previously represented the defendant obstetric

group PWH.  In particular, defendants adduced facts showing that the attorney previously

worked on PWH matters while at his prior firm, including birth trauma issues.  Defendant

also averred that the attorney participated in both "formal and informal discussions" about

matters relating to PWH, including the "concerns and strategies of PWH in defending

malpractice matters." Id. at 144.

Indeed, defendants offered the affidavit of the attorney's former law partner stating that the attorney had attended a "claims review meeting" with officers and agents of PWH where each of the claims pending against PWH being handled by the law firm was discussed, including potential strategies.  Id.  Nevertheless, the court concluded that the attorney's prior representation of PWH at his former firm was not substantially related to the matter at bar, rejecting defendants' argument that disqualification was warranted because the attorney had worked on PWH cases, and obtained information about its litigation plans and strategy during the course of his representation.  The court concluded that "[t]he record has revealed no 'patently clear' relationship between [the attorney's] prior representation in obstetrical malpractice cases at [his former firm] and [the attorney's current firm's] representation of the plaintiffs."  Id. at 147.

As Rule of Professional Conduct 1.9 and the court's decision in Vincent instruct, Liu's possession of Beta Pharma's confidential corporate information, including its general corporate strategies is insufficient to establish defendant's burden of demonstrating that Liu's prior representation of Beta Pharma is substantially related to the issues in this case.

Defendants' also contend that, from July 2011 to December 2012, Liu provided legal advice to Beta Pharma with regard to stock issues in particular.  Defendant Zhang maintains that Liu advised Beta Pharma in connection with its stock transactions regarding Zhejiang Beta Pharma, including the tax consequences of the transactions, and prospective repurchase of  Zhejiang Beta Pharma stock from prior purchasers.  (Id. at ¶19).  Further, Zhang maintains that in September 2012, Liu attended a Zhejiang Beta Pharma board meeting in China at which stock transactions were discussed, as well as Zhejiang Beta Pharma's intended initial public offering.  (Id. at ¶¶20 - 23).

As the Second Circuit has noted, the term "substantial relationship" is not used broadly in attorney disqualification matters.  Rather, the requirement of a substantial relationship has been factually honed to a showing that the relationship between the issues in the prior and present cases is patently clear, or that the issues are identical or essentially the same.  Defendants have not made such a showing on this record.

Even with reference to Liu's involvement in corporate stock issues, including those regarding Zhejiang Beta Pharma, it is not at all "patently clear" on this record that the stock issues to which Liu was privy are essentially the same as those at issue in plaintiff's complaint.  Even considering Beta Pharma's version of Liu's tenure of service as its general counsel – July of 2011 to December of 2012 – Liu was not counsel for Beta Pharma in 2010 and early 2011, at the time when the plaintiff's in this case purchased their Zhejiang Beta Pharma stock through Beta Pharma and its president Don Zhang.  Furthermore, Liu's tenure as Beta Pharma general counsel ended, by its own estimation, in December of 2012 – a long time before defendants approached plaintiffs about repurchasing those shares in July of 2013.  The record is clear that Liu did not approach plaintiffs on Beta Pharma's behalf concerning the repurchase of stock, nor did Liu participate in any repurchase negotiations with plaintiffs on behalf of Beta Pharma.[8]

Courts in this District have declined to disqualify an attorney even where that attorney had represented his former client for many years in areas of overlapping subject matter.  In Norris v. City of New Haven, No. 3:04cv543, 2006 WL 2567866 (D.Conn. Sept. 5, 2006) (Kravitz, J.), the court considered whether Attorney Echter, a former Deputy Corporation

---

[8] Although Zhang states in his affidavit that Liu advised Beta Pharma about "subsequent agreements entered into with Buyers to repurchase ZJBP stock," (Affidavit of Don Zhang at ¶19), Zhang also claims in his affidavit that Liu's legal relationship with Beta Pharma terminated in December of 2012, long before such agreements were negotiated with plaintiffs.

Counsel for the defendant City, should be disqualified from representing the plaintiff in her

employment claim against the City, which alleged that the City failed to comply with its Civil

Service Rules & Regulations, the City's Charter and the Constitution.  The court concluded

that disqualification was not warranted because, after a careful comparison of the

similarities between the issues in the former and present representation, the defendant City

failed to demonstrate that the representations were substantially related.  In particular,

although Attorney Echter defended litigation claiming that the City's promotional practices

violated the City's Charter and Constitution – the same claim made against the City by the

plaintiff he was currently representing – the court found that the issues were not sufficiently

identical, nor essentially the same.

In the earlier case of <u>Rodriguez v. New Haven</u>, 214 F.R.D. 66, 68 (2003) (Underhill,

J.), the court denied the plaintiff's motion to disqualify Attorney Echter.  In <u>Rodriguez</u>, the

plaintiff, Coppola, was a New Haven police detective who alleged that he had been

wrongfully investigated and disciplined by defendants.  He moved to disqualify Echter, who

was representing the City defendants on behalf of the Corporate Counsel's office, because

Echter had previously represented Coppola in a lawsuit filed against him and other City

officers alleging that he filed false police reports.  Judge Underhill concluded that the

representations were not substantially related, and that any information related by Coppola

to Echter in defense of the false report case would not be relevant to the alleged improper

discipline of Coppola – the issue in the current litigation.  <u>Id.</u> at 69.[9]

_____

[9] Coppola asserted that he and Echter drove to court together and discussed the earlier case, claiming that Echter thereby learned confidential information about Coppola that could be used to cross-examine Coppola in the current case.  Echter denied any present knowledge of any such confidential information, and Coppola rejected the court's offer to make an in camera showing in support of that claim.  <u>Id.</u> at 69 n. 2.

Norris and Rodriguez stand for the proposition that even where an attorney was deeply involved in the affairs of a prior client, including on subject matters that overlap with the litigation in which disqualification is sought, it does not necessarily follow that the two representations are substantially related as contemplated by Second Circuit precedent.  As demonstrated in plaintiffs' complaint in this case, the subject matter of plaintiffs' claims involve: (1) the sale of Zhejiang Beta Pharma stock taking place in 2010 and early 2011 – prior to Liu's representation of Beta Pharma, and (2) Beta Pharma's negotiations and agreements to repurchase that stock in late 2013 – nearly one year after Liu ceased any representation of Beta Pharma.

In short, the issues in the instant litigation are outside the period of Liu's service as Beta Pharma's general counsel.  In fact, at the time Liu represented Beta Pharma, this litigation was not pending at all, unlike in the cases on which defendant relies.  See Goldenberg v. Corporate Air, Inc. 189 Conn. 504 (1983) (successive representation involved the same ongoing litigation); MMR/Wallace Power & Industrial, Inc. v. Thames Associates, 764 F.Supp. 712 (D.Conn. 1991) (Burns, J.) (successive representation involved same ongoing litigation).  Thus, these cases are distinguishable on this factual record.[10]

Even where Liu may have been privy to issues involving Beta Pharma and Zhejiang Beta Pharma stock generally, disqualification is not mandated.  In American International Group, Inc. v. Bank of America Corp., 827 F.Supp.2d 341, 347 (S.D.N.Y. 2011), the court denied disqualification of the plaintiff's firm where one of its attorneys previously represented the defendants in the same litigation at another law firm, and did a small

---

[10] Defendants also cite Geffert Co., Inc. v. Dean, No. 09cv266, 2011 WL 683963 (E.D.N.Y. Feb. 16, 2011), however the district court disqualified the attorney in Geffert Co. because of a conflict of interest arising from concurrency of representation.

amount of work on the case.  The court held that this work presented no substantial risk of tainting the trial, stating: "[t]he Court declines to create a per se rule that any amount of work on a case requires disqualification."  Id. (citing Hempstead Video, Inc. v. Incorporated Village of Valley Stream, 409 F.3d 127 (2005)).

