**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| SHANSHAN SHAO, HONGLIANG CHU, QIAN LIU, SONG LU, AND XINSHAN KANG, | |
| Plaintiffs, | 3:14-cv-01177(CSH) |
| v. | |
| BETA PHARMA, INC., AND DON ZHANG, | MAY 4, 2017 |
| Defendants. | |

**OMNIBUS RULING ON JURISDICTIONAL INQUIRY,
DISCOVERY MOTIONS, AND MOTION TO DISMISS**

HAIGHT, Senior District Judge:

This Ruling resolves an inquiry about subject matter jurisdiction raised by the Court *sua sponte*, and several discovery-related or pretrial motions made by the parties.

## I.  JURISDICTION

In a Memorandum and Order filed on March 27, 2017 [Doc. 156], familiarity with which is assumed, the Court posed *sua sponte* inquiries intended to establish whether or not complete diversity of citizenship existed between the  parties to this civil action.  That inquiry implicated the Court's subject matter jurisdiction, since Defendants had removed the case from Connecticut Superior Court on the basis of diversity.

There were also pending at the time of the Court's inquiry three contested pretrial motions: Plaintiffs' motion [Doc. 110] to enforce subpoenas; Defendants' motion [Doc. 113] for clarification of an earlier Court ruling on a separate defense motion to quash subpoenas; and Plaintiffs' motion

1

[Doc. 114] for modification of that ruling. There was also pending a motion by Defendants [Doc. 133] to dismiss the fifth count of Plaintiffs' Second Amended Complaint. The Court stated in its jurisdictional memorandum that decisions on all those motions would be deferred until the question of subject matter jurisdiction *vel non* had been resolved.

Counsel for the parties have made timely submissions which comply with the Court's directions: specifically, Plaintiffs' submissions [Doc. 161] and Defendants' submissions [Doc. 162]. The Court has examined their contents, which adequately demonstrate that complete diversity of citizenship exists. In consequence, the Court's subject matter jurisdiction exists as well, and the litigation will continue in this forum. That litigation resumes with this resolution of the several pending motions.

## II. PLAINTIFFS' MOTION TO ENFORCE SUBPOENAS

This motion [Doc. 110] arises out of subpoenas *duces tecum* counsel for Plaintiffs served pursuant to Fed. R. Civ. P. 45 upon Defendants' certified public accountants. The subpoenas seek production of Defendants' tax returns and the accountants' workpapers which are purportedly relevant to the claims and defenses forming the subject matter of the underlying civil action.

The accountants, joined by counsel for Defendants, resist the subpoenas on the basis that 26 U.S.C. § 7216(a) precludes production of tax return preparation. That subsection provides: "Any person who is engaged in the business of preparing, or providing services in connection with the preparation of, returns of the tax" imposed by federal law "who knowingly or recklessly – (1) discloses any information furnished to him for, or in connection with, the preparation of any such return" shall be guilty of a misdemeanor.

Plaintiffs, pressing to enforce the subpoenas, counter with subsection 7216(b)(1)(B), which

provides that the prohibition contained in § 7216(a) "shall not apply to a disclosure of information if such disclosure is made – . . . (B) pursuant to an order of a court." The question on the present motion is whether this Court should issue that order in this case.

Judge Weinfeld's opinion in *Cooper v. Hallgarten & Co.*, 34 F.R.D. 482 (S.D.N.Y. 1964), furnishes one of the earliest, and most enlightening, judicial analyses of the compelled disclosure of tax returns in civil litigation. The plaintiff, in an action to rescind gas and oil leasehold interests on the ground of fraud, moved for a protective order excluding production of his income tax returns during his deposition. Judge Weinfeld partially granted that motion and denied the balance. The characteristic quality of his discussion justifies quoting it at some length:

> Public policy favors the nondisclosure of income tax returns. Criminal sanctions for unauthorized disclosure underscore this policy. The courts are not altogether in accord as to whether or not this public policy has cloaked the returns with a privilege in favor of taxpayers who are litigants in private suits. But assuming that a litigant's tax returns are not privileged and are subject to pretrial procedure, the public policy against disclosure cannot be ignored; it must be taken into account together with the policy which favors liberal pretrial discovery. Giving appropriate weight to each, the production of tax returns should not be ordered unless it clearly appears they are relevant to the subject matter of the action or to the issues raised thereunder, and further, that there is a compelling need therefor because the information contained therein is not otherwise readily obtainable.

34 F.R.D. at 483-84 (footnotes omitted).

Judge Weinfeld's formulation achieved academic recognition as "the *Cooper* Rule," a designation conferred upon the opinion by William A. Edmunson, *Discovery of Federal Income Tax Returns and the New "Qualified" Privileges,* 1984 Duke L.J. 938, 944-45 (1984). Its two-pronged test – relevance and need – is reiterated in subsequent cases such as *Smith v. Bader*, 83 F.R.D. 437, 438 (S.D.N.Y. 1979) (Sweet, *J.*), and *S.E.C. v. Cymaticolor Corp.*, 106 F.R.D. 545, 547 (S.D.N.Y.

1985) (Edelstein, *J*.).  Judges in this District approach the question in the same way: *see, e.g., Gattegno v. Pricewaterhousecoopers, LLP*, 205 F.R.D. 70, 73 (D. Conn. 2001) (Hall, *J.*) (citing *Cooper* and applying its two-pronged test).  Whether tax returns must be produced in a given case is fact-intensive.  To decide the present motion, it is necessary to summarize the pertinent circumstances in the case at bar.

Plaintiffs' account of events appears in the factual allegations of their Second Amended Complaint [Doc. 132], the current operative pleading.  It is there stated that the corporate Defendant Beta Pharma, Inc. ("BP") is a Delaware corporation with a principal place of business in Connecticut, of which the individual Defendant Don Zhang is majority stockholder and president.  BP is engaged in the business of researching, developing and marketing pharmaceuticals.  In "approximately 2002 and 2003" scientists employed by BP invented, patented and synthesized *Icotinib*, a substance which showed promise as a treatment for non-small cell lung cancer.  In "approximately 2002" BP joined with "other investors" (unnamed) to form a joint venture to develop, test and market Icotinib in the People's Republic of China.  For that purpose, the joint venturers formed non-party Zhejiang Beta Pharma Co. Ltd. ("ZBP"), a Chinese corporation.  BP contributed its patent rights to Icotinib to the joint venture and received in exchange a 45% interest in ZBP.  Zhang has been and is vice-president of ZBP and a director thereof.