Thus, as in American International Group, Inc., supra, that Liu may have had involvement, on some level, in Beta Pharma stock issues does not, by itself, require qualification.  By defendants' own admission that Liu's representation was limited to the period of July 2011 through December 2012, Liu was not involved in plaintiffs' stock purchases plead in the complaint, nor was he involved in the later, 2013 negotiation and agreements to repurchase that stock as alleged in the complaint.  The substantial relationship inquiry "requires a careful comparison of the similarities between the issues raised in the former and present representation."  Id. (citing Prisco v. Westgate Entertainment, Inc., 799 F.Supp. 266, 270 (D.Conn.1992)).  This precise factual analysis discloses that defendants cannot sustain their heavy burden of proving that Liu's prior representation of Beta Pharma and the stock sales and repurchase negotiations and agreements at issue in this litigation are "identical" or "essentially the same."

**B.   Defendants have failed to meet their heavy burden of showing that Liu had access to privileged information relevant to this litigation during the course of his prior representation of Beta Pharma.**

Review of the facts concerning Liu's prior representation of Beta Pharma demonstrates that that representation was not substantially related to the instant litigation against Beta Pharma.  Defendants have made no showing that the issues Liu handled in the prior representation are identical or essentially the same as those involved in this case. Accordingly, under the Second Circuit's decision in Evans and its progeny, defendants have

failed to prove that plaintiffs' chosen counsel should be disqualified from representing them in this action.

Defendants' attempt to disqualify plaintiffs' counsel lacks merit for an additional reason: defendants have failed to show a likelihood that Liu's prior representation of Beta Pharma gave him access to privileged information that is relevant to the instant litigation brought by the Shao plaintiffs, nor can defendants make any such showing.

Specifically, should a court conclude that a substantial relationship exists between an attorney's former representation of a client and the litigation in which disqualification is sought, a presumption may arise that the attorney who participated in both likely had access to pertinent privileged information. Leslie Dick Worldwide, 2009 WL 2190207 at *12 (citing Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp., 518 F.2d 751, 754 (2d Cir. 1975)). In Silver Chrysler Plymouth, the Second Circuit stated, however, that this presumption may be rebutted. 518 F.2d at 754. Explaining that an attorney who previously worked on behalf of an opposing party could rebut the presumption of confidential information, the Court cautioned:

> It will not do to make the presumption of confidential information rebuttable and then to make the standard of proof for rebuttal unattainably high. This is particularly true where, as here, the attorney must prove a negative, which is always a difficult burden to meet.

Id. (quoting Laskey Brothers of West Virginia, Inc. v. Warner Brothers Pictures, 224 F.2d 824, 827 (2d Cir. 1955)). See also Miroglio, S.P.A. v. Morgan Fabrics Corp., 340 F.Supp.2d 510, 512 (S.D.N.Y. 2004) (presumption of access is rebuttable); Almonte v. City of Long Beach, No. cv044192, 2007 WL 951863 at *3 (E.D.N.Y. March 27, 2007) (same).

As the District Court explained in Leslie Dick Worldwide, 2009 WL 2190207 at *13, "[p]ursuant to the third Evans factor, attorneys may attempt to show that their work for the

party seeking disqualification did not put them in a position to access confidential material. The inquiry focuses on what role the lawyer played in the prior matter, and the nature of the attorney's relationship with the client." Accordingly, where an attorney can demonstrate that the level of involvement in a prior case was minimal, and that the attorney was not "heavily involved in the facts," a court may conclude that the attorney was not likely to have had access to confidential information. Id. (citing Silver Chrysler Plymouth, 518 F.2d at 756–57; Evans, 715 F.2d at 791). Importantly, the party seeking disqualification must demonstrate the likelihood that the attorney's role in the prior case gave him access to privileged information that is actually relevant to the current litigation. New York v. Monfort Trust, No. CV 12-3755, 2014 WL 5018607 (E.D.N.Y. Oct. 7, 2014) (citing Government of India v. Cook, 569 F.2d 737, 739 (2d Cir. 1978)).

Plaintiffs have adduced rebuttal facts on this record demonstrating that Liu's prior general counsel work for Beta Pharma was limited to the period of July 2011 through December 2012, and thus Liu was not involved in plaintiffs' stock purchases plead in the complaint, nor was he involved in the later, 2013 negotiation and agreements to repurchase that stock as alleged in the complaint. See Monfort Trust, supra, (denying disqualification where the court was "unconvinced" that the attorney at issue had access to relevant privileged information during the course of the prior representation since the attorney's prior representation did not involve the negotiation and sale of the property at issue in the later litigation, or the preparation of the agreements "at the heart" of the later action); Norris v. City of New Haven, No. 3:04cv543, 2006 WL 2567866 (D.Conn. Sept. 5, 2006) (Kravitz, J.)(denying disqualification after concluding that there was no substantial relationship between the attorney's former representation and the matter before the court, and finding

that "[n]or is the Court convinced that Mr. Echter is in possession of any confidential information from the City that bears on the specific issues in this case").

Additionally, Katz' affidavit explains that, other than the materials transmitted for the investors, Liu has given Katz no documents in connection with representing the investors. (Affidavit of Jonathan Katz at ¶20).  Nor did Liu ever provide Katz with any confidential, privileged or non-public information concerning Beta Pharma, including, but not limited to, information regarding Beta Pharma's dealings with Zhejiang Beta Pharma stock.  (Id.).[11]

Defendants' attempt to disqualify plaintiffs' counsel fails under the third prong of Evans because they have failed to meet their burden of proving that Liu's prior representation of Beta Pharma gave him access to privileged information that is relevant to the instant litigation brought by the Shao plaintiffs.

C.     **The balance of interests does not weigh in favor of disqualification.**

As Judge Arterton observed in Vincent v. Essent Healthcare of Connecticut, 465 F.Supp.2d 142, 145 (D.Conn. 2006), "[p]rofessional rules of conduct do not bind this Court's broad discretion in deciding motions to disqualify.  See Glueck, 653 F.2d at 748; Hempstead Video, 409 F.3d at 132.  The rules and their commentary provide guidance, but Second Circuit courts must also conduct a balancing of interests.  See Hull, 513 F.2d at 570."   The three competing interests at issue are:

---

[11] An affidavit given by an attorney who is the subject of a disqualification motion is competent evidence regarding whether confidences have been shared.  See American International  Group, Inc. v. Bank of America Corp., 827 F.Supp.2d 341, 346 (2011) ("Though Defendants argue that affidavits from potentially 'infected' attorneys are insufficient to rebut the presumption of shared confidences, there is no such categorical rule.  The authority on which Defendants rely for that proposition is questionable, as courts in this jurisdiction have since found that such affidavits are reliable proof that confidences have not been shared.") (citing cases).

(1) the client's interest in freely selecting counsel of her choice, (2) the adversary's interest in the trial free from the risk of even inadvertent disclosures of confidential information, and (3) the public's interest in the scrupulous administration of justice.

Hull v. Celanese Corp., 513 F.2d 568, 570 (2d Cir. 1975).

On this record, the balance of interests weighs against disqualification of Attorney Katz. First, plaintiffs Shanshan Shao, Hongliang Chu, Qian Liu, Song Lu and Xinshan Kang would be significantly prejudiced by disqualification of their counsel because retention of an entirely new law firm would compromise the effectiveness of plaintiffs' discovery and trial preparation. Additionally, plaintiffs would suffer the cost burden of retaining new counsel and the concomitant cost of new counsel becoming familiar with the case. As this Court has noted, plaintiffs' litigation costs will have substantially increased. See Ardemasov v. Citibank, No. 3:12cv1570, 2014 WL 1614165 at *12 (D.Conn. April 23, 2014) (Haight, J.) ("At the outset, the Court is mindful of the hardship that Plaintiff would endure should his counsel be disqualified and also the resulting delay that would burden both parties. Plaintiff would have the larger burden and expense of securing new counsel, but both sides would likely suffer delay while the newly acquired counsel became acquainted with the facts and prior proceedings in this case.").

As to defendants' interest in a trial free from the risk of even inadvertent disclosures of confidential information, the record in this case discloses: (1) Liu's prior representation of Beta Pharma and the stock sales and repurchase negotiations and agreements at issue in this litigation are not "identical" or "essentially the same;" and (2) that Liu's prior representation of Beta Pharma did not give him access to privileged information relevant to this litigation. Accordingly, defendants will not be prejudiced by Katz' continuing representation of these plaintiffs.