The stage was thus set for the events leading directly to this litigation.  In 2010 and 2011, BP, acting by Zhang, sold to each of the five individual Plaintiffs shares of the capital stock of ZBP.  The number of shares sold to a particular Plaintiff represented a percentage interest in ZBP.  Plaintiffs' motion papers include copies of a contract between "Don Zhang, Seller, President of Beta Pharma, Inc." and Plaintiff "Shanshan Shao, Purchaser," and of another contract between Zhang,

similarly designated, and Plaintiff Liu Quan as Purchaser. Doc. 111, Ex. A, at 1-3, 6. These contracts are dated March 11, 2011 and March 15, 2011, respectively. The percentage interests of all stock in ZBP were relatively small: for the five Plaintiffs, they were respectively 0.1%, 0.05%, 0.2331%, 0.2207%, and 0.2%. Those interests were represented by agreed numbers of shares in ZBP. The underlying contracts provided that BP would hold the Plaintiffs' shares in the name of BP until BP and Zhang could cause those shares to be registered in each purchaser's name on the books of ZBP in China.

Apparently subsequent to these transactions, ZBP succeeded in developing Icotinib as a safe and effective treatment for non-small cell lung cancer. ZBP now markets Icotinib in China as a prescription drug under the brand name *Conmana,* and is in the process of making an initial public offering of ZBP shares in China.

"In or about July, 2013," Zhang again approached the five Plaintiffs. Zhang told Plaintiffs that ZBP had been valued at $600 million. Purporting to act on behalf of both BP and ZBP, Zhang represented to each Plaintiff that he would cause BP to repurchase a plaintiff's shares of ZBP based on the $600 million valuation and in proportion to that individual's percentage of share ownership, so that (as an example) a plaintiff holding 0.1% of ZBP shares would receive a calculated repurchase price of $600.000 (which would constitute a profit on the earlier initial investment). BP, acting by Zhang, made these repurchase offers in July, 2013. All five Plaintiffs accepted them and executed appropriate documents. Plaintiffs could not surrender their previously purchased ZBP shares because BP and Zhang had never delivered them.

Since July of 2013, Defendants have made partial payments of the repurchase amounts to some Plaintiffs, but have failed and refused to pay the full balances to anyone. Instead, Defendants

have engaged in communications with Plaintiffs in efforts to persuade them that the calculated repurchase prices are subject to several deductions, whose cumulative effect is to reduce the repurchase price by over 50%. Defendants assert that the repurchase payout amounts must be reduced by:

       *    approximately 10% for "China taxes";

       *    approximately 35% for "USA corporation taxes"; and

       *    "10% bonus shares to ZJBP employee from all initial shareholders."

Plaintiffs refuse to accept any of these reductions, in principle or in practice. Defendants insist upon them in their opposition to the present motions. The resulting disputes find expression among the several claims, sounding in contract and in tort, which Plaintiffs plead against Defendants in the Second Amended Complaint.

In these circumstances, Plaintiffs served the subpoenas at issue in this motion to enforce. Specifically, Plaintiffs' trial counsel caused subpoenas to be served (a) upon Teplitzky & Company, certified public accountants in Woodbridge, Connecticut; and (b) upon Deloitte & Touche, LLP and Deloitte Tax, LLP (collectively "Deloitte"), certified public accountants in Hartford, Connecticut. The subpoenas' broad demands for production are identically worded and embrace documents generated in 2007 if not earlier. A letter by Plaintiffs' counsel, Ex. F to Doc. 110, states counsel's understanding that "Deloitte has only been working with the defendants since 2012 or 2013"; the Teplitzky firm has apparently acted as Defendants' accountants for a longer term of years. Counsel seemingly wishes to ensure that the subpoenas reach all designated documents, whichever accountants were responsible for them at the time.

Each subpoena calls upon the recipient accounting firm to produce copies of its "complete

files with respect to Beta Pharma, Inc., Don Zhang, Zhejiang Beta Pharma Co. Ltd., Beta Pharma Canada, and Shanshan Sao, Hongjiang Chu, Qian Liu, Song Lu and Xinshan Kang," a demand that includes:

* Copies of federal income tax returns for Beta Pharma, Inc. and for Don Zhang, "including but not limited to the period 2007 through present," and (where pertinent) copies of all schedules, forms 1099, W-2 and K-1.

* State income tax returns for Beta Pharma, Inc., or Don Zhang filed in Connecticut, New Jersey, or any other state.

* All tax returns or tax information filings for Beta Pharma, Inc., or Don Zhang filed in any foreign country.

* All information filings with the IRS with respect to the activities of Don Zhang, Beta Pharma, Inc., or Zhejiang Beta Pharma in any foreign country.

* Supporting documents and accountant work papers with respect to any tax return previously identified.

* All documents referring or relating to any IRS audit of a previously identified tax return, or any IRS investigation of Beta Pharma, Inc. or Don Zhang.

* All documents referring or relating to Zhejiang Beta Pharma Co., Ltd.

* "All documents pertaining to any sale by Don Zhang or Beta Pharma to any person or organization of any interest in Zhejiang Beta Pharma (now known as Betta [sic] Pharmaceuticals, Inc.) whether or not said interest was evidenced by shares, or contract to purchase shares, or percentage interests."

*          *          *          *          *          *

Given the subject matter of this action, when coupled with the issues raised by the contentions of the parties, I conclude without difficulty that Plaintiffs' motion to enforce these subpoenas for federal tax records must be GRANTED.

Plaintiffs are entitled to separate Court orders pursuant to 26 U.S.C. § 7216(b). Those orders will direct the accounting firms of Teplitzky and Deloitte to produce under subpoena information furnished to each firm for, or in connection with, the preparation of federal income tax returns on behalf of Beta Pharma, Inc. or Don Zhang. One order will run to Teplitzky. The other order will run jointly to the two Deloitte entities. The Court will make these orders because production of these tax returns and related documents clearly satisfies the requirements of the two-pronged "*Cooper* rule" first articulated by Judge Weinfeld.

The first prong asks whether in a given case the tax returns "are relevant to the subject matter of the action or to the issues raised thereunder." *Cooper*, 34 F.R.D. at 484. In the case at bar, that relevance is manifest. I need not dwell overlong on the nature of relevance. The "Test for Relevant Evidence" is stated with striking brevity in Fed. R. Evid. 401: "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." That test is not as demanding as some found in the law. The Advisory Committee's Notes in 1972, proposing Rule 401, stress that "The standard of probability under the rule is 'more . . . probable than it would be without the evidence.' Any more stringent requirement is unworkable and unrealistic."