Finally, the public interest will be served by denying disqualification.  As Judge Arterton noted in Vincent:

> Third, the public interest will be better served by keeping this case on track for trial with the counsel who have represented the parties all along. The duplicative costs of bringing in new counsel and pressures to delay the start of trial of this nearly three-year-old case would undermine one of the Congressional purposes underlying the Civil Justice Reform Act—reducing delay and cost in civil litigation in federal courts. See 28 U.S.C. § 471 et seq.

465 F.Supp.2d at 148.  See also Ardemasov v. Citibank, 2014 WL 1614165 at *12, supra, (recognizing the financial hardship that a plaintiff would endure should his counsel be disqualified).

In sum, defendants' motion to disqualify should be denied where the balancing of the competing interests identified by the Second Circuit weighs in favor or Attorney Katz' continuing to represent Shanshan Shao, Hongliang Chu, Qian Liu, Song Lu and Xinshan Kang in this case.

**D.    Defendants have made no showing on this record that Katz' issuance of a subpoena to Liu in the pending Connecticut Superior Court action would result in tainting the trial in this matter.**

In addition to the New Jersey Superior Court action that Beta Pharma brought against Liu seeking the return of documents, Beta Pharma brought a second action against Liu in the Superior Court of New Jersey Chancery Division, Mercer County.  That action, brought by verified complaint, seeks damages and injunctive relief against Liu on various theories.  On September 26, 2014, Beta Pharma obtained a temporary injunction against Liu barring him, inter alia, from communicating with Katz.  (Exhibit F to defendants' motion).[12]  On September 26, 2014, counsel for Beta Pharma provided Katz with a copy of

---

[12] Specifically, the order bars "Attorney Liu from communicating with the attorneys who are representing adverse parties in Xie v. Beta Pharma et al, NNH-CV-13-6035116-S, pending

the New Jersey Superior Court order.  Although Katz is not a party to that order, he has had

no communications with Liu since he received the order.  (Affidavit of Jonathan Katz at ¶21).

On October 2, 2014, Katz noticed the deposition of Lance Liu in the Connecticut

Superior Court action brought by Dr. Xie, and issued a Subpoena Duces Tecum for his

attendance, with documents.  The marshal was not able to serve the subpoena.  (Id. at

¶22).  Even though Katz is not a party to the New Jersey court's order, in deference to that

court, Katz moved in the Connecticut Superior Court for orders governing the Liu deposition,

so that the deposition could proceed in concert with the New Jersey Order.  (Id. at ¶24).

See also Exhibit D.  Further, Katz noticed Liu's deposition because Liu has non-privileged

discoverable information in this case as evidenced by public sworn statements that have

been made by Zhang in the verified complaint in Beta Pharma's second New Jersey action

against Liu, Attorney Liu's own affidavit filed in the prior, dismissed New Jersey Superior

Court case against him, as well as Beta Pharma's own prior deposition notice and document

subpoena directed to Liu.  (Id. at ¶23).  Katz previously advised Attorney Glen Duhl, who

represents Beta Pharma and Zhang in the Xie action, of the basis for the Liu subpoena.

(Id.).

Disqualification is warranted only where an attorney's conduct would tend to "taint"

the underlying trial.  GSI Commerce Solutions, Inc. v. BabyCenter, LLC, 618 F.3d 204, 209

(2010).  Here, the record demonstrates that:  (1) the New Jersey Order was not directed to

Katz; (2) the deposition was a trial proceeding under the auspices of the Connecticut

Superior Court at which Beta Pharma's counsel would be present; and (3) in deference to

the New Jersey Court, and out of an abundance of caution, Katz moved in the Connecticut

in the Superior Court of Connecticut ("Xie Action") and Shao et al. v. Beta Pharma, Inc. et
al., No. Civil Action No. 3:14CV01177(CSH), pending in the USDC Conn. ("Buyers Action").

Superior Court for orders governing the Liu deposition, so that the deposition could proceed in concert with the New Jersey Order, while allowing plaintiff in the <u>Xie</u> matter to obtain non-privileged, discoverable information relevant to his case.

In view of these facts, defendants have wholly failed to shoulder their heavy burden of proving that Katz' direction of a subpoena to Liu in the Connecticut Superior Court action would, in any way, taint the underlying trial in this federal action.

## IV.   <u>CONCLUSION</u>

For all the foregoing reasons, defendants' motion to disqualify attorney Jonathan Katz from representing plaintiffs Shanshan Shao, Hongliang Chu, Qian Liu, Song Lu and Xinshan Kang in this action should be denied.

PLAINTIFFS SHANSHAN SHAO, HONGLING CHU, QIAN LU, SONG LU, AND XINSHAN KANG,

By:_____
Jonathan Katz, Esq.
Jacobs & Dow, LLC
350 Orange Street
New Haven, Connecticut 06511
Telephone: (203) 772-3100
Facsimile: (203) 772-1691
Federal Juris No.: ct00182
Email jkatz@jacobslaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 18, 2014, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

Jonathan Katz, Esq.
Jacobs & Dow, LLC
350 Orange Street
New Haven, Connecticut 06511
Telephone: (203) 772-3100
Facsimile:  (203) 772-1691
Federal Juris No.:  ct00182
Email jkatz@jacobslaw.com

# EXHIBIT A

EXHIBIT   3

SCHWARTZ & PONTERIO, PLLC
Attorneys for Defendant Lance Liu
By: John Ponterio (ID# 005311992    )
134 West 29th Street - Suite 1006
New York, New York 10001
Telephone: (212) 714-1200

| | |
|---|---|
| BETA PHARMA, INC., BETA PHARMA SCIENTIFIC, INC., and DON ZHANG, <br><br> Plaintiffs, <br><br> v. <br><br> LANCE LIU, <br><br> Defendant. | SUPERIOR COURT OF NEW JERSEY CHANCERY DIVISION <br><br> MERCER COUNTY <br><br> DOCKET NO.: C-46-14 <br><br> Civil Action <br><br> AFFIDAVIT OF LANCE LIU |

STATE OF __Connecticut__ )
                                                    ) ss.:
COUNTY OF __New Haven__ )

LANCE LIU, being duly sworn, deposes and says:

1.     I am the defendant in this proceeding and I respectfully submit this affidavit in opposition to plaintiffs' motion for a preliminary injunction.

2.     In 2011-2012, I performed certain legal work for plaintiffs. They have brought and maintained this proceeding, unnecessarily, to compel me to deliver their legal files. I have, however, already delivered all plaintiffs' client files in my possession to them. Plaintiffs agreed twice, in writing, to dismiss this proceeding upon delivery of the client files and I ask the Court enforce plaintiffs' agreement. As discussed more fully below, I have fulfilled my obligations as an attorney and I respectfully request that the Court dismiss the proceeding.

## Background

3.      I am a patent attorney with technical expertise in chemical and pharmaceutical sciences and in the last four years, I have devoted the majority of time in drug development in partnership with pharmaceutical companies, either as a consultant or as a business partner.

4.      In July, 2011, I began business discussions with plaintiff Beta Pharma Inc. ("Beta Pharma") in the development of certain pharmaceuticals.

5.      As the first step of collaboration, I began recruiting drug formulation scientists and purchasing certain formulation equipment while Beta Pharma provided laboratory space and paid the expenses of purchasing chemicals.

6.      By August, 2011, a collaboration agreement to develop generic drug products between Beta Pharma and I was drafted.  My plan was to work with Beta Pharma on generic drugs as a consultant or a business partner.

7.      Beta Pharma's business manager, Amy Chen, initially asked me to help Beta Pharma to handle certain legal issues with payment deferred because of Beta Pharma's liquidity issues. Initially I declined because my main interest with Beta Pharma was getting into generic drug business and I did not want to complicate the relationship.

8.      Don Zhang, Beta Pharma's CEO, advised me that the liquidity at Beta Pharma was only temporary and that I could help Beta Pharma to improve its liquidity problem by taking on some legal work on a deferred payment basis.