What may be said of the case at bar? In 2010 and 2011, the five Plaintiffs entered into written contracts purportedly with Defendant Beta Pharma, Inc., an American entity, pursuant to which BP sold and each Plaintiff purchased a percentage interest in Zhejiang Beta Pharma Co. Ltd.,

a Chinese entity. Plaintiffs were promised that they would ultimately receive shares in ZBP, but they had not received them when, in 2013, Defendant Don Zhang, purportedly on behalf of BP, offered to repurchase from Plaintiffs their initial ZBP interests at a profit to Plaintiffs. Plaintiffs agreed and executed repurchase contracts, but BP and Zhang now contend that the repurchase payments to be made to Plaintiffs must be substantially reduced by "China taxes" and "USA corporation taxes."

The record contains communications from Don Zhang or a Beta Pharma officer, to one or another of the Plaintiffs, stating that the repurchase payments to the Plaintiffs will be delayed, and in essence, asking Plaintiffs to take the claimed deductions from those payments on faith – certainly without a coherent explanation of the tax laws or regulations which Defendants assert justify or require those deductions. Plaintiffs are not obliged in law to take Defendants' protestations in that regard on faith. They are entitled to search for relevant evidence on those tax issues. Sensible places to start would seem to be tax returns and calculations prepared on behalf of Beta Pharma (which contracted to pay Plaintiffs the repurchase amounts) and Don Zhang (against whom Plaintiffs assert several claims for personal liability).

The core issues, posed by the Defendants themselves in their responses to Plaintiffs' demands for the repurchase payments, are relatively narrow. The contrast they present is stark.

Defendants' contention is that the initial transactions for the sale of ZBP shares by BP to Plaintiffs resulted in tax obligations *Beta Pharma* owed to USA and Chinese revenue authorities. That proposition is reflected in an "Agreement of Beta Pharma Payment Calculation" each Plaintiff was asked by Beta Pharma to sign in 2013, during the repurchase contracting, whose opening paragraph reads:

> I understand and fully agree with that the whole income from the transaction is subjected to C-Corporation income taxes and *Beta Pharma is obligated to pay its C-corporation taxes* by the law; and that the whole payment as shown in the calculation table below; and that the income from the transaction *will be reported to the IRS* and I am fully responsible for my own personal tax obligations from this transaction.

Doc. 111, Ex. A, at 9 (emphases added). In an e-mail dated October 2, 2013, sent by Don Zhang on behalf of Beta Pharma to one of the Plaintiffs, Zhang said with respect to the proposed repurchase payment: "In terms of RMB value each share, it is not finalized since we do not know how much taxes *we have to pay in USA* . . . . And other interest parts are attached with taxation both from China and the IRS of USA." *Id*. at 12 (emphasis added). In a September 28, 2013 e-mail to a Plaintiff, Zhang said: "We will return you preliminary [payment] first since it is not related with taxes at all. The profit part will be involved taxes [sic] both China and our corporation taxes so we will return the profit part after we have tax matter clearly resolved with the IRS." *Id* at 14. The "Beta Pharma Payment Calculation" prepared in 2013 lists, as deductions from the "1% Stock sale price," the previously noted "After China taxes (-10%)" and "After est. USA Corp taxes (-35%)."[1]

Plaintiffs' contention is that "these deductions were fraudulent, and were imposed on them by Zhang and Beta Pharma for the purpose of reducing their payout in excess of 50%." Brief, Doc. 111, at 10. Plaintiffs posit alternative *modi operandi* for this fraudulent scheme: "defendants were not entitled to reduce plaintiffs' gains by defendants' costs for 'China taxes,' U.S. corporate taxes, or payments to ZBP employees," or "defendants did not in fact incur those expenses." *Id*. at 6.

Where the truth lies remains for future determination, by discovery and proof. The Court

---

[1] The disputed deductions also include the "10% deduction" for a "10% bonus shares to ZJBP employee[s] from all initial shareholders." I do not discuss this item in connection with production of tax returns, since it does not seem to implicate that subject.

intimates no view on how the issues will ultimately be resolved. However, at this early stage, the relevance to those issues of Beta Pharma's and Zhang's tax returns and related accountants' work papers is clear. If Defendants' version of reality is true – Beta Pharma's obligations to pay US and Chinese taxes existed and Beta Pharma, like any honest taxpayer, endeavored earnestly to comply with them – one would expect to find in Beta Pharma's tax returns and its accountants' workpapers evidence which establishes or corroborates those realities. If, on the other hand, Plaintiffs' version of reality is true – Beta Pharma's invocation of illusory tax obligations serves the cynical and fraudulent purpose of cheating Plaintiffs of their just expectations – then one would expect to find in Beta Pharma's tax returns and its accountants' workpapers notations, gaps, omissions or silences supporting an inference which exposes a fraudulent scheme. Nor does the proper scope of these subpoenas exclude reference to Chinese taxes, although the accountants served with them are American. Foreign taxes paid abroad by American taxpayers may or must, in certain circumstances, be reported in returns filed with the IRS. One need say no more at present than this is a legitimate subject of inquiry in a § 7216(b) Court order.

I also conclude that the documents subpoenaed bear the requisite relevance to more than the Plaintiffs' core breach of contract claim discussed thus far in this Ruling. Plaintiffs' brief, Doc. 111 at 5, identifies as the first significant issue "Plaintiffs' claim that defendant Zhang operates Beta Pharma as his alter ego, commingling funds and transactions such that the alleged separate corporate existence of Beta Pharma should be disregarded."

I have had previous occasion in this case to observe that the allegations in plaintiffs' pleading, "if proven, would justify piercing BP's corporate veil to impose personal liability upon Zhang for any indebtedness BP bore to the Plaintiffs." Ruling, Doc. 109, at 2 (denying Defendants'

motion to quash subpoenas served on non-party banks). The same reasoning applies to the present subpoenas served on non-party accountants. The relevance of tax returns in the corporate veil-piercing context was recognized in *Sentry Insurance v. Brand Management Inc.*, Nos. 10-cv-347, 11-cv-3966, 2012 WL 3288178 (E.D.N.Y. Aug. 10, 2012), a thoughtful opinion by Magistrate Judge Mann:

> The Court's own research, however, has revealed that decisions in the Second Circuit have recognized that corporate tax returns are relevant to an alter ego/corporate veil analysis, and, in particular, to whether the dominated entity observed corporate formalities (i.e., by filing its own separate tax return) and whether that entity was adequately capitalized.