9.      In addition to the use of laboratory space, Don Zhang further promised to make a cash investment in the company as contemplated in the collaboration agreement drafted in August, 2011 when the liquidity situation improved.

10.     In reliance on Don Zhang's promises, I also began to purchase equipment, at my own costs, for Beta Pharma's drug formulation work, including: (i) an Agilent 1100 HPLC (ii) an HPLC made by Waters Corporation and (iii) a Vankel 7000 dissolution apparatus. In total, I spent approximately $19,000 on equipment. .

11.     I also recruited a pharmaceutical formulator, Dr. Yimin Sun of Southbury, CT, to help with the equipment set up and drug product screening at Beta Pharma's laboratory in Branford, CT.

12.     Between December, 2011 and November 3, 2012, I performed legal work for Beta Pharma relating to patent applications, leasing, employee relations, and corporate issues.

13.     I billed Beta Pharma for this work at $180/hour with 6% annual interest for any unpaid balance. In 2012, the amount of unpaid legal fees accumulated but the collaboration projects moved on a slow track and Dr. Yimin Sun, the formulator I recruited for the collaboration, moved on to a different company.

14.     Don Zhang promised to convert the balance of my unpaid legal fees from December, 2011 to September 13, 2012 in an amount of approximately $89,600 into shares of Zhejinag Beta Pharma at the same price he sold such shares to others.

15.     When the liquidity issue started to improve in October, 2012, my unpaid legal fees from December, 2011 to September 13, 2012 of approximately $89,600  would have been worth approximately $215,000 in Zhejiang Beta Pharma stock. Beta Pharma, however, reneged on both promises: (i) to make a cash investment into collaboration projects as stated in the agreement drafted in August, 2011 and (ii) to convert the unpaid legal fees into Zhejiang Beta Pharma shares.

16.    On November 3, 2012, I terminated my relationship with Beta Pharma, including any legal representation that I had previously provided.

17.    In December, 2012, Beta Pharma made a partial payment of legal fees in the amount of approximately $70,000. The payment was in cash because the value of the shares in Zhejiang Beta Pharma had substantially increased and Beta Pharma intended to keep the appreciation on the shares for itself. The remaining legal fee balance of approximately $50,000 was paid in cash in 2013.

18.    Because Beta Pharma reneged on its promise to pay the legal fees stock, I lost the significant appreciation in the value of such shares in an amount of approximately $125,000.

## The Client Files

19.    During my work for Beta Pharma, I only kept electronic copies of certain documents on my laptop and relied on Beta Pharma server for file storage and backup of all communications.

20.    At the height of Beta Pharma's liquidity crisis in 2012, it was unable to pay for the copying/printing fees.

21.    When I terminated my representation of Beta Pharma, I believed that the client had duplicates of all these files. In any event, I sent Don Zhang and Jirong Peng copies of any important or time-sensitive documents at the time I stopped my work for the company. For example, in January, 2013, I delivered all patent and trademark files to Beta Pharma electronically.

### This Proceeding

22.     Plaintiffs commenced this proceeding on June 27, 2014 to compel me to deliver their client files.

23.     That same day, counsel for plaintiffs contacted me by e-mail and offered to "withdraw this legal action," if I would deliver to them "all files associated with [my] representation of Beta Pharma Inc., Beta Pharma Scientific, Inc., and Don Zhang…" A copy of this e-mail is annexed as Exhibit A.

24.     Immediately after receiving this e-mail, I began to deliver, again, plaintiffs' client files to their new attorneys. Between June 27-30, 2014, I sent plaintiffs' counsel numerous documents relating to my representation of plaintiffs that had been stored on my personal laptop. Even though I believe they already had many of these documents, I delivered scores of files comprising over 5,000 documents.

25.     After I delivered the files, plaintiffs changed their position. Even though they, in all likelihood had the files to begin with, and even though I had acceded to their request and had delivered the client files again, they were no longer willing to drop the lawsuit but now insisted that I sign a consent order. I objected to this additional requirement and asked them to discontinue the case because I had delivered the client files. They refused to do so.

26.     On July 3, 2014, plaintiffs changed their position yet again and their attorney wrote and advised the Court that they "would accept a letter from Mr. Liu to the Court representing that he has turned over all of the files." A copy of counsel's letter is annexed as Exhibit B.

27.    Because of their ever-changing demands, I was forced to retain counsel to respond to this lawsuit. I have produced additional documents. Exhibit C is a chart setting forth, in detail, a catalog of the 6,199 pages I have produced to plaintiffs' counsel

### Files Delivered

28.    As noted above, initially I produced all the electronic files from my laptop related to my work for Beta Pharma. These were all saved in an electronic folder I had on the computer for the purpose of storing Beta Pharma work and I have produced them as documents Liu 0037-5769 as cataloged on the chart annexed as Exhibit C. It took me many hours over the course of three days to deliver these files.

29.    The only documents I have withheld from production from the Beta Pharma electronic folder on my laptop are approximately 13 files that I had saved to that same Beta Pharma folder, but that are unrelated to my legal work for Beta Pharma, including: (i) files concerning to an antibiotics patent that is owned by an unrelated third party; (ii) documents related to my visa application for business travel to China for the company; and (iii) one of my e-mail communications with my personal attorney from January, 2011, from a time before I began acting as attorney for Beta Pharma. Out of an excess of caution, and to be thorough, I offered to provide these documents (except for my privileged e-mail with my personal attorney) to plaintiffs' counsel for attorneys' eyes only, provided they gave me a non-disclosure agreement. A copy of my e-mail proposal is annexed as Exhibit D. Plaintiffs' counsel has not responded and has not offered any means of securing the confidentiality of these documents.

30.    In addition to the electronic files from my laptop computer, I have also now reviewed my Yahoo e-mail account and produced all the e-mails from my personal Yahoo account relating to my work for Beta Pharma that remain available. Any other e-mails I may

have sent or received on my Yahoo account relating to legal work for Beta Pharma have been deleted. I have produced the Yahoo e-mails to plaintiffs' counsel as documents Liu 5770-6199 as cataloged on the chart annexed as Exhibit C. Virtually all these e-mails were exchanged with plaintiff Don Zhang and with Beta Pharma's COO, Jirong Peng to their Beta Pharma e-mail addresses, so I assume plaintiffs already had copies of all these e-mails. While I worked for Beta Pharma, I had the use of a company e-mail address which I used for most of my e-mail communications. I no longer have access to the e-mails I sent and received using this e-mail address.

31.    I have also produced all my legal bills to the company. I have produced them as documents Liu 0001-0037 as cataloged on the chart annexed as Exhibit C. Again, I assume that the company has copies of these bills since they paid them, at least in part.

## The Motion Should Be Denied

32.    When I ceased work for Beta Pharma, I did not keep any physical files and I sent the company electronic copies of all important and time sensitive client files.

33.    When plaintiffs commenced this proceeding, they offered, twice (see Exhibits A-B), to drop the case if I would deliver all client files. I again delivered copies of all client files to their attorneys as cataloged in Exhibit C.

34.    I have delivered all the client files to plaintiffs so their motion to compel me to do so should be denied and the case should be dismissed.

## Conclusion

35.    I respectfully submit that I have fully honored my obligations as an attorney by providing plaintiffs with their client files. I respectfully request that the Court deny the motion and dismiss this proceeding. If the plaintiffs persist in maintaining this proceeding after the service and filing of this affidavit, I respectfully request that the court award me legal fees.

_____
LANCE LIU

Sworn to before me this
25ᵗʰ day of July, 2014

_____
Notary Public

Brigitte M Bessette
Notary Public
Connecticut
My Commission Expires 04/30/2017



8

# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SHANSHAN SHAO, HONGLIANG
   CHU, QIAN LIU, SONG LU,
   AND XINSHAN KANG,
   Plaintiffs,

       v.

BETA PHARMA, INC., AND
   DON ZHANG,
   Defendants.