2012 WL 3288178, at *7 (citations and parentheses omitted). In consequence, Judge Mann concluded that "the tax returns of Budget, Weber and the Insured Weber Entities are relevant" (Weber being the individual owner of the corporate party "Budget") and directed their production. *Id*. Judge Mann further "ordered the accountant for the Budget Defendants to produce his workpapers, and, thus, [plaintiff] Sentry presumably is now in possession of financial documents that substantially overlap with the information contained in the disputed tax returns." *Id.* That is a sensible additional order which I make in this case as well.

The careful reader of Judge Mann's opinion in *Sentry Insurance* will observe that the *probative value* of the tax returns required to be produced – that is to say, their *relevance* – lay in the ability of these documents to shed a light upon relationships, responsibilities and liabilities between the corporations and individuals involved in the litigation. That is what is involved in the case at bar.

Turning to another point, Defendants' brief opposes enforcement of the subpoenas by contending that "the subpoenas target communications between Defendants and their accountants,

and communications between Defendants' counsel and Defendants' accountants, many of which are highly likely to be protected from disclosure by the attorney-client privilege." Brief, Doc. 118, at 9. The brief's unadorned assertion is not supported in any specific or particularized fashion.

The protection of the attorney-client privilege may be invoked against a discovery demand under Fed. R. Civ. P. 26(b), or, as in this case, a subpoena *duces tecum*. *See United States v. Construction Products Research, Inc.*, 73 F.3d 464 (2d Cir. 1996). However, "the burden is on a party claiming the protection of a privilege to establish those facts that are the essential elements of the privileged relationship." *von Bulow by Auerspreg v. von Bulow*, 811 F.2d 136, 144 (2d Cir. 1987), *cert. denied*, 481 U.S. 1015 (1987) (citation and internal quotation marks omitted). In the case at bar, Defendants bear the burden of establishing that documents subject to the subpoenas served upon their accountants are protected by the attorney-client privilege. Defense counsel's brief is wholly inadequate to that task. As District Judge Droney (as he then was) aptly said in *Horace Mann Insurance Co. v. Nationwide Mutual Insurance Co.*, 240 F.R.D. 44, 47 (D. Conn. 2007): "That burden cannot be met by mere conclusory or ipse dixit assertions in unsworn motion papers authored by attorneys." (citation and internal quotation marks omitted).

If Defendants wish to press a claim that the attorney-client privilege forecloses production of specific documents otherwise falling within the subpoenas, they must expressly make the claim and furnish the particulars mandated by Fed. R. Civ. P. 26(b)(5)(A). Defendants must also serve on Plaintiffs the privilege log mandated by Local Civil Rule 26(e) (amended November 7, 2016). If Defendants fail to comply with these Rules, they will be held to have waived the privilege. Production under the subpoenas now having been directed by this Ruling, Defendants are entitled to a reasonable time to comply with the directions in this paragraph. That compliance must be

completed not later than **Friday, June 30, 2017,** unless application for an enlargement of time for good cause shown is made prior to that date.

The last point with which I must deal has to do with Defendants' contention that these subpoenas to their accountants are overbroad. In essence, Defendants make two arguments: the subpoenas are overly broad in subject matter, and they exceed the relevant time period. Thus, Defendants' brief, Doc. 118 at 7, states disapprovingly that "Plaintiffs make no attempt at describing the documents they really need and their overly broad discovery requests seek documents that have no temporal or substantive relation to the alleged transactions at issue (from 2010-2011, 2013)."

There is no merit to the argument that the subpoenas do not sufficiently particularize the documents Plaintiffs wish to examine. The subpoenas seek production of Defendants' tax returns. That is the common phrasing of subpoenas or discovery demands for tax returns, not infrequently encountered in civil litigation. It may be acknowledged that a request for "tax returns" without further detail is generalized to a degree. The district judge will think it right to compel production of the tax returns and enforce the subpoenas, or decline to do so and quash them. The judge's decision on the point, committed to his or her discretion, depends upon whether the inquiring party persuades the judge that the tax returns in question "are relevant to the subject matter of the action or to the issues raised thereunder," to quote *Cooper* one more time. 34 F.R.D. at 484. The ground for that fact-based inquiry is sufficiently laid by generalized demands for "tax records" and accountants' "workpapers."

The resulting production, if the subpoena is enforced, may be voluminous. In *Mitsui & Co. (U.S.A.) Inc. v. Puerto Rico Water Resources Authority*, 79 F.R.D. 72 (D.P.R. 1978), the underlying litigation arose out of a contract for the construction of a steam electric station in Puerto Rico, a

project which took years to complete. Mitsui, the plaintiff contractor, sued the defendant water authority for $30 million in damages caused by defendant's breach of contract. The water authority served a subpoena *duces tecum* upon Mitsui's accountants which required the accountants "to produce 'all documents' related with the accounting and taxation treatment of 'Mitsui & Co. (U.S.A.), Inc. construction contract with the PRWRA for construction of the Aguirre Project, covering the period from January 1st, 1970 to the present.'" 79 F.R.D. at 81-82. The district judge rejected Mitsui's contention that the subpoena was overbroad. The judge recognized that requested documents must be described with "reasonable particularity," as per Fed. R. Civ. P. 34(b), but added that "the 'reasonable particularity' requirement is not susceptible to exact definition. What is reasonably particular is dependent upon the facts and circumstances of each case," and quoted with approval Professor Moore's belief that "the appropriate question 'is whether a reasonable man would know what documents or things are called for.'" *Id*. at 82 (quoting 4A J. Moore, Federal Practice, § 34.07, at 34-57).

The court in *Mitsui* regarded the plaintiff's tax returns as relevant to for reasons analogous to circumstances in the case at bar. In objecting to production of its tax returns, Mitsui, the plaintiff construction company, claimed it had assigned the contract in suit to its parent company, and in consequence "Mitsui virtually suffered no losses at all which its income tax returns could show." 79 F.R.D. at 81. The court continued:

> Defendant seeks to obtain, through the requested documents now challenged, relevant information as to the following issues: (1) whether Mitsui suffered any damages on the Aguirre Project, (2) whether Mitsui is the real party in interest in the present litigation, (3) whether Mitsui has standing to sue, and (4) whether Mitsui breached the assignment clause of its contract with PRWRA.