Civil Action No. 3:14CV01177 (CSH)

NOVEMBER 18, 2014

AFFIDAVIT OF JONATHAN KATZ

STATE OF CONNECTICUT     )
                        )    ss.: November 18, 2014
COUNTY OF NEW HAVEN    )

    1.    My name is Jonathan Katz.  I am over age 18.  I believe in the obligation of an oath.

    2.    I am a member of the firm of Jacobs & Dow, LLC.

    3.    I represent plaintiffs Shanshan Shao, Hongliang Chu, Qian Liu, Song Lu and Xinshan Kang in the civil action Shao v. Beta Pharma, Inc., et al., docket no. 3:14cv01177(CSH) currently pending in the United States District Court for the District of Connecticut.  These investors purchased shares in Zhejiang Beta Pharma Co. Ltd, a privately held Chinese pharmaceutical company, from Beta Pharma Inc. and Don Zhang in 2010 and 2011.  The latest purchase agreement, with Qian Liu, is dated March 15, 2011.  Attached to this Affidavit are copies of Jirong Peng's email to Qian Liu dated November 17, 2013, the "Agreement of Beta Pharma Payment Calculation," and Qian Liu's email to Jirong Peng and Don Zhang dated November 18, 2013.

4.      I am making this affidavit in opposition to the motion of defendants Beta Pharma, Inc. ("Beta Pharma") and Don Zhang ("Zhang") to disqualify me, and my firm, from representing the plaintiffs in this action.

5.      I currently represent plaintiff Guojian Xie, Ph.D. in a lawsuit pending in the Connecticut Superior Court alleging breach of contract and other claims against Beta Pharma and Zhang.

6.      Dr. Xie's case against Beta Pharma and Zhang was initiated in Connecticut Superior Court by Attorney Thomas Flanagan in late December 2012, and was pending for nearly one year prior to the time my firm entered an appearance on Dr. Xie's behalf on November 25, 2013.  Attorney Donald Altschuler represented defendants.

7.      Dr. Xie brought Lance Liu to a meeting with me on October 30, 2013.  He told me that Liu was helping him in connection with some personal matters.

8.      By the time of this October 30, 2013 meeting, I had become aware that Dr. Xie already had a pending case against Beta Pharma and Zhang, and that Attorney Altschuler represented defendants Beta Pharma and Zhang.  Accordingly, when Liu arrived with Dr. Xie, there was no reason for me to believe that he represented, or had represented Beta Pharma. Indeed, it was reasonable for me to believe that if Liu had a potential conflict of interest, i.e. a prior representation of Beta Pharma, he would act accordingly in compliance with the Rules of Professional Conduct.

9.      In connection with my representation of Dr. Xie, through non-privileged sources, I became aware that Beta Pharma, through defendant Zhang, had sold stock in Zhejiang Beta Pharma.

2

10.     In March of 2014, Liu did bring to my attention that some of those investors were interested in bringing lawsuits against Beta Pharma and Zhang in connection with those stock transactions.

11.     Accordingly, Liu informed me that he would communicate with those investors about whether any were interested in retaining Jacobs & Dow, LLC to bring suit against Beta Pharma and Don Zhang.

12.     Attorney Liu acted as a contact between me and the stockholders, including Song Lu and Xinshan Kang, who live in China.   In particular, in view of his facility with the Chinese language, Liu transmitted my representation agreement to the stockholders, and transmitted the completed representation agreements back to me.  Liu also transmitted the investors' stock purchase agreements to me for review, as well as certain e-mails between the investors and Don Zhang, discussing Beta Pharma's repurchase of their shares.  None of these documents were Beta Pharma internal documents.   None were marked confidential, and none were attorney-client privileged between Beta Pharma and its lawyers.   After I received these initial documents, I have dealt directly with all of the investors that I represent. Liu's role as contact has ceased.

13.     The investors' email communications with Don Zhang establish that the investors warned Zhang that they were contemplating legal action against him and Beta Pharma as early as November, 2013.

14.     Liu and I agreed that Liu would be entitled to a forwarding fee of 25% of the contingent fee, which constituted a referral fee.

15.     In December, 2012, in Dr. Xie's case in Connecticut Superior Court, I served an interrogatory on Beta Pharma asking them to identify their lawyers, in order to identify the

lawyers who had prepared and managed Beta Pharma's stock option plan.  Beta Pharma did

not respond to that interrogatory until six months later, on June 23, 2014.  Their response

identified Lance Liu as having been their general counsel.

16.     My review of Beta Pharma's June 23, 2014 discovery response was the first time

I became aware that Lance Liu had served as Beta Pharma's general counsel.

17.     After I learned that Beta Pharma claimed that Liu had acted as its general

counsel, Liu and I terminated the forwarding fee arrangement, and I notified the investors.

18.      Liu no longer has any financial interest in the investor cases.

19.     Attorney Liu has not participated with me in representing the investors.  He had

no responsibility for the conduct of the litigation.

20.     Other than the materials he transmitted from the investors, Attorney Liu has

given me no documents in connection with representing the investors.  He has never provided

me with any confidential, privileged, or non-public information concerning Beta Pharma,

including, but not limited to, information regarding Beta Pharma's dealings with Zhejiang Beta

Pharma stock.

21.     Counsel for Beta Pharma provided me with a copy of a New Jersey Superior

Court order on September 26, 2014.  I am not a party to that order.  I have had no

communications with Liu since I received the order.

22.     On October 2, 2014, I noticed the deposition of Lance Liu in the <u>Xie</u> case and

issued a Subpoena Duces Tecum for his attendance, with documents.  The marshal was not

able to serve the subpoena.

23.     On October 1, 2014 and October 2, 2014, I advised Attorney Glen Duhl, who

represents Beta Pharma and Zhang in the <u>Xie</u> action, that Liu has non-privileged discoverable

information in this case.  The basis of that statement is public sworn statements that have been made by Don Zhang in the Verified Complaint for injunction that he filed in a pending Superior Court of New Jersey case against Liu, Attorney Liu's own affidavit filed in a prior, dismissed New Jersey Superior Court case against Liu, and Beta Pharma's own prior deposition notice and document subpoena for Lance Liu.

24.     Although I am not a party to the New Jersey court's order, in deference to that court I moved in the Connecticut Superior Court for orders to govern the conduct of the Lance Liu deposition, so that Liu's deposition could proceed in concert with the New Jersey Order.

25.     I have never represented Beta Pharma, Beta Pharma Scientific, Zhejiang Beta Pharma or Don Zhang.  I have never been asked to represent any of those parties.

26.     Lance Liu consulted me concerning some matters, and asked me to represent him.  The consultations are attorney-client privileged.  I am not representing him and I do not intend to do so.


_____
Jonathan Katz

Subscribed and sworn to before me this __18th__ day of November, 2014.

_____
Notary Public

PEGGI ROSSI
NOTARY PUBLIC
MY COMMISSION EXPIRES 12-31-16

5

From: jirong_peng@betapharma.com
To: qian_liu60@hotmail.com
CC: linda_zi@yahoo.com; office@betapharma.com; don.pharmaman@gmail.com
Subject: RE: Decision?
Date: Sun, 17 Nov 2013 17:49:53 +0000

Hi Qian and Linda,

Attached is the agreement of Beta Pharma payment calculation.

The transition was conducted through Beta Pharma.  As a US C-Corporation, Beta Pharma is obligated to pay all of the C-Corporation income taxes at company level  and have to be reported  to the IRS.  As shown in the table in the attached agreement, all of the calculations are based on the estimated after-tax income (1% = $3.3 million) instead of the gross income (1% = US$6 million).

Please review and send the signed copy back to us ASAP.  We'll arrange the payment soon after receiving the signed copy.  Please also provide your bank information to receive the payment if you haven't sent us earlier.

Please let us know should you have any more questions.  Thanks.

Best regards.

Jirong

Jirong Peng, Ph.D.
Beta Pharma, Inc.
5 Vaughn Dr.
Princeton, NJ 08540
U. S. A.

## Agreement of Beta Pharma Payment Calculation

I understand and fully agree with that the whole income from the transaction is subjected to C-Corporation income taxes and Beta Pharma is obligated to pay its C-corporation taxes by the law; and that the whole payment as shown in the calculation table below; and that the income from this transaction will be reported to the IRS and I am fully responsible for my own personal tax obligations from this transaction.