*Id*. These circumstances inclined Judge Toledo to grant defendant a § 7216(b) order directing

plaintiff's accountant to produce the tax records and other documents. He reasoned:

> Plaintiff has clearly put at stake its income and its standing to file this suit in its own name so as to waive any right it may have to maintain undisclosed its tax returns' matters. Mitsui could not claim losses over thirty million dollars and successfully evade disclosing its tax returns by now claiming that the losses were suffered by others. It has certainly made them relevant for the full disclosure of the facts involved. . . . [T]he tax returns and tax related documents could easily shed light upon the bind of relation existing between the different parties involved in the construction of this project and most of all it would shed light upon the role Mitsui's played in this whole project and its standing to file this suit. Certainly, the magnitude of the losses claimed in this case makes every document which could reasonably help to illuminate the facts involved relevant and discoverable.

*Id*. The court brushed aside the contention that the subpoena request was oppressive and burdensome: "From the description of the documents made by defendant in the subpoena *duces tecum* it is clear that Haskins & Sells [the accountants] can reasonably identify the documents requested. They refer to a specific client, project and lapse of time." *Id*. at 82.

*Mitsui* is fairly analogous to the case at bar because the present Plaintiffs, like the defendant water authority in *Mitsui,* contend that the adverse party's own actions materially affected that party's legal rights or obligations: Mitsui's right to claim damages from the defendant, or Beta Pharma's right to deduct taxes it paid in the US or China from amounts otherwise owing to Plaintiffs. In either case, the adverse party's tax returns "could reasonably help to illuminate the facts." Production of the tax returns was ordered in *Mitsui*. It will be in this case.[2]

---

[2] *Mitsui* cited with approval *Biliske v. American Live Stock Insurance Co.*, 73 F.R.D. 124 (W. D. Okla. 1977), where plaintiffs sued an insurance company which had denied their claims under their policy and defamed plaintiffs in the process, allegedly causing them severe business income losses. The district court granted defendant company's request for "all [plaintiffs'] tax returns and related documents," reasoning that: "Where the litigant himself tenders an issue as to the amount of his income, there is no privilege against disclosure of his tax

For these reasons, I decline to hold that the subpoenas' demand for production of "tax returns" is facially overbroad and entirely unenforceable.  However, the second question, the temporal sweep of these subpoenas, is problematic.  It seems unlikely that the problem affects Deloitte, which the record suggests began accounting services to Defendants only recently.  However, Teplitzky has been Defendants' accountants for an unstated number of years, and the subpoenas call for production of federal and state tax returns for Beta Phama, Inc. and Don Zhang "including but not limited to the period 2007 through present," in other words, open-ended and unlimited as to time.

Plaintiffs make no showing that so broad and sweeping a production is necessary or reasonable.  This is an important case on several levels, humane and economic: There is some indication that the ZBP-marketed substance, Icotinib, may be effective against a virulent form of cancer, with concomitant potentials to relieve human suffering and substantially reward investors.  But the pertinent events are relatively recent.  The intercorporate relationships between BP, ZBP, and the entrepreneurial individuals involved (principally Don Zhang), apparently began in 2002, when BP scientists invented the substance and ZBP was formed to develop it.  More to the point, the transactions which give rise to this litigation occurred in 2010 and 2011, when Zhang approached the Plaintiffs on behalf of BP and negotiated with them the initial contracts pursuant to which Plaintiffs bought and BP sold interests in ZBP.  Perhaps most to the point of all, it was not

_____

returns and they become legitimate subjects of inquiry under discovery procedure."  73 F.R.D. at 126 n. 1 (citations omitted).  While some cases appear to hold that one party's introduction as an issue in litigation of the amount of its income automatically entitles the opposing party to a § 7216(b) order for production of tax returns, I do not go that far, and conclude instead that every application for the statutory order turns on relevance, which is the product of a variety of circumstances.  Of course, the conduct of a party taxpayer/litigant itself can do a great deal to make its own returns relevant.  That is what happened in this case.

until 2013 that Zhang again approached Plaintiffs with the suggestion, subsequently accepted, that BP repurchase the ZBP interests previously sold to Plaintiffs. It is this more recent transaction, complicated by BP's disputed tax-related deductions from repurchase payments owing to Plaintiffs, that forms the immediate catalyst of this action and the issues lying at its heart.

While some degree of background evidence may be relevant to the issues, I am presently unable to discern any basis for enforcing production of tax returns earlier than 2009, which is one year before the earliest execution of the first set of contracts between Beta Pharma and the Plaintiffs. Accordingly, under the Court's Order, the subpoena recipients' obligation to produce the documents called for by the subpoenas begins with the tax returns and related documents for the year 2009. Plaintiffs' motion to ENFORCE the subpoenas will be GRANTED to that extent. The motion will be DENIED WITHOUT PREJUDICE to the extent that the subpoenas call for production of returns and documents for years prior to 2009, with leave granted to Plaintiffs, if so advised, to apply to enlarge that time frame on the basis of a subsequently articulated showing of necessity.

### III. DEFENDANTS' MOTION FOR CLARIFICATION

In an unrelated motion to quash other subpoenas served by Plaintiffs on non-parties, Defendants moved to quash a subpoena Plaintiffs served on JP Morgan Chase Bank, and another subpoena Plaintiffs served on the Bank of America. The Morgan subpoena called upon that bank to produce "all documents or records in regard to" Beta Pharma, Inc. The Bank of America subpoena called upon that bank to produce "all documents or records in regard to" Don Zhang.

The Court denied Defendants' motion to quash in a Ruling [Doc. 109], familiarity with which is assumed. I reasoned that "The bank records, corporate and individual, are clearly of core relevance to a veil-piercing claim." Doc. 109, at 3. The Ruling directed the banks to "produce

responsive records from January 1, 2011 though the present," a temporal restriction based on the fact that "the stock certificate sale contracts were apparently executed and the initial payments made by Plaintiffs in or about March 2011." *Id*. at 4.

Defendants now move [Doc. 113] to amend that Ruling to provide that "bank records only be produced through 2013." Doc. 113-1 at 3. They base that additional temporal restriction upon the perception that the repurchase transactions in suit were completed in 2013. *Id*.