**Liu Qian**
810 2nd Avenue, Verdun, QC, Canada I4G 2W6

| Date | Amount received | | Preliminary paid | | Check /wire # |
|------|------|------|------|------|------|
| | US$ | RMB | US$ | RMB | |
| 4/5/2011 | $45,121.00 | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| **Total** | **$45,121.00** | **¥ 0.00** | **$0.00** | | |

| | | | Remarks |
|------|------|------|------|
| Total Initial ZIBP shares | | 309,316,719 | |
| 1% Stock sale price | Initial sale price | $6,000,000.00 | |
| | After China taxes (~10%) | $5,401,735.54 | Actual amount received from sales |
| | After est. USA Corp taxes (~35%) | $3,301,735.54 | |
| Final after-tax income per share | US$ | $1.0674 | exchange rate $1=¥6.1598 in closing |
| | RMB¥ | ¥ 6.5751 | day, 6/17/2013 |
| Initial Shares | | 100,000 | |
| Initial price/share | | ¥ 3.00 | Total paid: US$45,121 |
| After 10% deduction | | 90,000 | 10% bonus shares to ZIBP employee from all initial share holders |
| Estimated total income | | $96,068.59 | |
| Paid back Primary | | $0.00 | See calculation bellow |
| Remaining dues | | $96,068.59 | |
| Primary paid | US$ | $0.00 | |
| | RMB¥ | | |
| | Total held back primary | $0.00 | |

Liu Qian


(Signature and Date)

From: qian_liu60@hotmail.com
To: jirong_peng@betapharma.com; don.pharmaman@gmail.com
CC: linda_zi@yahoo.com; office@betapharma.com
Subject: RE: Decision?
Date: Mon, 18 Nov 2013 15:25:22 -0500

Hi Don:

I am sorry to say that your proposal is not acceptable.

Your proposed share buy-back practice cannot be considered legal based on securities regulations even prior to IPO which was the original purpose of our investment. This practice is neither outlined in our signed agreement.

Amongst other issues, the following are a few points that we still do not understand as a matter of principle:
1. The process lacks uniformity and transparency. Please treat ALL of your investors equally and openly.
2. The capital gains are what WE need to report to authorities. You cannot act on our behalf.
3. We simply want our shares being bought back at fair market price which is ultimately the IPO price. There has been lack of evidence on this important question even prior to IPO.
4. The agreement stated all investment in Chinese RMB, not in USD (The USD paid to you was based on the exchange rate at that time). Thus your proposed calculations are wrong.
5. We have trouble to understand why your investors are responsible for the bonus of your employees. This is outrageous.

We look forward to receiving your sincere and honorable suggestions so that we do not need to go through legal actions in China or USA.

Yours truly,

Qian Liu

# EXHIBIT C

*In the Matter Of:*

BETA PHARMA, INC.

-vs-

LANCE LIU

WEI YUAN, PH.D.

October 29, 2014



**CONNOR REPORTING**

1650 One American Square
Indianapolis, IN 46282
Phone: 317-236-6022
Fax: 317-236-6015
Toll Free: 800-554-3376

1

```
 1    STATE OF NEW JERSEY          )
                                   )   SS:
 2    COUNTY OF MERCER             )

 3          IN THE SUPERIOR COURT OF MERCER COUNTY
                        LAW DIVISION
 4
      BETA PHARMA, INC.; BETA       )
 5    PHARMA SCIENTIFIC, INC.; and  )
      DON ZHANG,                    )
 6                                  )
                      Plaintiffs,   )
 7                                  )
           -vs-                     )  Docket No.
 8                                  )  MER-L-2040-14
      LANCE LIU,                    )
 9                                  )
                      Defendant.    )
10

11

12

13           DEPOSITION OF WEI YUAN, PH.D.

14

15          The videotaped deposition upon oral
16    examination of WEI YUAN, PH.D., a witness produced
      and sworn before me, Tara Gandel Hudson, RPR, CRR,
17    CSR 93-R-1039, a Notary Public in and for the
      County of Marion, State of Indiana, taken on behalf
18    of the Plaintiffs at the offices of BARNES &
      THORNBURG, 11 South Meridian Street, Indianapolis,
19    Marion County, Indiana, on the 29th day of October,
      2014, commencing at the hour of 1:43 p.m., pursuant
20    to the Indiana Rules of Trial Procedure with
      written notice as to the time and place thereof
21    having been given.

22

23

24

25
```



Wei Yuan, Ph.D.
October 29, 2014

2

```
                                                                    2
  1               A P P E A R A N C E S

  2     FOR THE PLAINTIFFS:
        Beta Pharma, Inc.; Beta Pharma Scientific, Inc.;
  3     and Don Zhang

  4             Christopher P. Jeter
                Naomi Y. Kwang
  5             BARNES & THORNBURG
                11 South Meridian Street
  6             Indianapolis, IN  46204
                317/231-7434
  7             chris.jeter@btlaw.com

  8             Jack L. Kolpen
                FOX ROTHSCHILD LLP
  9             997 Lenox Drive, Building 3
                Lawrenceville, NJ 08648-2311
 10             609/895-3304
                jkolpen@foxrothschild.com
 11             (Appearing telephonically)

 12
        FOR THE DEFENDANT:
 13     Lance Liu

 14             John Ponterio
                Matthew Schwartz
 15             SCHWARTZ & PONTERIO PLLC
                134 West 29th Street
 16             Suite 1006
                New York, NY  10001
 17             jponterio@splaw.us
                917/338-3879
 18             (Appearing telephonically)

 19
        ALSO PRESENT:
 20
                Sara Williams, Videographer
 21             Andrew Alam, videographer trainee

 22

 23

 24

 25
```



Wei Yuan, Ph.D.
October 29, 2014

2☐

27

```
 1   Q   Right now I'm talking about the lawsuit against

 2       Beta Pharma.

 3   A   Yeah.

 4   Q   I'm interested in the first time you spoke to

 5       Lance Liu on the phone.

 6   A   Okay.  That means after this date.

 7   Q   After what date?

 8   A   This --

 9   Q   After May?

10   A   After May, yes.

11   Q   2014?

12   A   Yes.

13   Q   So is it sometime in May 2014?

14   A   Yeah, sometime in May.

15   Q   Now in that conversation, did he ask you to

16       participate in this lawsuit?

17   A   I say earlier, Dr. Wang initiated this.

18       Initiated this.  He want -- he wants to do

19       something for us, for four of us, because he

20       think Beta Pharma, basically, knowingly

21       misled --

22   Q   Okay.

23   A   -- the investor.

24   Q   I guess I'm trying to understand, is the purpose

25       that you talked to Lance Liu, was he asking you
```



2☐

28

```
 1        if you want to participate in the lawsuit?  Is

 2        that why he was calling you?

 3   A    Call me, no.  That's already -- lawsuit already

 4        set.  He call me because he say the lawyer -- I

 5        said earlier -- the lawyer represent those

 6        investors want to send you a letter, want you to

 7        sign.

 8   Q    So he told you they wanted you to send you a

 9        letter?

10   A    Yeah.

11   Q    And would you sign?

12   A    Yeah.

13   Q    And you said?

14   A    I said yeah.  Then I call back and say, well, I

15        want to know what's the charge, what's lawyer

16        fee for this lawsuit.  And then we discussed

17        that lawsuit -- then -- no.  That's -- that

18        charge.

19   Q    Hold on one second.

20            So Mr. Liu on the phone simply said to you

21        that Dr. Wang wanted to send you a retainer

22        letter for you to sign for this lawsuit?

23   A    Dr. Wang?

24   Q    Isn't that what you just said?

25   A    No.  Katz.
```