Defendants prefer to characterize their present motion as one "for clarification, not a motion for reconsideration." Reply Brief, Doc. 120, at 1. In point of fact, the Ruling is perfectly clear and the present motion seeks to alter its directions, the customary function of a motion for reconsideration. In any event, there is no merit to Defendants' request. The repurchase agreements were signed by Plaintiffs in 2013, but Defendants have refused to pay the amounts Plaintiffs contend they are entitled to receive under the contracts. Instead, Defendants say that certain tax payments subject their contractual payments to Plaintiffs to reductions which Plaintiffs dispute as irrelevant at best, or fraudulently contrived at worst. The repurchase transactions continue to hold center stage in the litigation drama, and these non-party bank records are as germane to the parties' rights and obligations as they ever were. In addition, Plaintiffs correctly point out in their opposition to the present motion that their veil-piercing claim is implicated in other liability claims pleaded in the complaint.

Defendants ' motion for clarification will be DENIED. The Court adheres to its Ruling in Doc. 109.

## IV.  PLAINTIFFS' MOTION FOR MODIFICATION

The other side of this particular litigation coin is neatly presented by Plaintiffs' motion [Doc.

114], self-styled to "modify" the same prior Court Ruling, Doc. 109. As we have seen, Defendants' motion [Doc. 113] seeks to stop the banks' document production earlier: 2013, rather than through the present. Plaintiffs seek to start that production earlier: January 1, 2010, rather than January 1, 2011.

Plaintiffs' companion motion awakens Defendants' indignant awareness of the restrictions placed on motions for reconsideration. Defendants' counsel, having argued energetically that the Court should consider the merits of their motion to clarify the Ruling [Doc. 109] (because it is *not* a motion for reconsideration), now argue with equal verve that the Court should disregard the merits of Plaintiffs' motion to modify the Ruling (because it *is* a motion for reconsideration).

This topic could, if allowed, consume a full afternoon session of analysis and discussion by a Federal Practice II seminar at a leading law school. But the exercise is not worth it in this case. It is readily apparent that while Defendants' motion lacks merit, Plaintiffs' motion should be granted, conclusions I am permitted to reach by the maxim *fiat justitia*.

The temporal limitations upon bank document production the Court placed in its prior Order were triggered, as the Ruling shows, by the Court's perceptions of when the transactions in suit were entered into and the resulting disputes were raging. The starting date for document production of January 1, 2011 reflected the Court's understanding that the first set of ZBP stock certificate sale contracts "were apparently executed and the initial payments made by Plaintiffs in or about March 2011." Doc. 109, at 4. Plaintiffs' present motion papers show that Hongliang Chu, the first plaintiff to purchase ZBP shares from BP and Zhang, executed his contract on February 15, 2010 and paid the purchase price called for on February 16 of that year. Two other Plaintiffs executed purchase agreements in 2010, one in March and the other in August. To correct this misapprehension,

Plaintiffs' motion [Doc. 114] will be GRANTED, and the Court's Order [Doc. 109] will be modified to provide that the documents to be produced under the subpoenas are those created during the period January 1, **2010** through the present.

### V. DEFENDANTS' MOTION TO DISMISS THE FIFTH COUNT OF THE SECOND AMENDED COMPLAINT

The final motion resolved by this Ruling is a motion by Defendants [Doc. 133] under Fed. R. Civ. P. 12(b)(6) to dismiss the Fifth Count of Plaintiffs' Second Amended Complaint [Doc. 132] for failure to state a claim. The Fifth Count asserts a tort claim against the individual Defendant, Don Zhang.

The first four counts all sound in contract. The First and Second Counts allege breach of contract claims against the corporate Defendant, Beta Pharma, Inc. The Third and Fourth Counts allege breach of contract claims against Don Zhang.

The First Count alleges at ¶ 19 that Beta Pharma "has breached its contracts with plaintiffs by failing to register their ownership interests with ZBP, and by failing to pay the agreed price to plaintiffs to repurchase plaintiffs' shares." The "contracts" to which this allegation refers are the ZBP shares sale and purchase contracts executed in 2010 and 2011, and the ZBP shares repurchase agreements entered into in July 2013. The Second Count alleges a breach of contract claim against Beta Pharma "seeking expectation damages," a claim that focuses upon BP's "failure and refusal to pay the agreed price" specified in the 2013 repurchase agreements, with the consequence that "plaintiffs continue to own their shares." Second Count, ¶ 19.

The Third Count alleges at ¶ 23 that Don Zhang committed the same breaches of "contracts" that are alleged against Beta Pharma in ¶ 19 of the First Count. The Fourth Count alleges against Zhang the same breach of contract claims, seeking "expectation damages" of similar nature to those

pleaded against Beta Pharma in the Second Count.

The Fifth Count is the only count in the Second Amended Complaint that sounds in tort. It is captioned "Breach of Fiduciary Duty against Defendant Zhang," and is pleaded against Don Zhang only. The allegations of the count reiterate and recite the history of the invention and patenting of Icotinib in the United States; the developing, testing and marketing of that substance in China; the relevant conduct of Beta Pharma, Inc.; the formation and conduct of Zhejiang Beta Pharma Co. Ltd.; the offices held by Zhang in both those entities; and Zhang's conduct in arranging the two stock interest transactions with Plaintiffs (the initial contracts of sale, followed by the repurchase agreements) that form the subject matter of this action. Having re-asserted all those events, Plaintiffs allege in ¶ 19 of the Fifth Count that, "[a]s a result of the facts alleged in this count, Zhang has been at all relevant times a fiduciary with respect to plaintiffs, and has owed plaintiffs a fiduciary duty of the utmost loyalty, honesty and integrity, and Zhang's fiduciary duties continue to this day." Zhang is alleged to have breached that duty in a number of specific ways.

Defendants base their Rule 12(b)(6) motion to dismiss the Fifth Count on two grounds. Defendants contend that the count is barred by the economic loss doctrine. Alternatively, Defendants argue, the count fails to allege a legally cognizable fiduciary relationship. These questions are intertwined. I consider them together. Plaintiffs oppose the motion in its entirety.

"The economic loss doctrine, a judicially created principle, prohibits recovery in tort where the relationship between the parties is contractual in nature and the only losses alleged are purely economic." *Doherty, Beals & Banks, P.C. v. Sound Community Services, Inc.*, No. cv106005795, 2011 WL 2177257 (Conn. Super. Ct. May 19, 2011), at *5 (citation and internal quotation marks omitted). The Connecticut trial courts found it easier to pronounce the principle than to apply it

uniformly in a variety of cases. In *Ulbrich v. Groth*, 78 A.3d 76 (Conn. 2013), the Supreme Court of the State undertook to clarify the rule. After reviewing earlier Connecticut cases, *Ulbrich* holds that the economic loss doctrine "applies to tort claims that arise out of and are dependent on the contractual relationship between the parties," but the doctrine does not apply "to tort claims that are independent of the plaintiff's contract claim, and that can survive even if the contract claim fails." 76 A.3d at 97 (citations and internal quotation marks omitted). A tort claim falling within the latter category is not barred by the economic loss doctrine.