32

```
 1        the folks on the phone.  Do you recognize this

 2        email?

 3    A   I recognize, yes.

 4    Q   And did you receive this email?

 5    A   Yes, yes.

 6    Q   And, and who is Ben Kurtis?

 7    A   Ben is who called me.

 8    Q   And it says -- is this an accurate --

 9            (A discussion was held off the record at

10        the request of the reporter.)

11    Q   We'll try not to talk over each other; okay?

12    A   Yeah.  I say I recant everything I say here.

13        Basically, I ambushed; I did not prepare for

14        this.  Okay.  Yeah.

15    Q   Talk about this email.  You say the first line

16        there, it says, "During our call yesterday you

17        indicated you would provide us with an

18        affidavit."

19    A   Yes, but -- yeah.

20    Q   So this email is dated September 11th.

21    A   Yes.

22    Q   So you had a phone conversation with Ben

23        Kurtis --

24    A   Yes.

25    Q   -- on September 10th?
```



34

```
 1        not even look -- I don't remember those email.
 2        Yes.
 3   Q    What did he ask you?
 4   A    Ask you about what was saying here, what was
 5        saying here.
 6   Q    Asked you about the affidavit?
 7   A    Yeah.  Affidavit.  Yes.
 8   Q    And what did you say at the time?
 9   A    What I say, I say I recant this.  Based on the
10        email, tell the truth here (indicating).  Yes.
11   Q    This email?
12   A    Yes.
13   Q    You notice he says if the affidavit is
14        accurate --
15   A    Yeah.
16   Q    -- please sign it, have it notarized.  "If the
17        affidavit is not accurate, please let us know."
18   A    No.  No, that's not accurate.  It's not
19        accurate.  Yes.  All based on the fact.  Here,
20        on the email here, just say I don't remember
21        those email.  Here.  I already say I recant
22        this.  I basically reset, reset.
23   Q    Okay.
24   A    Reset.  Already say it.  Reset this.
25            MS. KWANG:  Rescind.
```



4☐

45

```
 1   Q    -- Dr. Wang --

 2   A    Dr. Wang.

 3   Q    -- to Lance Liu?

 4   A    Yeah.

 5   Q    And you were copied on it?

 6   A    Yes.

 7   Q    We have a copy of that.

 8   A    Yeah.

 9   Q    Before June 2014 had you ever talked to Lance

10        Liu on the phone?

11   A    Before June, yes.  I talked to -- I talked to

12        Lance Liu over the phone.

13   Q    Was in May?

14   A    May.  Yeah.  Before --

15   Q    That's what you said earlier, May 2014.

16   A    It should be, yeah.

17   Q    Again, did you review Statement 2 with Ben

18        Kurtis?

19            Did you go over Statement 2 with Ben

20        Kurtis?

21   A    Vaguely.  Vaguely.

22   Q    But you did?

23   A    Yes, yes.  If I signed, if I signed this, I at

24        that time -- yeah, I responsible for this.

25   Q    And in Exhibit A, the email Ben Kurtis told you
```



Wei Yuan, Ph.D.
October 29, 2014

4☐

46

1    to sign if it was truthful or to change it if

2    something was wrong; is that correct?

3  A  That means my recollection -- my recollection

4    lapse.  My recollection lapsed.  My memory

5    lapsed.  Okay.  That's why I recant this

6    (indicating).  Yes.

7         MR. JETER:  We've been going for about an

8    hour.  Let's take a short break.

9         THE VIDEOGRAPHER:  We're going off the

10   record.  The time is 2:33 p.m.

11        (A recess was taken.)

12        THE VIDEOGRAPHER:  This is the beginning of

13   Tape 2 in the deposition of Wei Yuan.  The time

14   is 2:49 p.m., and we are back on the record.

15        MR. PONTERIO:  Excuse me, Chris.  Just one

16   second.  I'm again requesting that we be

17   provided now with the documents that the witness

18   provided at the beginning of the deposition.

19        MR. JETER:  Okay.  We're going to get them

20   scanned right now, and I'll email them to you.

21        MR. PONTERIO:  Thank you.

22        THE WITNESS:  Refer to this?

23        MR. JETER:  Yes.

24        THE WITNESS:  Okay.  Who is that?

25        MR. JETER:  That's Mr. Liu's lawyer.

Wei Yuan, Ph.D.
October 29, 2014

4☐

47

```
 1          THE WITNESS:  John's lawyer?

 2          MR. JETER:  No, Lance Liu's lawyer.

 3    Q    I want to remind you you're still under oath to

 4         tell the truth, Mr. Yuan; okay?

 5    A    Of course.

 6    Q    You want to continue on Exhibit D --

 7    A    Yeah.

 8    Q    -- which is the signed affidavit.

 9    A    Yeah.

10    Q    We discuss Sentence 2 --

11    A    But, Chris, can I ask a question?  I say reset.

12         Everything start from zero.  That means I recant

13         this.  That means I recant.

14    Q    But I want to talk about at the time you signed

15         it --

16    A    But I recant this --

17          MR. JETER:  Whoever's on the phone, please

18         mute if you're not talking.  If you're not

19         talking, it gets a little bad with the feedback.

20    Q    We're going get there.

21    A    Yeah.

22    Q    Can you look at Sentence 3.

23    A    I said reset.

24    Q    We're going to get there.

25    A    Okay.
```



| | | |
|---|---|---|
| 1 | Q | Sentence 3.  "On or about June 2014 Mr. Liu |
| 2 | | unexpectedly called" -- |
| 3 | A | Not true. |
| 4 | Q | That's not true.  Did you review this with |
| 5 | | Mr. Kurtis? |
| 6 | A | No.  That means I remember -- I don't remember |
| 7 | | anything until I see the email. |
| 8 | Q | So you signed this affidavit stating that you |
| 9 | | told the truth -- |
| 10 | A | Yes. |
| 11 | Q | -- and had it notarized, and you didn't know |
| 12 | | this was true? |
| 13 | A | Yeah, but, Chris, I tell you, I recant this. |
| 14 | | That means everything, everything reset. |
| 15 | Q | At the time you signed it, you certified that it |
| 16 | | was true and accurate? |
| 17 | A | But anything I said -- I say here (indicating) |
| 18 | | that means I not -- I don't remember the email. |
| 19 | | Basically. |
| 20 | Q | Sentence 3.  Why is sentence 3 not true? |
| 21 | | "On or about June 2014, Mr. Liu |
| 22 | | unexpectedly called me." |
| 23 | A | Before.  That means before June. |
| 24 | Q | Was it in May? |
| 25 | A | Yes.  I think it's May.  Based on the email. |

49

```
 1    Q    So if it said on or about May, that would be

 2         correct?

 3    A    Double check.  Based on the email, I gave my

 4         phone number to Lance Liu on May 14th.  I think.

 5         Until then -- Lance know my phone number -- yes,

 6         email.

 7    Q    Sentence 4.  Read Sentence 4 to yourself.

 8              "In our telephone conversation" --

 9              Let me back up just a minute.  Back up to

10         Sentence 3.  In May when Mr. Liu called you,

11         were you expecting his call?

12              Or was it unexpected?

13    A    This, this, you can't -- the two -- two type of

14         meetings I expected.  That means if I have

15         appointment, say at this time, that's expected.

16         If we don't have a appointment, that means he

17         just call randomly.  You can say unexpected or

18         expected because I gave the phone to Lance.

19    Q    You gave him your phone number?

20    A    Yes.  Here (indicating)

21              So that means could be expected, could be

22         unexpected.

23              MR. JETER:  I think we need to mark these

24         probably.  Guys on the phone, getting the scans

25         coming in to me, and I'm going to send them to
```



Wei Yuan, Ph.D.
October 29, 2014

52

52

1   Q   Why are the dates on these emails written?

2   A   Because this email, what I trying to print out,

3       basically the date, it didn't show up.  That's

4       why I -- I can't email -- I can forward you

5       authentic email.  Okay.

6   Q   You can forward these to me --

7   A   Yes.

8   Q   -- after we're done here today?

9   A   Forward to Lance lawyer and --

10  Q   Forward to me, to both of us?

11  A   Get card for both.  Yes.

12  Q   So you knew Mr. Liu had your telephone number?

13  A   Yes.

14  Q   But you didn't necessarily expect him to call

15      you in June of 2014?