With due deference to the Connecticut Supreme Court, one must acknowledge that the *Ulbrich* decision adds one set of generalized labels to another, and continues to leave it to trial courts to decide whether or not to apply the doctrine to the facts of a particular case. The facts in *Ulbrich* were a fertile ground for litigation. The *Ulbrich* plaintiffs purchased, at a foreclosure sale auction, certain real estate and personal property previously used by a debtor to operate a special events facility. "After the auction, the plaintiffs discovered that much of the personal property at the site was not included in the sale because it was not owned by the debtors." 78 A.3d at 87. That unwelcome and startling revelation, which transformed plaintiffs from successful bidder to unauthorized possessor of some stranger's property, resulted in plaintiffs suing the secured seller (the foreclosing bank) and the company that conducted the auction. Plaintiffs' theory of the case was that those defendants "owed them a common-law duty of care to identify accurately the personal property that was subject to the . . . secured party sale." *Id.* at 91. In consequence, plaintiffs asserted tort claims against the bank and auctioneer, alleging negligence and negligent misrepresentation. Plaintiffs also asserted a breach of warranty claim against the bank, which arose out of the same inaccuracies as to property ownership. At trial, defendants moved for a directed verdict on the tort

claims, based on the economic loss doctrine.  The trial court denied the motion, and later refused to set aside the jury's verdict in plaintiffs' favor on those tort claims.

The Connecticut Supreme Court reversed on that issue and remanded the case to the trial court with the direction "to grant the defendants' motion to set aside the verdict on the negligence and negligent misrepresentation claims and to render judgment for the defendants on those counts." 78 A.3d at 94, 135.  As noted *supra*, the *Ulbrich* court reasoned that the tort claims barred by the economic loss doctrine are those that "arise out of and are dependent on the contractual relationship between the parties," while the tort claims hurdling the bar are those that  "are independent of the plaintiff's contract claim, and that can survive even if the contract claim fails."  *Id*. at 97.  Plaintiff Ulbrich's tort claims did not clear the bar.  The court reasoned:

> The plaintiffs' negligence and negligent misrepresentation claims in the present case are not "independent," however, from their article 9 breach of the implied warranty of title claim.  Rather, both the tort claims and the warranty claim are premised on the same alleged conduct with respect to the same personal property and rely on the same evidence.  More fundamentally, the plaintiffs have pointed to no theory under which they could prevail on their negligence and negligent misrepresentation claims even if their breach of the implied warranty of title claim failed.

*Id*. at 97-98 (footnote omitted).  One cannot fault the court's reasoning.  Plaintiffs thought they were buying at auction property the debtor owned.  In fact, the property belonged to someone else.  The illusion and reality of property ownership, when viewed together, establish in a single breath the bank's breach of warranty of title and the basis for taxing the bank and auctioneer with tortious conduct.  Both theories  – contract (warranty) and tort  – rely on precisely the same evidence, no more, no less.  It is not surprising that plaintiffs could not point to a tort theory on which they could prevail if the jury found against them on the breach of warranty of title theory.  In that respect,

plaintiffs were set an impossible task, in logic or in law.

During its comprehensive opinion in *Ulbrich*, the Connecticut Supreme Court dwelt at some length on the circumstances that would insulate a tort claim from the bar of the economic loss doctrine. The *Ulbrich* court paraphrased its earlier decision in *Flagg Energy Development Corp. v. General Motors Corp.,* 709 A.2d 1075, 1088-89 (1998), as holding that "a plaintiff that has a contractual relationship with the defendant can bring a negligent misrepresentation claim against the defendant when the negligent misrepresentation induced the plaintiff to enter into a contract. . . . Such a claim would not 'arise out of' the breach of any contractual obligation because it would implicate contract formation." 78 A.3d at 98. For that proposition, *Ulbrich* cites additional authorities, as follows: *Budgetel Inns, Inc. v. Micros Systems, Inc.*, 88 F. Supp. 2d 1137, 1147 (E. D. Wis. 1998) ("fraud in the inducement by definition occurs prior to the formation of the contract itself, thus, it never constitutes a breach of contract"); *Abi-Najim v. Concord Condominium. LLC*, 699 S.E.2d 483, 490 (Va. 2010) (economic loss doctrine does not bar fraudulent inducement claim because fraud "was perpetrated by [the defendant] *before* a contract between the two parties came into existence [and] therefore it cannot logically follow that the duty [that the defendant] allegedly breached was one that finds its source in the [c]ontracts" [emphasis in original]).[3]

In the case at bar, the claim for breach of fiduciary duty Plaintiffs assert in the Fifth Count against Don Zhang is a tort claim. *Flannery v. Singer Asset Fin. Co., LLC,* 17 A.3d 509, 513 (Conn. App. Ct. 2011) ("Breach of fiduciary duty is a tort action governed by the three year statute of limitations"). The question that arises is whether this is one of the tort claims that is barred by the

---

[3] The citations and parenthetical material appearing in the concluding lines of the paragraph of text are reproduced from the Connecticut Supreme Court's opinion in *Ulbrich*, 78 A.3d at 98.

economic loss doctrine.

The Court answers that question in the negative. The Second Amended Complaint is replete with factual allegations, whose truth must be accepted on this motion to dismiss, which describe Zhang's conduct prior to execution of the ZBP share transactions in suit. Plaintiffs' theory of the case, adequately pleaded, is that "Zhang breached his fiduciary duty to plaintiffs by making representations to them that were deliberately false, fraudulent and misleading, or that defendant should have known were false and misleading, in order to induce plaintiffs to enter into stock purchase agreements," upon which "plaintiffs relied in entering into those agreements." Plaintiffs' brief, Doc. 134, at 6. Common-law claims for such tortious conduct, intended by the defendant to induce the plaintiff to enter into a contract, and occurring during contract formation but prior to contract execution, are held by the cited Connecticut Supreme Court cases to fall outside the economic loss doctrine. Plaintiffs' Fifth Count is not precluded by that doctrine.