16  A   I can say yes and no.  So -- because if I have

17      your phone number, I can call you, you receive a

18      phone call unexpectedly because no appointment;

19      right?  If I say I call you at 3:00 o'clock, you

20      expected this phone call.  So it's the same, yes

21      and a no.

22  Q   When Lance Liu got your phone number --

23  A   Yeah.

24  Q   -- had you already agreed to join the investor

25      lawsuit against Beta Pharma?

Wei Yuan, Ph.D.
October 29, 2014

53

53

| 1 | A | Yes. |
|---|---|---|
| 2 | Q | Pointing to page 3 of Exhibit F. |
| 3 | A | May '14.  Here. |
| 4 | | This Dr. Wang send it to -- forward to |
| 5 | | Zhang on May 14th and the copy to me. |
| 6 | Q | And at this point you had told Dr. Wang that you |
| 7 | | would participate in the lawsuit? |
| 8 | A | Long before this. |
| 9 | Q | Long before this. |
| 10 | A | Yeah. |
| 11 | Q | When? |
| 12 | A | Between -- |
| 13 | Q | January? |
| 14 | A | Between January and this date. |
| 15 | Q | Okay.  I want to go to Sentence No. 4 in the |
| 16 | | affidavit, Exhibit D.  "In our telephone |
| 17 | | conversation Mr. Liu explained that there was a |
| 18 | | lawsuit where people were suing Beta Pharma |
| 19 | | because they had bought Beta Pharma stock but |
| 20 | | never in fact received the stock." |
| 21 | | Is that statement -- is that sentence true? |
| 22 | A | I don't know exactly the phone conversation, but |
| 23 | | Lance Liu know there's a lawsuit. |
| 24 | Q | How did he know that? |
| 25 | A | I don't know.  Because that's why he forwarded |

Wei Yuan, Ph.D.
October 29, 2014

67

1    Q    Why do you think he knew before your phone call

2         that you weren't going to participate?

3    A    Perhaps the lawyer told him.  My judgment.

4         Personal judgment.

5    Q    Do you know who this signature is above your

6         name on the last page of the affidavit?

7    A    That's my signature.  Yes.  But I recant this.

8         Okay.  That's the one -- that's the former --

9         that's the one from a bank.  From the bank.

10        That's the notary.

11   Q    So you took this into a bank?

12   A    Yeah.

13   Q    Got it notarized?

14   A    Yeah, notarized, yes.

15   Q    You swore and subscribed to this statement?

16   A    I recant this.

17   Q    On this day?

18   A    On that day, yes.

19   Q    You swore that this was true?

20   A    Yes.

21   Q    You talked about it with Mr. -- with Ben Kurtis,

22        Mr. Kurtis?  You talked about this statement

23        with Mr. Kurtis, didn't you, on September 10 and

24        September 12 over the phone?

25   A    Yeah, I talked to --



68

1   Q   And you went over this document line by line?

2   A   I say I'll recant.  Today, what I say today, if

3       any contradiction, is based on today's

4       statement.

5   Q   On this day.  I'm talking about on

6       September 12th, 2014, did you sign everything in

7       this affidavit?

8   A   I signed that one.  I recant that one because

9       the memory lapse.  The recollection -- without

10      this email, I really cannot remember anything.

11  Q   Did you tell Dr. Wang you were dropping out of

12      the lawsuit?

13  A   Yes.

14  Q   Did you call him?

15  A   He know from somewhere.  I don't know.  But

16      he -- Dr. Wang let me know, he say, if you drop

17      the lawsuit, and I say yes.  That's because Wu,

18      W-U, drop out.  He won't go to court in this

19      country.  Basically travel, what he say, the

20      travel fee perhaps is -- it's going to be huge.

21  Q   What did Wang say when you told him you were

22      dropping out?

23  A   He says, "What are you going to do?"

24          I say, "What Mr. Zhang, Z-H-A-N-G, want to

25      do for this.  I want to wait and see."

# EXHIBIT D

DOCKET NO.: NNH-CV13-6035116-S  :     SUPERIOR COURT

GUOJIAN XIE                             :     JUDICIAL DISTRICT OF NEW HAVEN

VS.                                     :     AT NEW HAVEN

BETA PHARMA, INC., ET AL.               :     OCTOBER 6, 2014

## MOTION FOR ORDERS RE: DEPOSITION OF LANCE LIU

Plaintiff and defendants have noticed the deposition of Attorney Lance Liu.  Both sides

have represented that he has discoverable information in this case.  Both sides have claimed

that he has attorney-client privileged documents and information.  As a result, disputes have

arisen concerning the conduct of his deposition.

WHEREFORE, plaintiff moves this court to issue an order governing the conduct of

discovery from Attorney Lance Liu.  A proposed form of order is attached as Exhibit A.

THE PLAINTIFF,
GUOJIAN XIE

By_____
Jonathan Katz
JACOBS & DOW, LLC
350 Orange Street
New Haven, CT 06511
Telephone:  203-772-3100 / Fax:  203-772-1691
Juris No.: 432271

<u>O R D E R</u>

The foregoing Motion having been heard, it is hereby

ORDERED:

BY THE COURT,

_____
                                                Clerk

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served electronically via email, this 6th day of October, 2014, to:

Donald Altschuler, Esq.
Altschuler & Altschuler
509 Campbell Avenue
West Haven, CT 06516
Donalt44@sbcglobal.net; Altschuler.don@snet.net

Glenn A. Duhl, Esq.
Attorney Jillian Orticelli
Siegel, O'Connor, O'Donnell & Beck, P.C.
150 Trumbull Street
Hartford, CT 06103
gduhl@siegeloconnor.com
jorticelli@siegeloconnor.com

Jack L. Kolpen, Esq.
Benjamin R. Kurtis, Esq.
Fox Rothschild LLP
Princeton Pike Corporation Center
997 Lenox Drive, Building 3
Lawrenceville, NJ 08648-2311
jkolpen@foxrothschild.com
bkurtis@foxrothschild.com

Lance Liu
4 Colonial Court
Middlebury, CT 06762
lanceliu2000@gmail.com

Jonathan Katz

# EXHIBIT A

DOCKET NO.: NNH-CV13-6035116-S      :      SUPERIOR COURT

GUOJIAN XIE                         :      JUDICIAL DISTRICT OF NEW HAVEN

VS.                                 :      AT NEW HAVEN

BETA PHARMA, INC., ET AL.           :      OCTOBER 6, 2014

## ORDERS RE: DEPOSITION OF ATTORNEY LANCE LIU

1.      Attorney Lance Liu will appear for his deposition at the offices of Jacobs & Dow, LLC, 350 Orange St. New Haven, CT within 30 days of this order, on a date and time to be agreed on by the parties hereto and the deponent.

2.      Defendants may cross notice Attorney Liu's deposition and serve or re-serve their own subpoena within 10 days hereof.

3.      The deponent will bring to the deposition all responsive documents subpoenaed by all parties.

4.      The deponent will segregate privileged documents and index them, producing privilege logs for each privilege claimed, setting forth the date, author, all recipients, and general subject matter of each document for which a privilege is claimed. All privilege logs will be exchanged among all parties. The documents will be examined by the person who holds the privilege.  Counsel will make a good faith effort to resolve disputes about whether documents are privileged from discovery.  No counsel will remove any document on an ex-parte basis.  If the parties cannot agree that a particular document is privileged, the disputed document will be submitted to the court for in- camera review.

5.      Attorney Liu's examination and cross examination will proceed in accordance with the Connecticut Practice Book.  Issues of privilege will be addressed on a question by question basis. Counsel may instruct the witness not to answer, or the witness may refuse to answer, only to assert and preserve a privilege.

6.      Disputes about instructions not to answer and other unagreed privilege issues will be submitted to the court for decision.

7.     The "Stipulated Protective Order" of September 30, 2014, Docket Entry 168, is hereby granted and made an Order of the Court.

8.     Examination of the witness will continue, subject to necessary interruptions for court rulings, until it is completed.

9.     This court retains jurisdiction over this order and the conduct of the deposition.

BY THE COURT

_____, J.