That conclusion does not fully resolve Defendants' motion to dismiss the Fifth Count. Plaintiffs' claim for breach of fiduciary duty survives the economic loss doctrine in principle, but it does not follow that the claim is sufficiently pleaded in practice. Thus, Defendants' alternative contention is that the Fifth Count must be dismissed under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

The standard of review has become familiar. Although a complaint need not provide detailed factual allegations to survive a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff must set forth sufficient factual allegations, accepted as true, that "state[s] a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (internal quotation marks omitted). All factual allegations must be accepted

as true, and all reasonable inferences drawn in plaintiff's favor. The court need not credit legal conclusions or mere conclusory statements purporting to be factual. *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678). Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Harris*, 572 F.3d at 72 (quoting *Iqbal*, 556 U.S. at 679). To survive a motion to dismiss, claims must be supported by factual allegations that are "enough to raise a right to relief above the speculative level"and with "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

Accordingly, the present motion turns upon whether the Plaintiffs' Fifth Count alleges a plausible claim against Zhang for breach of a fiduciary duty Zhang owed to Plaintiffs. Claims that a fiduciary relationship has been breached are frequently asserted in litigation. The Supreme Court of Connecticut recently reviewed the elements of the claim in *Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*,761 A.2d 1268 (Conn. 2000):

> In the seminal cases in which this court has recognized the existence of a fiduciary relationship, the fiduciary was either in a dominant position, thereby creating a relationship of dependency, or was under a specific duty to act for the benefit of another. . . .
>
> In the cases in which this court has, as a matter of law, refused to recognize a fiduciary relationship, the parties were either dealing at arm's length, thereby lacking a relationship of dominance and dependence, or the parties were not engaged in a relationship of special trust and confidence. . . .
>
> . . . .
>
> The law will imply [fiduciary responsibilities] only where one party to a relationship is unable to fully protect its interests [or where one party has a high degree of control over the property or subject matter of another] and the unprotected party has placed its trust and confidence in the other.

761 A.2d at 1278-80 (citations and internal quotation marks omitted).

Applying the *Iqbal - Twombly* standard of review to this case, I conclude without difficulty that the Plaintiffs' Fifth Count sufficiently alleges a plausible claim against Zhang for breach of fiduciary duty. In consequence, the claim survives this motion to dismiss under Rule 12(b)(6).

Whether Plaintiffs can prove the claim remains to be seen, following discovery, possible summary motion practice, and a plenary trial. It enough on the motion to dismiss to note the picture that clearly emerges from Plaintiffs' well-pleaded factual allegations, such as those in ¶ 16 of the Fifth Count:

> At all relevant times, defendant Zhang has been the President, director and principal stockholder of Beta Pharma, and a Vice President and director of ZBP, and is listed as an inventor of icotinib, and was one of the initial participants in the joint venture giving rise to ZBP, and has had full and complete access to all corporate, financial and scientific information concerning Beta Pharma and similar access to all corporate, financial and scientific information concerning ZBP, and thereby has had at all relevant times superior knowledge and expertise to plaintiffs concerning ZBP shares, BP, and the relationship between BP and ZBP.

Second Amended Complaint, Doc. 132. One may contrast this portrayal of Zhang, a seemingly gifted scientist and inventor, entrepreneur, and corporate insider of pharmaceutical companies in the United States and China, with the individual Plaintiffs, made known to the reader only as persons of Chinese ethnicity who Zhang persuaded, in a series of person-to-person encounters, to invest by purchasing interests in ZBP shares, and then sell those interests back again. During the years when these transactions were taking place – 2010 through 2013 – Zhang presumably knew everything there was to know about Icotinib, that substance's promise and progress, the interrelationship of Beta Pharma (US) and Zhejiang Beta Pharma (China), and the investors' prospects of gain, while the Plaintiffs (for all that appears) knew next to nothing. To quote again from the Connecticut

Supreme Court's decision in *Hi-Ho Tower*, Zhang and the Plaintiffs were not "dealing at arm's length" (which would be fatal to a claim of fiduciary duty); rather, Zhang was "in a dominant position, thereby creating a relationship of dependency" (which establishes the claim).[4] 761 A.2d at 1278-79.

The briefs of counsel contain additional arguments which, in the view I take of the case, I need not discuss. The Defendants' motion to dismiss the Fifth Count of the Second Amended Complaint will be DENIED.

## VI. CONCLUSION

For the foregoing reasons, the several presently pending Motions are decided as follows:

1. The Court's *sua sponte* inquiry [Doc. 156] into the existence *vel non* of subject matter jurisdiction is resolved, since the Court HOLDS that subject matter jurisdiction exists by reason of the complete diversity of the parties.

2. Plaintiffs' Motion [Doc. 110] to Enforce Subpoenas is GRANTED IN PART and DENIED IN PART, WITHOUT PREJUDICE.

3. Defendants' Motion [Doc. 113] for Clarification is DENIED.

---

[4] The Court's *sua sponte* inquiry into subject matter jurisdiction [Doc. 156], a question resolved in favor of jurisdiction by Part I of this Ruling, called the parties' attention to the factually similar state case of *Wang v. Beta Pharma, Inc.*, No. CV14650848S, 2016 WL 1315313 (Conn. Super. Ct. Mar. 9, 2016). I now observe that Beta Pharma and Zhang, the defendants in that case as well as this one, moved to strike the claims of plaintiff Wang, a chemist, for negligent misrepresentation, fraudulent misrepresentation, and breach of fiduciary duty. Judge Fischer denied that motion, holding with respect to Wang's fiduciary duty claim that "the plaintiff has provided sufficient facts to establish a fiduciary relationship with the defendants and that the economic loss doctrine does not bar his breach of fiduciary claims in counts five and eight." 2016 WL 1315313 (March 9, 2016), at *5. I do not cite that opinion as authority, since Wang's position as party plaintiff was somewhat different, and this able Connecticut judge's decisions are not binding on me. I am gratified to note, however, that Judge Fischer's reasoning in arriving at his conclusions in *Wang* resembles my own in this case.

4.  Plaintiffs' Motion [Doc. 114] for Reconsideration to Modify the Court's Ruling [Doc. 109] is GRANTED.

5.  Defendants' Motion [Doc. 133] to Dismiss the Fifth Count in Plaintiffs' Second Amended Complaint is DENIED.

The foregoing is SO ORDERED.

Dated:  New Haven, Connecticut
        May 4, 2017


                                        */s/Charles S. Haight, Jr.*
                                        CHARLES S. HAIGHT, JR.
                                        Senior United States District Judge